**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED PRIOR TO THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| TH PROPERTIES, L.P., *et al.*[1] | : | Case No. 09-13201 (SR) |
| Debtors. | : | (Jointly Administered) |

# SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF DEBTORS AND DEBTORS-IN-POSSESSION AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP**
Natalie D. Ramsey, Esquire
Joseph O'Neil, Jr., Esquire
Laurie A. Krepto, Esquire
123 South Broad Street
Philadelphia, PA 19109
(215) 772-1500 (Telephone)
(215) 772-7620 (Facsimile)

*Counsel for the Debtors and Debtors-in-Possession*

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
Brubacher Excavating
Reading Materials, Inc.
Central Concrete Co., Inc.
Vernon & Janet Ruth
Norman D. Rittenhouse
Andrea Construction, Inc.

Dated: December 8, 2011

[1] The Debtors and the last four digits of their taxpayer identification numbers are: TH Properties, L.P. (4545); TH Properties of New Jersey, L.P. (5640); Northgate Development Company, LP (8803); Morgan Hill Drive, LP (4624); TH Properties, Inc. (1947); TH Properties, LLC (7147); and Swamp Pike LP (7841). The principal place of business for the Debtors is 345 Main Street, Harleysville, PA 19438.

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN DATED DECEMBER 8, 2011, FILED BY TH PROPERTIES, L.P., TH PROPERTIES OF NEW JERSEY, L.P., NORTHGATE DEVELOPMENT COMPANY, LP, MORGAN HILL DRIVE, LP, TH PROPERTIES, INC., THP PROPERTIES, LLC, AND SWAMP PIKE LP, DEBTORS AND DEBTORS IN POSSESSION, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE") (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN"). THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. OVERVIEW OF THE PLAN ..... 3
A. General Structure of the Plan ..... 3
B. Summary of Treatment of Claims and Interests under the Plan ..... 4
III. PLAN VOTING INSTRUCTIONS AND PROCEDURES ..... 15
A. Notice to Holders of Claims and Interests ..... 15
B. Voting Rights ..... 16
C. Solicitation Materials ..... 16
D. Voting Procedures, Ballots and Voting Deadline ..... 17
E. Confirmation Hearing and Deadline for Objections to Confirmation ..... 18
IV. GENERAL INFORMATION CONCERNING THE DEBTORS ..... 19
A. Overview of Business Operations ..... 19
B. Summary of Assets ..... 20
C. Historical Financial Information ..... 20
D. Events Leading to Commencement of the Chapter 11 Cases ..... 20
V. THE CHAPTER 11 CASES ..... 21
A. Continuation of Business; Stay of Litigation ..... 21
B. Retention of Professionals ..... 22
C. Interim Fee Applications ..... 22
D. Adversary Proceedings ..... 25
E. Authorization to Use Cash Collateral of Existing Lenders, Enter into DIP Financing Arrangements, and Sale of Lots Free and Clear ..... 27
F. Other Relevant Post-Petition Activity ..... 29
VI. SUMMARY OF THE PLAN ..... 30
A. Overall Structure of the Plan ..... 31
B. No Substantive Consolidation ..... 31
C. Classification and Treatment of Claims and Interests ..... 31
1. Treatment of Unclassified Claims under the Plan ..... 32
(a) Administrative Claims ..... 32
(b) Class 1: Miscellaneous Secured Lender ..... 34



2831671v5

**TABLE OF CONTENTS**
(continued)

**Page**


(c) Class 2 Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate Phase IIA Project ..... 35

(d) Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township ..... 36

(e) Class 4: Certain Mechanics Lienholders ..... 36

(f) Class 5: Miscellaneous Secured Vendor Claims ..... 37

(g) Class 6: Secured Claims of Taxing Authorities ..... 37

(h) Class 7: Priority Employee Wage & Benefit Claims ..... 37

(i) Class 8: Deposit Holders ..... 38

(j) Class 9: General Unsecured Claims ..... 38

(k) Class 10 Limited Partner Interests in the LP Debtors ..... 38

(l) Class 11: General Partner Interests in the LP Debtors ..... 38

(m) Class 12: Interests in the GP Debtor and THP, Inc ..... 38

(n) Class 13: Intercompany Claims ..... 38

D. Reservation of Rights Regarding Claims ..... 39

E. Allowed Claims, Distribution Rights and Objections to Claims ..... 39

1. Allowance Requirement ..... 39

2. Date of Distribution ..... 39

3. Making of Distributions ..... 39

4. Objection Procedures ..... 40

F. Disposition of Executory Contracts and Unexpired Leases ..... 40

1. Contracts and Leases Deemed Rejected ..... 40

2. Cure with Respect to Assumed Contracts and Leases ..... 41

3. Rejection Damages ..... 41

G. Revesting of Assets; Release of Liens ..... 41

H. Post-Consummation Corporate Structure, Management and Operation and Implementation of Plan ..... 41

1. The Contribution and Buildout of Northgate Phases IV and V ..... 41

**TABLE OF CONTENTS**
(continued)

**Page**


2. The Buildout of the Real Property Owned by the Debtors ...... 42
3. Project Budgets. ...... 42
4. No Substantive Consolidation and New General Partners ...... 42
5. Abandoned Projects ...... 43
6. The Board/Boards ...... 43
7. Management Agreement ...... 44
8. Salary ...... 44
9. Reconstitution of the THP, Inc. Board ...... 44
10. Other Projects ...... 44
11. Powers of the THP, Inc. Board ...... 45
12. Disbursement of Proceeds from the Projects ...... 45
13. Project Budgets ...... 46
14. Completion of Projects and Option to Purchase Projects ...... 46
15. The Release by the Debtors, the Estates and the Committee of Hendricks and the Affiliated Entities ...... 47
16. Corporate Action ...... 47
17. Income Taxes ...... 47
18. Revesting of Assets ...... 47

I. Confirmation and/or Consummation ...... 48
1. Requirements for Confirmation of the Plan ...... 48
2. Conditions to Confirmation Date and Effective Date ...... 49

J. Releases, Discharge, Injunctions, Exculpation and Indemnification ...... 50
1. Releases by Debtors in Favor of Third Parties ...... 50
2. Releases by Creditors of Claims Against Third Parties ...... 51
3. Discharge and Discharge Injunction ...... 51
4. Exculpation Relating to Chapter 11 Cases ...... 52

K. Preservation of Rights of Action ...... 53

L. Retention of Jurisdiction ...... 53

M. Amendment, Alteration and Revocation of Plan ...... 55

N. Plan Implementation Documents ...... 56

**TABLE OF CONTENTS**
(continued)

**Page**

VII. CERTAIN RISK FACTORS TO BE CONSIDERED ..... 56
A. General Considerations ..... 56
B. Certain Bankruptcy Considerations ..... 56
C. Claims Estimations ..... 57
D. Conditions Precedent to Consummation ..... 57
E. Inherent Uncertainty of Financial Projections ..... 57
F. Certain Tax Considerations ..... 58
VIII. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ..... 58
A. Feasibility of the Plan ..... 58
B. Acceptance of the Plan ..... 59
C. Best Interests Test ..... 59
D. Liquidation Analysis ..... 60
E. Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation ..... 61
F. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative ..... 61
IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..... 62
A. Alternative Plan(s) of Reorganization ..... 62
B. Liquidation Under Chapter 7 ..... 62
X. THE SOLICITATION; VOTING PROCEDURES ..... 63
A. Parties in Interest Entitled to Vote ..... 63
B. Classes Entitled to Vote to Accept or Reject the Plan ..... 63
C. Solicitation Order ..... 63
D. Waivers of Defects, Irregularities, Etc ..... 64
E. Withdrawal of Ballots; Revocation ..... 64
F. Voting Rights of Disputed Claimants ..... 64
G. Further Information; Additional Copies ..... 65

# I. INTRODUCTION

The debtors and debtors in possession in the above-referenced chapter 11 cases (these "Chapter 11 Cases") are the following related companies (collectively, the "Debtors" or the "Company"):

TH Properties, L.P.
TH Properties of New Jersey, L.P.
Northgate Development Company, LP
Morgan Hill Drive, LP
TH Properties, Inc.
TH Properties, LLC
Swamp Pike LP

The Debtors and the Committee submit this disclosure statement (as may be amended, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") for use in the solicitation of votes on the Third Amended Joint Chapter 11 Plan Dated as of December 8, 2011 (as may be amended, the "Plan"). A copy of the Plan is attached hereto as Appendix A. Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and liquidation under chapter 11 and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

By order entered on or about November __, 2011, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, and all exhibits thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan and (b) entitled to receive a distribution under such plan are

entitled to vote on the plan. Claims in Class 9 are Impaired and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims in this Class are entitled to vote to accept or reject the Plan. Claims in Classes 1 through 8 and Interests in Class 10 and 12 are Unimpaired by the Plan; accordingly, the Holders thereof are conclusively presumed to have accepted the Plan. Interests and Claims in Classes 11 and 13 are Impaired but do not receive any distribution under the Plan and therefore are conclusively presumed to have rejected the Plan.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN" AND ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS AND THE COMMITTEE DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN PARTS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS AND THE COMMITTEE DO NOT UNDERTAKE ANY OBLIGATION TO, AND DO NOT INTEND TO, UPDATE THE DISCLOSURES REGARDING THE PROJECTIONS; THUS, THE DISCLOSURES

REGARDING THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS. FURTHER, THE DEBTORS AND THE COMMITTEE DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE DEBTORS, MAY DIFFER FROM ACTUAL RESULTS.

THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN WILL ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND THEIR ESTATES. THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

## II. OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Plan designates eleven Classes of Claims and two Classes of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

### A. General Structure of the Plan

The Plan is structured as a joint plan and is focused on the buildout of certain key Projects. Payments to creditors will be made according to a "waterfall" of the proceeds from the build out of the Projects as reflected in the Project Budgets for the Projects and which is explained more fully herein.

The Debtors and the Committee have estimated the ultimate distributions that will be made in respect of Allowed Claims and Interests. As explained more fully in Section VII entitled "Certain Risk Factors to Be Considered," however, because of inherent uncertainties, many of which are beyond the Debtors' and Committee's control, there can be no guaranty that actual performance will meet the Debtors' and Committee's estimates. The Debtors and the Committee nonetheless believe that if the Plan is not consummated, it is likely that Holders of Claims against and Interests in the Debtors' estates will receive less than they would if the Plan is confirmed because liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code will not result in a higher distribution to any Class of Claims or Interests.

## B. Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtors under the Plan. For certain Classes of Claims, estimated percentage recoveries also are set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including (where not Allowed by the Plan) the amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Class 9 will actually be realized by the Holders of Allowed Claims in such Class.

| Type of Claim | Description and Treatment under Plan |
| --- | --- |
| **Unclassified — Administrative Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $3,064,085.00 | "Administrative Claim" means a Claim for: (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(l), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; (c) any Allowed administrative claim or superpriority claim granted to a lender pursuant to Cash Collateral Orders; (d) Claims of the DIP Lenders in connection with the DIP Financing Facilities; and (e) Claims of the H&K Entities for amounts posted as financial security pursuant to Final Order of the Bankruptcy Court. |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | Administrative Claims. Administrative Claims are Unimpaired. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors and the Committee, as the case may be, and the Holder of such Administrative Claim; (b) such other treatment on such other terms and conditions as may be agreed upon by the Holder of such Claim and the Debtors and the Committee, as the case may be, or as the Bankruptcy Court may order or has ordered (pursuant to a Final Order); or (c) if such claim is for post petition property or real estate taxes, the Pro Rata Share of said taxes (plus interest) on such lots that remain in the Debtors' estates as homes on such lots are sold under the Plan. To the extent property has been conveyed to another entity pursuant to a section 363 sale, a deed in lieu of foreclosure, or some other mechanism, and such property is no longer property of the Debtors' estate as of the Effective Date of the Plan, the entity to whom such property has been conveyed is solely responsible for payment of any outstanding taxes on such property (other than Biltmore Estates, the Debtors having paid the outstanding taxes in connection with a Bankruptcy Court Order authorizing them to be paid when this property was transferred). The current estimated amount of post – petition real estate taxes to be paid under the plan is $288,505.39. All Administrative Claims shall be paid pro rata until paid in full as set forth on the Budgets attached hereto as Exhibit C in Section 7.03 and 7.12 of the Plan.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| **Class 1 — Miscellaneous Secured Lender Claims**<br><br>Estimated Aggregate Allowed Amount: $27,030,456.00 | Class 1 consists of Miscellaneous Secured Lender Claims.<br><br>Class 1: Miscellaneous Secured Lender Claims. Class 1 Miscellaneous Secured Lender Claims are Unimpaired.[2] The Holders of the Following Miscellaneous Secured Lender Claims (a) Affinity Bank in the amount of $1,088,155.32 relating to the following properties: Arbor Court in Pennsburg Borough ($535,609.63), Stoneacre Ridge (Ellis) ($272,341.25), and Leidy ($280,204.44) in New Hanover Township; (b) Beneficial Savings Bank in the amount of $1,972,782.54 relating to the property at Melbourne Hill in Lower Frederick Township; (c) First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company in the approximate amount of $19,650,762 relating to the following properties: Newport Landing (Nagdev) ($102,417.18) and Sandanato ($126,773.23) in Bristol Township, Kingston Hill (Lester) ($189,785.69), Normandie in Upper Salford ($9,182,959.54), the Fleet Maintenance Building ($429,316.61) in Lower Salford Township, property located at Village at Wynstone, Swamp Pike in Gilbertsville, New Hanover Township ($7,826,750.00) and certain lots at Coddington View in Upper Pottsgrove Township ($4,370,576); (d) VIST Bank in the amount of $5,410,776.08 relating to the properties at Berwind II in Douglass Township and Edgehill in Upper Frederick Township; (e) Univest National Bank in the amount of $801,031.88 relating to properties at Westport Farm in Franconia Township; (f) Indymac Bank in the amount of $2,563,156.61 relating to property located at Kingston Hill III in New Hanover Township; (g) Wachovia Bank, N.A. in the amount of $7,698,772.06 relating to property located at Village at Wynstone in New Hanover Township; (h) Bucks County Bank in the amount of $285,000 relating to property located at 1104 Berkley Drive, Pennsburg; (i) |

[2] Some of the Claim amounts have been adjusted to reflect post-petition paydowns and some of the Claim amounts listed are as of the Petition Dates. These Claim amounts will ultimately be adjusted based on the status of the sale of the collateral and paydowns on some loans through cross-collateral provisions in the loan documents to the extent the Secured Lender also provided DIP financing or use of Cash Collateral during the Chapter 11 Cases.

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | VIST Bank in the amount of $307,761.68 relating to property located at Kingston Hill Phase IV in New Hanover Township; (j) Wilmington Trust N.A. in the approximate amount of $2,579,046.86 relating to certain property located at Northgate Phase I in Upper Hanover Township in the event the settlement agreement referenced in section 3.05 of the Plan is not approved by the Court; (k) 233 Schuylkill Road LP in the amount of $1,897,264.92 relating to property located at Stoneacre Ridge (Brusch) in New Hanover Township and (k) Gehringer Plumbing on Lots 54 through 63 at Cliffside Manor Phase II in Bedminster Township shall receive in full satisfaction, settlement, release, extinguishment and discharge of each such Miscellaneous Secured Lender Claim, the return of the property securing such Miscellaneous Secured Lender Claim (unless such property has already been returned). Any Allowed Claim for a deficiency shall be treated as a Class 9 General Unsecured Claim, unless otherwise waived by the Holder of each such Miscellaneous Secured Lender Claim.<br><br>The Holders of the following Miscellaneous Secured Lender Claims (a) National Penn Bank in the amount of $127,773.23 for certain remaining lots in Kingston Hill II in New Hanover Township and $6,511,683.59 for Whitfield Estates I, IIA, IIB, and III in Upper Macungie Township; (b) Susquehanna Bank in the amount of $19,189,314.55 relating to property located at Burbank Grove in Upper Providence Township; and (c) Continental Bank in the amount of $4,955,873.55 relating to the property at Ivywood in East Coventry Township, agreed, during the course of the Debtors' cases in full satisfaction, settlement, release, extinguishment and discharge of each such Secured Claim, to permit the sale of each respective Property pursuant to Bankruptcy Code section 363 and to receive the proceeds thereof. Any Allowed Claim for a deficiency shall be treated as a Class 9 General Unsecured Claim, unless otherwise waived by the Holder of each such Miscellaneous Lender Secured Claim.<br><br>Class 1 Miscellaneous Secured Lender Claims are Unimpaired under the Plan and are not entitled to vote |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2 — Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate Phase IIA Project**<br><br>Estimated Aggregate Allowed Amount: $1,480,201.59 plus interest | Class 2 consist of the Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate Phase IIA Project<br><br>Class 2 Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate Phase IIA Project. The Class 2 Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate IIA Project in Upper Hanover Township is Unimpaired. The Holder of the Allowed Class 2 Secured Lender Claim of TE at the Northgate I Project shall receive in full satisfaction, settlement, and release, extinguishment and discharge of such Claim on the Northgate Phase I Project (subject to the liens of Reading Materials) the principal amount of $650,000 with interest at the annual fixed rate of ten percent (10%) to be paid from the net proceeds of each closing of the sale of the remaining lots for sale at the Northgate Phase I Project in accordance with the payment scheme set forth in a settlement agreement to be approved by the Court and set forth on the Budgets attached hereto as Exhibit C and Section 7.02 hereof. Pursuant to the terms of that settlement agreement, the interests of Wilmington Trust, N.A., as may be assigned to M&T Bank, in Northgate Phase I Project and the Wynstone Project, will be transferred to TE for cash, subject to all existing loans and approvals. In the event the settlement agreement referenced herein is not approved by the Court, then TE shall have no claim with respect to the Northgate Phase I Project, and Wilmington Trust shall have a Class 1 Miscellaneous Secured Lender Claim with respect to the Northgate Phase I Project (subject to Reading Material, Inc.'s first priority lien as set forth in Class 5), and the Wynstone Project shall remain subject to Wilmington Trust, N.A.'s rights and liens outside of these Chapter 11 Cases since it is owned by a non-debtor entity. |

| **Type of Claim** | **Description and Treatment under Plan** |
|---|---|
| | The Holder of the Allowed Class 2 Secured Lender Claim of TE at the Northgate Phase IIA Project shall receive in full satisfaction, settlement, and release, extinguishment and discharge of such Claim on the existing Northgate Loan Documents in the principal amount of $750,844.94 over twenty-four months with interest at the annual fixed rate of ten percent (10%) to be paid from the net proceeds of each closing at the Northgate Phase IIA Project in accordance with the Budgets attached hereto as Exhibit C and Section 7.02 hereof.<br><br>Class 2 Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate Phase IIA Project is Unimpaired Under the Plan and is not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 3 — Secured Lender Claim of First Niagara Bank, a national banking association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township**<br><br>Estimate Aggregate Allowed Amount: $1,908,780 plus interest. | Class 3 consists of the Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township<br><br>Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township. Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township is Unimpaired. The Holder of the Allowed Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company shall receive in full satisfaction, settlement, and release, extinguishment and discharge of such Claim: (a) the total amount of $935,680, together with accrued interest, plus a split of the excess depending on the sales of homes from the sale of the homes at Coddington View in Upper Pottsgrove Township in accordance with the DIP Financing Order dated November 5, 2009 [Docket No. 714]; and (b) an |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | amount up to $973,100 for the buildout of fourteen additional homes at Coddington View Upper Pottsgrove Township in accordance with a DIP Financing Order II dated May 24, 2011 [Docket No. 1904]. Pursuant to DIP Financing Order II, First Niagara was granted stay relief to exercise its state law remedies with respect to the balance of lots at Coddington View and shall be treated a Class 1 Miscellaneous Secured Lender Claim with respect to this portion of its claim.<br><br>Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township is Unimpaired and is not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 4 — Certain Mechanics Lienholders Claims**<br><br>Estimate Aggregate Allowed Amount: $7,564,572.67 | Class 4 consists of Certain Mechanics Lienholders Claims.<br><br>Class 4: Certain Mechanics Lienholders Claims.<br><br>Class 4 Certain Mechanics Lienholders consists of the Claims of UGI HVAC Enterprises, Inc., d/b/a ServiceMark ("ServiceMark"), ProBuild Company, LLC ("ProBuild"), Edgemont Stone & Supply Co., the H&K Entities and American Rock Mechanics, Inc. ("AMROC"). Class 4 Certain Mechanics Lienholders Claims shall receive payment or release liens in accordance with the settlements approved by the Bankruptcy Court [Docket Nos. 693, 1305, 1548, 1778, 1780, 1865, and 1872], as well as those that are approved prior to Plan confirmation. With respect to the liens of ProBuild and Servicemark on homes sold by the Debtors pre-petition, said liens are secured by liens granted by the Debtors on its otherwise unencumbered Barton Ridge Project and the liens of these entities on the homes sold pre-petition shall be released by them on or before upon plan confirmation. The remaining liens on the Barton Ridge Project in the first priority amount of $92,576.18 in favor of ProBuild and the second priority amount of $69,306.00 in favor of ServiceMark shall be paid from the pool of funds set |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | aside in Section 7.13 of the Plan (once funded), or from the proceeds of sales of the units in Barton Ridge, whichever occurs first. With respect to the liens of the H&K Entities, pursuant to the settlement agreements entered into with the Debtor, said liens attach to the Debtors' Biltmore, Northgate and Kingston Hill projects and shall be paid in accordance with the Court approved settlement agreements. In the event of a conflict or contradiction in terms between the Plan, the Confirmation Order and the Orders approving the above referenced settlement agreements, the Orders approving the terms and content of the settlement agreements shall control. Should any of the holders of Certain Mechanics Lienholders Claims have Claims other than the Certain Mechanics Lienholders Claims, they shall be treated in accordance with Section 3.12 of the Plan, as General Unsecured Claims, or as set forth in any Final Order entered by the Bankruptcy Court in the Chapter 11 Cases.<br><br>Class 4 Certain Mechanics Lienholders Claims are Unimpaired and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: <u>100%</u> |
| **Class 5 — Miscellaneous Secured Vendor Claims**<br><br>Estimate Aggregate Allowed Amount: $715,980.94 plus interest | Class 5 consists of Miscellaneous Secured Vendor Claims<br><br><u>Class 5: Miscellaneous Secured Vendor Claims</u>. Class 5 Miscellaneous Secured Vendor Claims are Unimpaired. Class 5 consists of the Miscellaneous Secured Vendor Claims of (a) Reading Materials, Inc. first priority lien in the amount of $211,405.94 (granted pursuant to that certain order authorizing DIP Financing [Docket No. 693] and providing for the second priority liens of Wilmington Trust FSB or TE upon Court approval, relating to certain lots in Northgate Phase I in Upper Hanover Township; (b) Hearth & Home Technologies, Inc. at Stoneacre Ridge – Trolley Line ($354,575.00); and (c) Carroll Engineering Corp. at Melbourne Hill Sewer Plant Property ($150,000). In full satisfaction, settlement, release, extinguishment and discharge of each such Miscellaneous Secured Vendor Claim, the Holder of such claim shall (a) retain its lien(s) on each of the |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | respective Properties (absent such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors and the Committee, as the case may be); and/or (b) enter into an agreement with the Reorganized Debtors to complete all or a portion of construction on each Property, which shall include a means to satisfy payment of the lien. Any Allowed Claim for a deficiency shall be treated as a Class 9 General Unsecured Claim, unless otherwise waived by the Holder of each such Miscellaneous Secured Claim. Further, in the event any of these Properties are developed as part of the Plan, any net proceeds distributed in accordance with Plan Section 7.12.<br><br>Class 5 Miscellaneous Secured Vendor Claims are Unimpaired and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 6 — Secured Claims of Taxing Authorities**<br><br>Estimate Aggregate Allowed Amount: $30,085.34 | Class 6 consists of Secured Claims of Taxing Authorities<br><br>Class 6: Secured Claims of Taxing Authorities. Class 6 consists of the pre-petition secured claims of various Taxing Authorities for property taxes on unsold lots. Each holder of an allowed Class 6 Secured Taxing Authority Claim shall receive in full satisfaction thereof payment of their respective taxes (plus statutory interest), on such lots that remain in the Debtors' estates as homes on such lots are sold under the Plan, and they shall retain any liens on the respective lots until such time as the lots are sold.<br><br>Class 6 Secured Taxing Authority claims are Unimpaired and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 7 — Priority Wage & Benefit Claims**<br><br>Estimate Aggregate Allowed Amount: $230,062.22 plus accruing interest | Class 7 consists of Priority Wage & Benefit Claims<br><br>Class 7: Priority Employee Wage & Benefit Claims. Class 7 Priority Employee Wage & Benefit Claims are Unimpaired. This Class consists of Holders of Priority Employee Wage & Benefit Claims. Each |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | Holder of an Allowed Class 7 Priority Employee & Wage Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the amount of such unpaid Allowed Priority Employee Wage & Benefit Claim in Cash with interest at the prime rate set forth in the Wall Street Journal from the Petition Date to the date such distribution is made as sufficient funds are accumulated to pay such claims as set forth on the Budgets attached to the Plan as Exhibit C and in Sections 7.02 and 7.13 of the Plan. Such Claims shall be paid pro rata as distributions are made along with Administrative Claimants, until paid in full as set forth in the Plan Budgets (Plan Exhibit C).<br><br>Class 7 Priority Wage & Benefit Claims Are Unimpaired and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: <u>100%</u> |
| **Class 8 — Deposit Holders Claims**<br><br>Estimate Aggregate Allowed Amount: $361,524.00 | Class 8 consists of Deposit Holders.<br><br><u>Class 8: Deposit Holders</u>. This Class consists of Deposit Holders. Each Holder of an Allowed Class 8 Deposit Holder Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the full amount of such Allowed Deposit Holder Claim on the Effective Date of the Plan.<br><br>Class 8 Deposit Holder Claims are Unimpaired and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: <u>100%</u> |
| **Class 9 — General Unsecured Claims**<br><br>Estimated Aggregate Allowed Claims $105,909,826.00 | Class 9 consists of General Unsecured Claims.<br><br><u>Class 9: General Unsecured Claims</u>. Class 9 General Unsecured Claims are Impaired. This Class consists of General Unsecured Trade Claims, all Mechanic's Liens Claims on retained Projects (other than those in Class 4 herein), and all other Claims not otherwise classified in the Plan. Each Holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its Pro Rata Share of the sums available after payment in full of Administrative |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| | Claims, the applicable Secured Claims of Lenders and applicable Secured Claims of Taxing Authorities, Priority Wage & Benefit Claims and Deposit Holder Claims, as set forth on the Plan Budgets (Plan Exhibit C) and Sections 7.02 and 7.13 in the Plan.<br><br>Class 9 General Unsecured Claims are Impaired and are entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: <u>8-12%</u> |
| **Class 10 — Limited Partner Interests in the LP Debtors** | Class 10 consists of Limited Partner Interests in the LP Debtors<br><br><u>Class 10: Limited Partner Interests in the LP Debtors</u>. Class 10 Interests are Unimpaired. In exchange for the New Value Contribution, the Interests of the Hendricks, as limited partners, in the LP Debtors shall remain equal to the interests they held as of the Petition Date. The Hendricks own all of the Class 10 Hendricks Interests.<br><br>Class 10 Limited Partner Interests in the LP Debtors are Unimpaired and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: <u>100%</u> |
| **Class 11 — General Partner Interests in the LP Debtors** | Class 11 consists of General Partner Interests in the LP Debtors<br><br><u>Class 11: General Partner Interests in the LP Debtors</u>. The Class 11 Interests in the LP Debtors are held by Northgate Development Company, LLC, Morgan Hill Drive, LLC, Hendricks of NJ, LLC, and Swamp Pike, LLC. All the Class 11 Interests shall be cancelled and extinguished on the Effective Date.<br><br>Class 11 General Partner Interests in the LP Debtors are Impaired, not entitled to vote on the Plan and shall be conclusively presumed to have rejected the Plan.<br><br>Estimated Percentage Recovery: <u>0%</u> |
| **Class 12 — Interests in the GP** | Class 12 consists of Interests in the GP Debtor and |

| Type of Claim | Description and Treatment under Plan |
|---|---|
| **Debtor and THP, Inc.** | THP, Inc.<br><br>Class 12: Interests in the GP Debtor and THP, Inc. Class 12 Interests in the GP Debtor and THP, Inc. are unimpaired. In exchange for the New Value Contribution, the Class 12 Interests held by the Hendricks in the GP Debtor and THP, Inc. shall remain equal to the interests they held as of the Petition Date. The Hendricks own all of the Class 12 Interests.<br><br>Class 12 Interests in the GP Debtor and THP, Inc. are Unimpaired and therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 13 — Intercompany Claims** | Class 13 consists of Intercompany Claims<br><br>Class 13: Intercompany Claims. Class 13 Intercompany Claims are Impaired. Holders of Class 13 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished.<br><br>Class 13 Intercompany Claims are Impaired, not entitled to vote on the Plan and shall be conclusively presumed to have rejected the Plan.<br><br>Estimated Percentage Recovery: 0% |

THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## III. PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Notice to Holders of Claims and Interests

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein. No such information will be relied upon in making a determination to vote to accept or reject the Plan.

### B. Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the plan and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. In these Chapter 11 Cases, under the Plan, only Holders of Claims in Class 9 are entitled to vote on the Plan. Claims in other Classes are either (i) Unimpaired and their Holders are deemed to have accepted the Plan, or (ii) receiving no distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Allowed Claims in the voting Classes are entitled to vote on the Plan. A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors. However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.

### C. Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors and the Committee, will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the

hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

Natalie D. Ramsey, Esquire
Joseph O'Neil, Jr., Esquire
Laurie A. Krepto, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Phone: (215) 772-1500
Fax: (215) 772-7620

**D. Voting Procedures, Ballots and Voting Deadline**

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

The ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN JANUARY 6, 2012, AT 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

Joseph O'Neil, Jr., Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109
Phone: (215) 772-1500
Fax: (215) 772-7620
Email: joneil@mmwr.com

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE

SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are being sent to you. If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

Joseph O'Neil, Jr., Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109
Phone: (215) 772-1500
Fax: (215) 772-7620
Email: joneil@mmwr.com

For further information and general instruction on voting to accept or reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS AND THE COMMITTEE URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E. Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for January 12, 2012, at 10:30 a.m. (prevailing Eastern time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (i) be in writing, (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (iv) state with particularity the basis and nature of any objection to the Plan and (v) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the Eastern District of Pennsylvania, 900 Market Street, Suite 400, Philadelphia, Pennsylvania 19107, www.paeb.uscourts.gov, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before 5:00 p.m. **(prevailing Eastern time) on January 13, 2012**. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

# IV. GENERAL INFORMATION CONCERNING THE DEBTORS

## A. Overview of Business Operations

The Debtors are part of a family of fully integrated homebuilder and real estate services companies engaged in the acquisition, development, construction and sales with respect to premier housing communities located in Southeastern Pennsylvania and New Jersey.

THP, Inc. was founded by brothers Todd and Tim Hendricks in 1992 with the goal of creating affordable, quality new homes to first time home buyers and first time "move-up" buyers. At its peak in 2005, THP, Inc. delivered over 600 homes and generated over $170 million. It currently remains one of the largest privately-owned homebuilders in the Philadelphia and Lehigh Valley areas and was selected in 1998 to *Inc. Magazine's* list of 500 fastest growing private companies.

THP, Inc. sold homes in residential communities consisting of single and multi-family homes averaging about $336,000 for single-family homes to $246,000 for town/twin homes. At the height of its success, THP, Inc. controlled over 7,000 lots, and by 2007 was selling a variety of projects in 18 active communities.

THP, Inc. projects typically start with the acquisition of raw land by an affiliate. THP, Inc. then designs each project, obtains the necessary permits and approvals for the land-development, prepares the land for construction, and finally constructs the actual homes, town homes, condominiums, or a combination thereof, depending upon the project. As is typical with larger scale homebuilders, other affiliated companies market and sell the homes, and/or provide brokerage services as well as title insurance, closing services, and mortgage banking services. This efficient acquisition, development and sales model contributed significantly to THP Inc.'s bottom line and enabled it to sell affordable, quality housing, consistent with its goals.

At the height of its operations, THP, Inc. employed over 250 people in site infrastructure, construction, sales, customer service and administration. The combination of the recent recession, severe slump in the housing market, as well as the credit crisis forced THP, Inc. to cease operating in mid April as part of its ongoing efforts to reorganize its core business and restructure its lender obligations. Shortly thereafter, THP, Inc. and certain affiliated companies filed for Chapter 11 protection.

By reorganizing its business and restructuring its financial obligations, it is THP Inc.'s goal to fulfill its commitments to deliver completed quality homes to existing purchasers who have entered into agreements of sale, as well as to market and sell the remaining lots within these Projects as completed homes. These communities include Barton Ridge Project, Biltmore Estates Project, Coddington View Project, Kingston Hill Project, Northgate Phases IIA, II, and III. Additionally, if the mortgage granted to Gehringer Plumbing on Lots 54 through 63 at Cliffside Manor Phase II is avoided as set forth in Class 5 of the Plan, then such Lots shall be developed as part of the Plan as well, with the net proceeds distributed in accordance with Plan Section 7.12 of the Plan.

### B. Summary of Assets

The Debtors filed Schedules with the Bankruptcy Court that detail the assets owned by each of the Debtors. Such assets include cash on hand, bank accounts and investments, security deposits, insurance policies, stock interests, accounts receivable, intellectual property, vehicles, office equipment, furnishings and supplies, machinery, fixtures, equipment and supplies used in business, inventory, and other items of personal property. The Schedules will provide asset values on a net book basis, which are not reflective of actual values. The Schedules may be reviewed on the Bankruptcy Court electronic case filing system, or during business hours in the offices of the Clerk of the Bankruptcy Court. Information regarding the Debtors' assets is also available in the Liquidation Analysis attached hereto as Appendix B.

### C. Historical Financial Information

Since inception in 1992, THP, Inc. has delivered over 4,700 homes, resulting in revenues over $1.2 billion from operations. For calendar year 2008, the Debtors' consolidated operations delivered 385 homes to homebuyers and generated approximately $125 million in revenues. For calendar year 2007, the Debtors' consolidated operations delivered 501 homes to homebuyers and generated approximately $169 million in revenues. For calendar year 2006, the Debtors' consolidated operations delivered 444 homes to homebuyers and generated approximately $137 million in revenues. For calendar year 2005, the Debtors' consolidated operations delivered 604 homes to homebuyers and generated approximately $172 million in revenues.

### D. Events Leading to Commencement of the Chapter 11 Cases

THP, Inc. began seeing the first signs of the slowdown in the residential real estate markets in late 2005 through a significant slowdown in buyer traffic. In adjusting to this slowdown over the next year, THP, Inc. began implementing a number of strategies to maintain sales velocity and attract buyers. These included sales strategies such as increased marketing and targeted promotions which were largely successful through late 2006. As the slowdown intensified THP, Inc. began to offer more significant monetary incentives including offering of non-standard upgrades not usually included in the base sales price, credits toward closing costs and limited price reductions which were again successful in maintaining sales and closings. Starting in late 2007, the THP, Inc. also began to experience increased scrutiny and loan requirements from lenders in the underwriting process for new loans. These loan requirements began to require significantly larger equity contributions in order to close. Many times this was in the form of direct cash contribution from working capital or leveraging free cash flow from already existing projects in order to decrease the amount of time it would take the banks to be repaid. THP, Inc. consummated these transactions and continued to successfully sell units at rates well above its peers.

Unfortunately, as the market continued to decline, THP, Inc. was forced to offer further incentives and price discounts in order to sell units. While still profitable, cash flow from settlements after bank repayment began to dwindle. Exacerbating this reduction in cash flow, the credit markets, especially for residential real estate, began to show signs of weakness in late 2007 and early 2008, THP, Inc.'s lenders began invoking various rights under their loan agreements in the form of miscellaneous collateral calls as properties were re-appraised at

dramatically reduced values, loan acceleration (greater repayment per settlement), and additional security such as cross-collateralization of existing loans. By mid 2008, THP, Inc. was realizing very little, and in some cases negative cash flow from closings after the repayment of debt. Normally this cash flow was the source of funds for operating costs and any shortfall from loan funding for work by vendors on the projects themselves. Without this cash flow THP, Inc. began to experience a significant increase in accounts payable and was forced to dramatically cut costs via layoffs and discontinuation of its land development work.

In conjunction with these cost reductions, THP, Inc. began working with its lenders to attempt to restructure the debt on each of the projects to increase cash flow. The company experienced some willingness from lenders on this front; however, it came to an abrupt end with the paralysis of the credit markets brought on by the collapse of Freddie Mac, Bear Stearns, Lehman Brothers and others in 2008. Faced with the inability to effectively restructure its debt in order to realize sufficient cash flow coupled with even further price depreciation, THP, Inc. continued operation as it sought alternate financing solutions and implemented further staff reductions and other cost-cutting measures. During mid to late 2008 and early 2009, THP, Inc.'s operating costs continued to deplete working capital and drive accounts payable to unmanageable levels. Ultimately, this lack of cash culminated in the inability of THP, Inc. to pay the collateral call of one of its banks and led to their filing of a confession of judgment against the company. Due to cross default provisions in its loan documents, the filing of this confession of judgment set in motion a chain of events which, in a very short amount of time, deprived THP, Inc. of the ability to borrow from any existing lines of credit to fund home construction. Without access to these lines or significant cash on hand, THP, Inc. was unable to continue operations and suspended operations on April 21st, 2009 while it evaluated its options.

After meeting with its attorneys, lenders, and financial consultants, the company decided that there was no option but to file for bankruptcy protection.

## V. THE CHAPTER 11 CASES

### A. Continuation of Business; Stay of Litigation

As described above, on April 30, 2009 (the "Initial Petition Date"), TH Properties, LP, TH Properties of New Jersey, L.P., Northgate Development Company, LP, Morgan Hill, LP, and TH Properties, Inc. filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. On April 20, 2010, TH Properties, LLC, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and its case is being jointly administered with the other Debtor cases. On September 14, 2010, Swamp Pike LP also filed a voluntary petition under chapter 11 of the Bankruptcy Code docketed as Case number 10-17865 (SR) in the United States Bankruptcy Court for the Eastern District of Pennsylvania and its case is also being jointly administered along with the chapter 11 cases of the other Debtors under the above-referenced caption. The Debtors continue as debtors-in-possession pursuant to sections 1107 and 1108 Bankruptcy Code.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens

against property of the Debtors and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess their businesses and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Cases are pending.

### B. Retention of Professionals

The Debtors retained Montgomery, McCracken, Walker & Rhoads, LLP ("MMWR"), to represent them in the Chapter 11 Cases, which retention was approved pursuant to an Order dated May 28, 2010 [Docket No. 137]. Additionally, the Bankruptcy Court entered an order dated July 16, 2009, allowing the Debtors to retain Amper, Poltiziner & Mattia LLP ("Amper") as its accountants [Docket No. 351], and an order dated allowing the Debtors to retain Robert C. Reeves, Jr. as its real estate advisor pursuant to an order dated July 16, 2009 [Docket No. 350]. Additionally, the Debtors retained Lagreca and Quinn Real Estate Services, Inc. as its Real Estate Consultants, which retention was approved by Court order dated June 25, 2009 [Docket No. 257]. An order was entered by the Court on February 18, 2010 approving the expansion of services to be rendered by Amper [Docket No. 1011].

The Committee was appointed by the Office of the United States Trustee on May 26, 2009 [Docket No. 86] and consists of the following members: Brubacher Excavating, Inc., Reading Materials, Inc., Central Concrete, Inc., Andrea Construction, Inc., and Deposit Holders Vernon and Janet Ruth. The Committee retained Ciardi Ciardi & Astin, PC as its counsel pursuant to an Order dated October 1, 2009 [Docket No. 612], and Bederson & Company LLP as its accountants pursuant to an Order dated October 1, 2009 [Docket No. 614]. Sometime in late July, 2011, counsel for the Committee resigned and presently the Committee has no counsel.

### C. Interim Fee Applications

Interim fee applications filed by the various professionals retained in the Chapter 11 Cases to date are as follows:

| **Bederson & Company, LLP** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Application Docket No. Date Filed** | **Order** | **Period Covered** | **Requested Fees** | **Requested Expenses** | **Approved Fees** | **Approved Expenses** | **Payment Made (Amount & Date)** |
| Initial App DN 897 Filed 12/28/09 | DN 996 Filed 2/16/10 | 5/22/09-10/31/09 | $35,373.00 | $128.06 | $35,373.00 | $128.06 | 2/22/10 - $2,941.89<br>2/22/10 - $10,557.00<br>2/23/11 - $1,288.85 |
| 2nd Interim DN 1190 Filed 6/18/10 | DN 1371 Filed 9/10/10 | 11/1/09-4/30/10 | $5,411.00 | $33.32 | $5,411.00 | $33.32 | |
| 3rd Interim DN 1557 Filed 12/6/10 | DN 1893 Filed 5/26/11 | 5/1/10-10/31/10 | $6,683.00 | $60.56 | $6,683.00 | $60.56 | |
| | | | | | | | |
| **TOTALS** | | 5/22/09-10/31/10 | **$47,467.00** | **$221.94** | **$47,467.00** | **$221.94** | **$14,787.74** |

| Ciardi Ciardi & Astin, P.C. | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Application Docket No. Date Filed** | **Order** | **Period Covered** | **Requested Fees** | **Requested Expenses** | **Approved Fees** | **Approved Expenses** | **Payment Made (Amount & Date)** |
| 1st Interim DN 820 Filed 11/25/09 | DN 940 Filed 1/14/10 | 5/22/09-10/31/09 | $167,440.00 | $1,754.90 | $167,440.00 | $1,754.90 | 1/22/10 - $48,093.00<br>2/22/10 - $14,077.29<br>2/23/11 - $6,263.65 |
| 2nd Interim DN 1123 Filed 5/20/10 | DN 1211 Filed 6/17/10 | 11/1/09-4/30/10 | $135,559.25 | $4,970.48 | $135,559.25 | $4,970.48 | |
| 3rd Interim DN 1490 Filed 11/15/10 | DN 1618 Filed 1/18/11 | 5/1/10-10/31/10 | $109,628.00 | $7,367.42 | $109,628.00 | $7,367.42 | |
| 4th Interim DN 1740 4/12/11 | DN 1870 Filed 5/11/11 | 11/1/10-3/31/11 | $95,147.00 | $2,945.41 | $95,147.00 | $2,945.41 | |
| 5th Interim DN 1967 8/5/11 | DN 1983 Filed 9/7/11 | 4/1/11-7/31/11 | $106,054.70 | $25,650.27 | $106,054.70 | $25,650.27 | |
| | | | | | | | |
| **TOTALS** | | 5/22/09-7/31/11 | **$613,828.95** | **$42,688.48** | **$613,828.95** | **$42,688.48** | **$68,433.94** |

| EisnerAmper LLP (f/k/a Amper, Poltiziner & Mattia, LLP) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Application Docket No. Date Filed** | **Order** | **Period Covered** | **Requested Fees** | **Requested Expenses** | **Approved Fees** | **Approved Expenses** | **Payment Made (Amount & Date)** |
| 1st Interim DN 876 Filed 10/15/09 | DN 877 Filed 12/16/09 | 4/30/09-8/31/09 | $114,144.00 | $2,137.93 | $114,144.00 | $2,137.93 | 2/22/10 - $9,670.16<br>2/22/10 - $20,597.85<br>2/23/11 - $5,033.99 |
| 2nd Interim DN 1315 Filed 8/4/10 | DN 1358 Filed 8/30/10 | 9/1/09-12/31/09 | $25,576.50 | $0 | $25,576.50 | $0 | |
| 3rd Interim DN 1576 Filed 12/16/10 | DN 1642 Filed 1/31/11 | 1/1/10-4/30/10 | $13,871.00 | $27.60 | $13,871.00 | $27.60 | |
| 4th Interim DN 1696 3/9/11 | DN 1742 Filed 4/12/11 | 5/1/10-12/31/10 | $90,402.50 | $206.08 | $90,402.50 | $206.08 | |
| 5th Interim DN 1948 7/19/11 | DN 1979 Filed 8/23/11 | 1/1/11-4/30/11 | $23,805.50 | $10.43 | $23,805.50 | $10.43 | |
| DN 1996 10/15/11 | **PENDING** | 5/1/11-8/31/11 | $34,213.00 | $0 | **PENDING** | **PENDING** | |
| | | | | | | | |
| **TOTALS** | | 4/30/09-4/30/11 | **$302,012.50** | **$2,382.04** | **$267,799.50** | **$2,382.04** | **$35,302.00** |

| Lagreca & Quinn | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Application Docket No. Date Filed** | **Order** | **Period Covered** | **Requested Fees** | **Requested Expenses** | **Approved Fees** | **Approved Expenses** | **Payment Made (Amount & Date)** |
| 1st & Final DN 1561 Filed 12/7/10 | DN 1611 Filed 1/5/11 | 4/30/09- 6/25/09 | $3,000.00 | $0 | $3,000.00 | $0 | 2/23/11 - $175.57 |
| | | | | | | | |
| **TOTALS** | | 4/30/09- 6/25/09 | **$3,000.00** | **$0** | **$3,000.00** | **$0** | **$175.57** |

| Montgomery, McCracken, Walker & Rhoads, LLP | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Application Docket No. Date Filed** | **Order** | **Period Covered** | **Requested Fees** | **Requested Expenses** | **Approved Fees** | **Approved Expenses** | **Payment Made (Amount & Date)** |
| 1st Interim DN 576 Filed 9/21/09<br><br>Amended 1st Interim DN 647 Filed 10/15/09 (to respond to objections) | DN 760 Filed 11/9/09 | 4/30/09- 8/31/09 | $712,354.50<br><br>$700,588.50 | $39,133.68<br><br>$39,133.68 | <br><br>$700,588.50 | <br><br>$39,133.68 | 2/22/10 - $64,856.14<br>2/22/10 - $138,049.78<br>2/23/11 - $31,417.34<br>2/23/11 - $36,563.60 |
| 2nd Interim DN 1434 Filed 10/11/10 | DN 1488 Filed 11/9/10 | 9/1/09- 12/31/09 | $463,681.50 | $43,891.95 | $463,681.50 | $43,891.45 | |
| 3rd Interim DN 1517 Filed 11/22/10 | DN 1613 Filed 1/6/11 | 1/1/10- 4/30/10 | $307,221.00 | $16,974.75 | $307,221.00 | $16,974.75 | |
| 4th Interim DN 1598 12/27/10 | DN 1651 Filed 2/2/11 | 5/1/10- 8/31/10 | $284,010.50 | $34,947.39 | $284,010.50 | $34,947.39 | |
| 5th Interim DN 1705 3/17/11 | DN 1743 Filed 4/12/11 | 9/1/10- 12/31/10 | $265,072.50 | $16,971.69 | $265,072.50 | $16,971.69 | |
| 6th Interim DN 1944 7/19/11 | DN 1979 Filed 8/23/11 | 1/1/11- 4/30/11 | $316,893.00 | $11,586.25 | $316,893.00 | $11,586.25 | |
| | | | | | | | |
| **TOTALS** | | 4/30/09- 4/30/11 | **$2,337,467.00** | **$163,505.71** | **$2,337,467.00** | **$163,505.21** | **$270,886.86** |

| Robert C. Reeves, Jr., CPA | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Application Docket No. Date Filed** | **Order** | **Period Covered** | **Requested Fees** | **Requested Expenses** | **Approved Fees** | **Approved Expenses** | **Payment Made (Amount & Date)** |
| 1st & 2nd<br>DN 289<br>Filed 7/1/09 | DN 583<br>Filed<br>9/21/09<br><br>Up to<br>$37,000 | 5/1/09-<br>6/30/09 | $86,218.75 | $9,993.26 | Up to $37,000<br>(As the fees & expenses requested in this 1st & 2nd fee app are included in the 1st interim fee app, the fees & expenses requested here are not included in the totals.) | | 4/30/09 - $9,525.40<br>8/21/09 - $10,000.00<br>2/22/10 - $9,109.77<br>2/22/10 - $9,405.19<br>2/28/11 - $4,169.35<br>4/13/11 - $20,000<br>5/13/11 - $10,000<br>6/13/11 - $10,000<br>7/1/11 - $30,594.16 |
| 1st Interim<br>DN 573<br>Filed 9/21/09 | DN 882<br>Filed<br>12/18/09 | 4/30/09-<br>8/31/09 | $99,531.25 | $10,022.62 | $99,531.25 | $10,022.62 | |
| 1st Interim<br>DN 881<br>Filed 9/21/09<br>Entered<br>12/18/09 | | 4/30/09-<br>8/31/09 | $99,531.25 | $10,022.62 | $99,531.25 | $10,022.62 | |
| 2nd Interim<br>& Final<br>DN 1897<br>Filed 6/2/11 | DN 1934<br>Filed<br>6/29/11 | 4/30/09-<br>8/30/09 | $3,250.00<br><br>Final:<br>$102,781.25 | 0.00<br><br>Final:<br>$10,022.62 | $3,250.00<br><br>Final:<br>$102,781.25 | $0.00<br><br>Final:<br>$10,022.62 | |
| | | | | | | | |
| **TOTALS** | | 5/1/09-<br>8/31/09 | **$102,781.25** | **$10,022.62** | **$102,781.25** | **$10,022.62** | **$112,803.87** |

In connection with the payment of professionals, the Debtors filed a Motion to Establish Protocol for Payment of Professional Fees [Docket No. 955] seeking to distribute pro rata those sums of monies being held in escrow for payment of Professional fees by the Debtors. An order approving the relief requested was entered on February 9, 2010 [Docket No. 990].

### D. Adversary Proceedings

There were several adversary proceedings commenced during the course of the Chapter 11 Cases.

On May 26, 2009, the Debtors filed a Complaint against Allen Township, Bedminster Municipal Authority, Bedminster Township, East Coventry Township, Franconia Sewer Authority, Franconia Township, Hatfield Township, Hatfield Township Municipal Authority, Limerick Township, Lower Salford Township, Lower Southampton Township, New Hanover Township, New Hanover Township Authority, North Penn Water Authority, PennDOT (Bucks County), PennDOT (Montgomery County), Pottstown Borough Authority, Red Hill Borough, Red Hill Water Authority, Richland Township, Richland Township Water Authority, Skippack Township, Upper Hanover Authority, Upper Hanover Township, Upper Pottsgrove Township, Upper Providence Township, Winslow Township, International Fidelity Insurance Company, Bond Safeguard Insurance Company, and John Does 1-100 [Docket No. 90]. This Complaint, which was docketed as an adversary proceeding No. 09-00171, sought to prevent the municipalities from drawing down on the various bonds that the Debtors obtained in order to complete work at various sites, except where it was necessary for welfare and safety [09-00171 Docket No. 1]. Contemporaneous with the Complaint, the Debtors filed a motion for a preliminary injunction seeking the relief set forth in the Complaint [09-00171 Docket No. 2].

Following a hearing on June 2, 2009, the Court granted the motion for a preliminary injunction and ordered that the Defendants were enjoined from drawing down the bonds for 60 days. The Injunction also provided that the municipalities had to give the Debtors ten days' notice of any repairs that were necessary for the safety and welfare of the community. If the Debtors disagreed with the characterization of the work to be done, they could file an expedited motion; if no motion was filed, the bondholders were entitled to draw on the bonds beginning on the eleventh day.

The injunction was extended on numerous occasions and the number of defendants to which it applied was reduced over time and the adversary proceeding was ultimately closed by the Debtors.

On September 23, 2009, Debtors and Debtors-In-Possession filed a Complaint against Allan A. Meyers Co. ("Meyers") seeking injunctive relief extending the automatic stay to include THP LLC, the holding company for TH Properties, LP. [Docket No. 589]. The complaint is docketed at Adversary Proceeding No. 09-00290. Meyers had filed a lawsuit against THP LLC on July 29, 2009 for breach of contract in connection with Biltmore Estates. At that time, THP LLC was not a party to the bankruptcy proceedings, but because a judgment against THP LLC could have enabled Meyers to realize the assets in TH Properties, LP, the Complaint was filed. The parties resolved the Complaint amicably via a stipulation.

In order to prevent other creditors from executing on THP LLC's assets, a voluntary petition for relief under Chapter 11 of the Bankruptcy Code was filed by THP LLC on April 20, 2010 and the Chapter 11 Case of THP, LLC is being jointly administered with the cases of the other Debtors.

On or about March 24, 2010, the Debtors and the Committee commenced Adversary Proceeding No. 10-0013 [Docket No. 1060] against Bank of America. The Complaint was filed as part of the overall disputes with Bank of America regarding use of cash collateral and lift stay relief. The Complaint sought a determination of the validity and extent of BOA's liens vis-a-vis certain holders of mechanic liens. This Complaint has since been resolved and dismissed.

On or about October 10, 2010, the Debtors and the Committee commenced an adversary proceeding against multiple defendants at Adversary Proceeding No. 10-00384 (SR) seeking a declaratory judgment to determine that certain escrowed funds are property of the estate pursuant to section 541 of the Bankruptcy Code. These funds arise out of real property agreements requiring that the seller place funds in an escrow to be used by the buyer/Debtor for payment of "rollback" taxes. Such "rollback" taxes are to be payable by the person or entity that ultimately develops each of the properties and are assessed against the properties as a rollback under The Pennsylvania Farmland and Forest Land Assessment Act of 1974, 72 P.S. §§5490.01-5490.12 or any other Act of the Commonwealth of Pennsylvania. The Complaint is still pending as of the filing of the Plan.

On or about October 7, 2010, Morgan Hill Drive LP and the Committee commenced a complaint against International Fidelity Insurance Co. and Upper Hanover Township at Adversary Proceeding No. 10-00390 (SR) for declaratory and injunctive relief and breach of

contract relating to certain performance bonds and set-asides letters for the installation and completion of site work at Northgate Phase 2. The Complaint is resolved and will be dismissed.

On or about January 12, 2011, the Township of Franconia and Franconia Sewer Authority commenced an action against THP Properties LP and Lexon Insurance Company at Adversary Proceeding No. 11-00025 (SR) for declaratory relief, breach of contract and statutory bad faith for the alleged failure to complete improvements as Belmont Estates Phases I and II. The Debtor has been named only as a nominal defendant and the matter is still pending.

On or about March 1, 2011, TH Properties, LP and the Committee commenced a complaint against the Township of Richland and Wilmington Trust Bank at Adversary Proceeding No. 11-00240 (SR) for declaratory relief and injunctive that escrowed funds relating to Brayton Gardens II subdivision Phases II and III Security Agreements are property of the estate. Wilmington Trust Bank has been dismissed as a defendant and the matter as against the Township of Richland is still pending.

On or about March 17, 2011, International Fidelity Insurance Company commenced a complaint against Susquehanna Bancshares, Inc., and TH Properties, L.P. at Adversary Proceeding No. 11-00273 (SR) for declaratory relief, an accounting, breach of contract, negligence, and conversion regarding the completion of improvements required under a development agreement entered into with New Hanover Township. This matter is resolved and has been dismissed.

On or about June 13, 2011, TH Properties, LP and the Committee commenced a Complaint against North Penn Water Authority at Adversary Proceeding No. 11-00465 (SR) for declaratory relief to determine that the Debtor is entitled to reimbursement of tapping fees and for turnover of property of the estate. This matter was recently filed and is still pending.

On or about June 23, 2011, the Debtors and the Committee commenced a complaint against James H. Hasson, Margaret I. Hasson, Commonwealth Land Title Insurance Company and VIST Financial Corp. for declaratory relief regarding a determination that certain escrowed funds are property of the estate and for turnover of such funds. This matter was recently filed and is still pending.

The Committee, with the consent of the Debtors, commenced sixty-seven (67) preference and/or fraudulent actions against numerous vendors, banks, townships, and related entities prior to the expiration of the statute of limitations in April 2011. The Committee entered into a stay agreement to stop further prosecution of the complaints until the Committee was able to determine whether continued prosecution of such actions was beneficial to the estates. The actions are still pending.

### E. Authorization to Use Cash Collateral of Existing Lenders, Enter into DIP Financing Arrangements, and Sale of Lots Free and Clear

At the inception of the case, the Debtors strategized with their counsel and the Committee as to which projects that they desired to retain and develop long-term as part of their chapter 11 exit strategy. In accordance with that plan, the Debtors attempted to negotiate cash collateral and/or post-petition financing with the lenders for each of the projects. Cash collateral is defined

in section 363 of the Bankruptcy Code and includes, but is not limited to, "cash, negotiable instruments, documents of title, securities, deposit accounts, … other cash equivalents … and … proceeds, products, offspring, rents or profits of property subject to a security interest…" 11 U.S.C. § 363(a). Under the Bankruptcy Code, the Debtors are prohibited from using cash collateral unless either the appropriate creditors consent or the Bankruptcy Court, after notice and a hearing, authorizes such action.

During the course of the case, the Debtors successfully negotiated cash collateral and/or post-petition financing with the following lenders to build-out the following projects: Continental Bank for Westport Farms; Susquehanna Bank for Hawthorne Estates; VIST Bank for Kingston Hill; Hyperion Bank for Cliffside Manor; Susquehanna Bank for certain lots at Burbank Grove, Wilmington Trust Bank for Northgate Phase 1A; First Niagara for Coddington View; and Bank of America for Biltmore Estates and Northgate. As a result of these financing arrangements, the Debtors were able to complete and deliver 92 homes to customers over the course of the Chapter 11 Cases.

Additionally, the Debtors conducted a section 363 sale of certain lots in Kingston Hill II and Whitefield Estates I, IIA, IIB, and III for National Penn Bank in exchange for an agreement by National Penn Bank to contribute to the Debtors' estates certain lots at Barton Ridge and lot 105 at Kingston Hill. The Debtors also conducted a section 363 sale of Ivywood for Continental Bank in exchange for a waiver of the bank's unsecured deficiency claim and of Burbank Grove for Susquehanna Bank. These lenders are identified in Class 1 of the Plan.

To the extent the Debtors were unable to negotiate cash collateral or post-petition financing for Projects, or independently determined it was not in their best interests to pursue such financing, the projects were turned over to the lenders and/or vendors and include the following: Affinity Bank for property located at Arbor Court and Stoneacre Ridge; Beneficial Savings Bank for property located at Melbourne Hill; First Niagara Bank for property located at Newport Landing, Sandanato, Kingston Hill, Normandie, Village at Wynstone, and the Fleet Maintenance Building; VIST Bank for properties at Berwind II and Edgehill; Univest Bank for property located at Westport Farms; Indymac for property located at Kingston Hill; Wachovia Bank for property located at Village at Wynstone; Bucks County Bank for property located at 1104 Berkeley Drive in Pennsburg; VIST Bank for property located at Kingston Hill Phase IV; 233 Schuylkill Road LP for property located at Stoneacre Ridge; Gehringer Plumbing for Lots 54 through 63 at Cliffside Manor Phase II; National Penn Bank for certain remaining lots in Kingston Hill II and Whitfield Estates I, IIA, IIB and III; Susquehanna Bank for property located at Burbank Grove; and Continental Bank for property at Ivywood. These claims are classified in Class 1 of the Plan.

The vast majority of the Debtors' vendors have supported the Debtors post-petition efforts and at times, have donated labor and equipment to maintain and/or clean up projects in order to move forward with construction and sales once agreements are in place. In addition, many of the vendors have agreed to complete work on the homes THP, Inc. has sold in exchange for a promise (and actual) payment for their labor and supplies at the settlements of particular homes. Excluding debt service, payments to professionals and a set aside of funds for unsecured creditors, these vendors have been paid over $9.4 million to date and hundreds of people throughout the region have remained employed.

Furthermore, THP, Inc. has completed or is in the process of completing numerous homes that were under construction when its reorganization case was filed, and, to date, has sold over 106 homes in its Belmont, Hawthorne, Westport Farms, Kingston Hill, Northgate Phase IIA, II and III, Biltmore Estates, Coddington, Burbank Grove, Cliffside Manor, Whitfield and Barton Ridge developments, generating revenue sufficient to pay over $15 million to its secured creditors and, as noted above, over $9.4 million to its contractors, suppliers and laborers.

**F. Other Relevant Post-Petition Activity**

The two flagship properties identified by the Debtors as integral to an exit strategy from chapter 11 were the Biltmore Estates Project and Northgate Phases I, IIA, II and III which were secured by loans from Bank of America. While the Debtors had negotiated post-petition financing with Bank of America, the agreements provided for payoff s by certain dates which were extended over the course of the Chapter 11 Cases. Ultimately, the Debtors were able to pay off Bank of America timely in two separate transactions involving the buyout of Bank of America's interests in the properties.

First, Bank of America agreed to reduce its initial buyout amount from the total sum of $18 million to $13 million for both Projects and to extend the time to receive payment in full of this reduced payoff amount. This agreement was memorialized in a consent order that has been filed with and approved by this Court on March 30, 2011 [Document No. 1728]. Bank of America was also paid the sum of $4 million through a note purchase and assignment on Northgate by Turnersville Estates, LP ("Turnersville") on or about March 31, 2011. After crediting payments from closings to Bank of America in accordance with the Consent Order, Turnersville paid $3,530,695.83, and now holds Bank of America's lien on Northgate for the remaining balance due (after the Debtors paid down the initial acquisition loan in connection with several Bankruptcy Court approved settlements and with the Committee's approval) of $750,844.99. Turnersville has also agreed to the Debtors' buildout of the Northgate Phase I (subject to Court approval) as well as Northgate phases IIA, II and III as set forth in Class 2 and Section 7.02 of the Plan. Turnersville's Claim is classified as Class 2 under the Plan.

Second, the Debtors' obtained approval by the Court of several inter-related transactions regarding Biltmore Estates Project and Northgate Phases IIA, II and III. The Debtors sold the Biltmore Estates Project to a designee of Blooming Glen Contractors, Inc. Reading Materials, Inc., Lehigh Valley Site Contractors, Inc. and Haines & Kibblehouse, Inc. (collectively, the "H&K Entities"), Skippack Group LLC ("SGLLC"), for the sum of $3.8 million which was secured by a $5.5 million loan allocated to the purchase of Biltmore Estates Project and the payoff of Bank of America's debt. [Docket No. 1728]. The financial institution providing the financing, Abington Bank as a condition of making the loan, has required that SGLLC take ownership of Biltmore Estates Project and pledge the property to the bank to secure the loan that will be paid off in accordance with a specific "waterfall" structure. That "waterfall" provided that in exchange for taking on the risk of the risk as borrower, and for agreeing to post financial security of $6 million for site improvements to allow the continued development of all phases of Northgate project, the H&K Entities received a fee of $500,000. The Biltmore loan as well as the mechanics liens held by the H&K Entities, the $500,000 fee to H&K and the amounts advanced for site improvements will be paid back from the sale of homes at Biltmore and Northgate Phases IIA, II and III (as set forth in Final Orders of the Bankruptcy Court entered in

the Bankruptcy Case) with the exception of a set aside of funds in the amount of $45,000 per unit for overhead, professional fees, priority and unsecured claims. Once these items are satisfied, the sales proceeds will be allocated to professionals, priority claimants, and unsecured claimants in accordance with the Plan.

Additionally, as part of their exit strategy, the Debtors filed a motion to approve a settlement agreement with the H&K Entities which addressed the payment of their mechanics' liens, and also sought approval of a payment structure that addresses the repayment of funds borrowed by the H&K Entities (and secured by Biltmore) to facilitate the buyout of Bank of America as well as various parties' obligations in connection with Northgate Phases I, IIA, II and III and Biltmore Estates Project pursuant to Bankruptcy Rule 9019. That motion was approved by an order of the Court dated April 28, 2011 [Docket No. 1778].

Another integral part of the Debtors' exit strategy is premised on the buildout of Northgate Phases IV and V, which are currently not owned by the Debtors. Hendricks, as their New Value Contribution, shall cause title to Northgate Phases IV and V to be contributed to the Debtors under the Plan as provided by Section 7.01 of the Plan.

The Plan is also premised on the buildout of a number of Projects, as follows: Barton Ridge Project, Biltmore Estates Project, Coddington View Project, Kingston Hill Project, the Northgate Phase I Project (subject to Court approval), the Northgate Phase IIA Project, and the Northgate Phases II, and III Project. Additionally, once the issues regarding certain preferential transfers are either resolved or disposed of by the Bankruptcy Court with respect to the adversary proceedings commenced against ProBuild East, LLC (Adv. Pro No. 11-00354-SR) regarding property located at Keen Road, East Vincent Township, Chester County, PA, and Broc Supply Company, Inc. (Adv. Pro. No. 11-00340-SR) regarding property located at 517 Fifth Avenue, Bristol Township, Bucks County, PA, these properties shall also be developed as part of the Plan, with the net proceeds distributed in accordance with Plan Section 7.12.

As part of its exit strategy, the Debtors also engaged in negotiations with certain Mechanic Lien's Holders regarding their claims. These settlements agreements were approved by the Court at Docket Nos. 693, 1305, 1548, 1778, 1780, 1865, and 1872. As part of these settlements, certain liens of such Mechanics Lien Holders were transferred to other properties and/or otherwise treated in accordance with the orders approving the settlement agreements. All of these liens are being paid in accordance with the respective settlement agreements as set forth in the Plan Budgets attached to the Plan as Exhibit C. The claims of these Mechanic Lien Holders are classified and treated under Class 4 under the Plan or if there are any portions that are unsecured, under Class 9 of the Plan.

## VI. SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A. Overall Structure of the Plan

The Plan sets forth the means for satisfying Claims against and Interests in the Debtors. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated: (a) the Claims in certain Classes will be Reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Debtors or the Committee will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

## B. No Substantive Consolidation

The Plan does not provide for the substantive consolidation of the Debtors.

## C. Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors and the Committee believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors and the Committee intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors and the Committee believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. In the event any Class rejects the Plan, the Debtors and the Committee will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class. Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and Interests. Although the Debtors and the Committee believe that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1. *Treatment of Unclassified Claims under the Plan*

(a) *Administrative Claims*

An Administrative Claim is defined in the Plan as a Claim for: (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(l), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iii)

compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to a lender pursuant to Cash Collateral Orders; (d) claims of DIP Lenders in connection with DIP financing facilities a lender and (e) Claims of the H&K Entities for amounts posted as financial security pursuant to Final Orders of the Bankruptcy Court.

Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for therein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to by the Debtors and the Committee, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon by the Holder of such Claim and the Debtors or the Purchaser, as the case may be, or as the Bankruptcy Court may order; or (c) if such claim is for post petition property or real estate taxes, the Pro Rata Share of said taxes (plus interest) on such lots that remain in the Debtors' estates as homes on such lots are sold under the Plan. To the extent property has been conveyed to another entity pursuant to a section 363 sale, a deed in lieu of foreclosure, or some other mechanism, and such property is no longer property of the Debtors' estate as of the Effective Date of the Plan, the entity to whom such property has been conveyed is solely responsible for payment of any outstanding taxes on such property (other than Biltmore Estates, the Debtors having paid the outstanding taxes in connection with a Final Order authorizing them to be paid when this property was transferred). The current estimated amount of post – petition real estate taxes to be paid under the plan is $288,505.39. All Administrative Claims shall be paid pro rata until paid in full as set forth on the Budgets attached hereto as Exhibit C in Section 7.03 and 7.12 of the Plan.

At the outset of the Chapter 11 Cases, the professionals agreed that they would be paid for the professionals fees incurred during the course of the case post-Effective Date and over time under any proposed plan. Recently, counsel for the Committee changed its position and demanded payment in full of its professionals' fees on the Effective Date of the Plan. In late July, 2011, counsel for the Committee indicated that his firm would resign, and has filed a motion to withdraw as counsel. Further, the Committee has not located alternative counsel. Nevertheless, the Debtors and the Committee voted to proceed with the Plan as proposed herein. The Plan reflects the original agreement reached among the professionals.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases will be paid in the ordinary course of business by the Reorganized Debtors.

Under the Plan, applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (a) from the Petition Date through the Effective Date or (b) at any time during the Chapter 11 Cases when such compensation is sought pursuant to

sections 503(b)(2) through (b)(5) of the Bankruptcy Code, must be Filed no later than ninety (90) days after the Effective Date or such later date as the Bankruptcy Court approves, and must be served on (a) the Debtors, THP, 345 Main Street, Harleysville, PA 19438 (Attn: Tim Hendricks), (b) counsel to the Debtors, Montgomery, McCracken, Walker & Rhoads, LLP, 123 South Broad Street, Philadelphia, PA 19109 (Attn: Joseph O'Neil, Jr., Esquire), (c) Chairperson for the Committee: Steve Nelson, c/o the H&K Group, P.O. Box 1467, Skippack, PA 19474; (d) the Office of the United States Trustee, 833 Chestnut Street, Suite 500, Philadelphia, Pennsylvania 19107; and (e) any other party designated by the Bankruptcy Rules or any order of the Court to receive notice. Applications that are not timely Filed will be barred and will not be considered by the Court. The Debtors will pay any valid claims for Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

(b) *Class 1: Miscellaneous Secured Lender*

Class 1: Miscellaneous Secured Lender Claims. Class 1 Miscellaneous Secured Lender Claims are Unimpaired.[3] The Holders of the Following Miscellaneous Secured Lender Claims (a) Affinity Bank in the amount of $1,088,155.32 relating to the following properties: Arbor Court in Pennsburg Borough ($535,609.63), Stoneacre Ridge (Ellis) ($272,341.25), and Leidy ($280,204.44) in New Hanover Township; (b) Beneficial Savings Bank in the amount of $1,972,782.54 relating to the property at Melbourne Hill in Lower Frederick Township; (c) First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company in the approximate amount of $19,650,762 relating to the following properties: Newport Landing (Nagdev) ($102,417.18) and Sandanato ($126,773.23) in Bristol Township, Kingston Hill (Lester) ($189,785.69), Normandie in Upper Salford ($9,182,959.54), the Fleet Maintenance Building ($429,316.61) in Lower Salford Township, property located at Village at Wynstone, Swamp Pike in Gilbertsville, New Hanover Township ($7,826,750.00) and certain lots at Coddington View in Upper Pottsgrove Township ($4,370,576); (d) VIST Bank in the amount of $5,410,776.08 relating to the properties at Berwind II in Douglass Township and Edgehill in Upper Frederick Township; (e) Univest National Bank in the amount of $801,031.88 relating to properties at Westport Farm in Franconia Township; (f) Indymac Bank in the amount of $2,563,156.61 relating to property located at Kingston Hill III in New Hanover Township; (g) Wachovia Bank, N.A. in the amount of $7,698,772.06 relating to property located at Village at Wynstone in New Hanover Township; (h) Bucks County Bank in the amount of $285,000 relating to property located at 1104 Berkley Drive, Pennsburg; (i) VIST Bank in the amount of $307,761.68 relating to property located at Kingston Hill Phase IV in New Hanover Township; (j) 233 Schuylkill Road LP in the amount of $1,897,264.92 relating to property located at Stoneacre Ridge (Brusch) in New Hanover Township; (k) Wilmington Trust N.A. in the approximate amount of $2,579,046.86 relating to certain property located at Northgate Phase I in Upper Hanover Township in the event the settlement agreement referenced in subsection (c) herein is not approved by the Court; and (l) Gehringer Plumbing on Lots 54 through 63 at Cliffside Manor Phase II in Bedminster Township shall receive in full satisfaction, settlement,

[3] Some of the Claim amounts have been adjusted to reflect post-petition paydowns and some of the Claim amounts listed are as of the Petition Dates. These Claim amounts will ultimately be adjusted based on the status of the sale of the collateral and paydowns on some loans through cross-collateral provisions in the loan documents to the extent the Secured Lender also provided DIP financing or use of Cash Collateral during the Chapter 11 Cases.

release, extinguishment and discharge of each such Miscellaneous Secured Lender Claim, the return of the property securing such Miscellaneous Secured Lender Claim (unless such property has already been returned). Any Allowed Claim for a deficiency shall be treated as a Class 9 General Unsecured Claim, unless otherwise waived by the Holder of each such Miscellaneous Secured Lender Claim.

The Holders of the following Miscellaneous Secured Lender Claims (a) National Penn Bank in the amount of $127,773.23 for certain remaining lots in Kingston Hill II in New Hanover Township and $6,511,683.59 for Whitfield Estates I, IIA, IIB, and III in Upper Macungie Township; (b) Susquehanna Bank in the amount of $19,189,314.55 relating to property located at Burbank Grove in Upper Providence Township; and (c) Continental Bank in the amount of $4,955,873.55 relating to the property at Ivywood in East Coventry Township, agreed, during the course of the Debtors' cases in full satisfaction, settlement, release, extinguishment and discharge of each such Secured Claim to permit the sale of each respective Property pursuant to Bankruptcy Code section 363 and to receive the proceeds thereof. Any Allowed Claim for a deficiency shall be treated as a Class 9 General Unsecured Claim, unless otherwise waived by the Holder of each such Miscellaneous Lender Secured Claim.

(c) *Class 2 Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate Phase IIA Project*

Class 2 Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate Phase IIA Project. The Class 2 Secured Lender Claim of TE at the Northgate Phase I Project (subject to Reading Materials, Inc. first priority lien as set forth in Class 5) and the Northgate IIA Project in Upper Hanover Township is Unimpaired. The Holder of the Allowed Class 2 Secured Lender Claim of TE at the Northgate I Project shall receive in full satisfaction, settlement, and release, extinguishment and discharge of such Claim on the Northgate Phase I Project (subject to the liens of Reading Materials) the principal amount of $650,000 with interest at the annual fixed rate of ten percent (10%) to be paid from the net proceeds of each closing of the sale of the remaining lots for sale at the Northgate Phase I Project in accordance with the payment scheme set forth in a settlement agreement to be approved by the Court and set forth on the Budgets attached hereto as Exhibit C and Section 7.02 hereof. Pursuant to the terms of that settlement agreement, the interests of Wilmington Trust, N.A., as may be assigned to M&T Bank, in Northgate Phase I Project and the Wynstone Project, will be transferred to TE for cash, subject to all existing loans and approvals. In the event the settlement agreement referenced herein is not approved by the Court, then TE shall have no claim with respect to the Northgate Phase I Project, and Wilmington Trust shall have a Class 1 Miscellaneous Secured Lender Claim with respect to the Northgate Phase I Project (subject to Reading Material, Inc.'s first priority lien as set forth in Class 5), and the Wynstone Project shall remain subject to Wilmington Trust, N.A.'s rights and liens outside of these Chapter 11 Cases since it is owned by a non-debtor entity.
The Holder of the Allowed Class 2 Secured Lender Claim of TE at the Northgate Phase IIA Project shall receive in full satisfaction, settlement, and release, extinguishment and discharge of such Claim on the existing Northgate Loan Documents in the principal amount of $750,844.94 over twenty-four months with interest at the annual fixed rate of ten percent (10%) to be paid

from the net proceeds of each closing at the Northgate Phase IIA Project in accordance with the Budgets attached as Exhibit C to the Plan.

(d) *Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township.*

Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company at Coddington View in Upper Pottsgrove Township is Unimpaired. The Holder of the Allowed Class 3 Secured Lender Claim of First Niagara Bank, a National Banking Association, successor by merger to Harleysville Bank and Trust Company shall receive in full satisfaction, settlement, and release, extinguishment and discharge of such Claim: (a) the total amount of $935,680, together with accrued interest, plus a split of the excess depending on the sales of homes from the sale of the homes at Coddington View in Upper Pottsgrove Township in accordance with the DIP Financing Order dated November 5, 2009 [Docket No. 714]; and (b) an amount up to $973,100 for the buildout of fourteen additional homes at Coddington View Upper Pottsgrove Township in accordance with a DIP Financing Order II dated May 24, 2011 [Docket No. 1904]. Pursuant to DIP Financing Order II, First Niagara was granted stay relief to exercise its state law remedies with respect to the balance of lots at Coddington View and shall be treated a Class 1 Miscellaneous Secured Lender and Secured Vendor Claim with respect to this portion of its claim.

(e) *Class 4: Certain Mechanics Lienholders.*

Class 4 Certain Mechanics Lienholders Claims consists of the Claims of UGI HVAC Enterprises, Inc., d/b/a ServiceMark ("ServiceMark"), ProBuild Company, LLC ("ProBuild"), Edgemont Stone & Supply Co., the H&K Entities and American Rock Mechanics, Inc. ("AMROC"). Class 4 Certain Mechanics Lienholders Claims shall receive payment or release liens in accordance with the settlements approved by the Bankruptcy Court [Docket Nos. 693, 1305, 1548, 1778, 1780, 1865, and 1872], as well as those that are approved prior to Plan confirmation. With respect to the liens of ProBuild and Servicemark on homes sold by the Debtors pre-petition, said liens are secured by liens granted by the Debtors on its otherwise unencumbered Barton Ridge Project and the liens of these entities on the homes sold pre-petition shall be released by them on or before upon plan confirmation. The remaining liens on the Barton Ridge Project in the first priority amount of $92,576.18 in favor of ProBuild and the second priority amount of $69,306.00 in favor of ServiceMark shall be paid from the pool of funds set aside in Section 7.13 hereof (once funded), or from the proceeds of sales of the units in Barton Ridge, whichever occurs first. With respect to the liens of the H&K Entities, pursuant to the settlement agreements entered into with the Debtor, said liens attach to the Debtors' Biltmore, Northgate and Kingston Hill projects and shall be paid in accordance with the Court approved settlement agreements referenced above. In the event of a conflict or contradiction in terms between the Plan, the Confirmation Order and the Orders approving the above referenced settlement agreements, the Orders approving the terms and content of the settlement agreements shall control. Should any of the holders of Certain Mechanics Lienholders Claims have Claims other than the Certain Mechanics Lienholders Claims, they shall be treated in accordance with

Section 3.12, as General Unsecured Claims, or as set forth in any Final Order entered by the Bankruptcy Court in the Chapter 11 Cases.

(f) *Class 5: Miscellaneous Secured Vendor Claims.*

Class 5: Miscellaneous Secured Vendor Claims. Class 5 Miscellaneous Secured Vendor Claims are Unimpaired. Class 5 consists of the Miscellaneous Secured Vendor Claims of (a) Reading Materials, Inc. first priority lien in the amount of $211,405.94 (granted pursuant to that certain order authorizing DIP Financing [Docket No. 693] and providing for the second priority liens of Wilmington Trust FSB or TE upon Court approval, relating to certain lots in Northgate Phase I in Upper Hanover Township; (b) Hearth & Home Technologies, Inc. at Stoneacre Ridge – Trolley Line ($354,575.00); and (c) Carroll Engineering Corp. at Melbourne Hill Sewer Plant Property ($150,000). In full satisfaction, settlement, release, extinguishment and discharge of each such Miscellaneous Secured Vendor Claim, the Holder of such claim shall (a) retain its lien(s) on each of the respective Properties (absent such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors and the Committee, as the case may be); and/or (b) enter into an agreement with the Reorganized Debtors to complete all or a portion of construction on each Property, which shall include a means to satisfy payment of the lien. Any Allowed Claim for a deficiency shall be treated as a Class 9 General Unsecured Claim, unless otherwise waived by the Holder of each such Miscellaneous Secured Claim. Further, in the event any of these Properties are developed as part of the Plan, any net proceeds distributed in accordance with Plan Section 7.12.

(g) *Class 6: Secured Claims of Taxing Authorities.*

Class 6 Secured Claims of Taxing Authorities. Each holder of an allowed Class 6 Secured Taxing Authority claim shall receive in full satisfaction thereof payment of their respective property taxes (plus statutory interest), on such lots that remain in Debtors' estates as homes on such lots are sold under the Plan, and they shall retain any liens on the respective lots until such time as the lots are sold. Class 6 Secured Taxing Authority Claims are unimpaired and are not entitled to vote on the Plan.

(h) *Class 7: Priority Employee Wage & Benefit Claims.*

Class 7 Priority Employee Wage & Benefit Claims are Unimpaired. This Class consists of Holders of Priority Employee Wage & Employee Claims. Each Holder of an Allowed Class 7 Priority Employee & Wage Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the amount of such unpaid Allowed Priority Employee Wage & Benefit Claim in Cash with prime interest at the rate set forth in the Wall Street Journal from the Petition Date to the date such distribution is made on as sufficient funds are accumulated to pay such claims as set forth on the Budgets to the Plan as Exhibit C. Such Claims shall be paid pro rata as distributions are made along with Administrative Claimants, Class 7 Priority Wage & Benefit Claims, and Class 7 Priority Deposit Holders until paid in full as set forth in the budgets attached as Exhibit C to the Plan and on Section 7.02 and 7.11 of the Plan.

(i) *Class 8: Deposit Holders.*

Class 8 Deposit Holders are unimpaired. Each Holder of an Allowed Class 8 Deposit Holder Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the amount of such unpaid Allowed Deposit Holder on the Effective Date of the Plan.

(j) *Class 9: General Unsecured Claims.*

Class 9 General Unsecured Claims are Impaired. This Class consists of General Unsecured Trade Claims, all Mechanic's Liens Claims on the retained Projects (other than those in Class 4 herein), and all other Claims not otherwise classified in the Plan. Each Holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its Pro Rata Share of the sums available after payment in full of Administrative Claims, the applicable Secured Claims of Lenders and applicable Secured Claims of Taxing Authorities, Class 7 Priority Wage & Benefit Claims, and Class 8 Deposit Holders as set forth on the Budgets attached to the Plan as Exhibit C and Sections 7.03 and 7.11 of the Plan.

(k) *Class 10 Limited Partner Interests in the LP Debtors.*

Class 10 Interests are Unimpaired. In exchange for the New Value Contribution, the Interests of the Hendricks, as limited partners, in the LP Debtors shall remain equal to the interests they held as of the Petition Date. The Hendricks own all of the Class 10 Limited Partner Interests.

(l) *Class 11: General Partner Interests in the LP Debtors.*

Class 11: General Partner Interests in the LP Debtors. Class 11 Interests are impaired. The Class 11 Interests in the LP Debtors are held by Northgate Development Company, LLC, Morgan Hill Drive, LLC, Hendricks of NJ, LLC, and Swamp Pike, LLC. All the Class 11 Interests shall be cancelled and extinguished on the Effective Date.

(m) *Class 12: Interests in the GP Debtor and THP, Inc.*

Class 12: Interests in the GP Debtor and THP, Inc. Class 12 Interests are unimpaired. In exchange for the New Value Contribution, the Class 12 Interests held by the Hendricks in the GP Debtor and THP, Inc. shall remain equal to the interests they held as of the Petition Date. The Hendricks own all of the Class 12 Interests.

(n) *Class 13: Intercompany Claims.*

Class 13 Intercompany Claims are Impaired. Holders of Class 13 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished.

### D. Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. The Debtors specifically reserve all rights, remedies, claims, defenses and Causes of Action.

### E. Allowed Claims, Distribution Rights and Objections to Claims

#### 1. *Allowance Requirement*

Only Holders of Allowed Claims are entitled to receive distributions under the Plan. An Allowed Administrative Claim is a Claim or any portion thereof that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become Allowed by failure to object pursuant to Section 8.05 of the Plan. An Allowed Claim is such Claim or any portion thereof (other than an Administrative Claim) of (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that at the time of the Effective Date the Debtors have not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

#### 2. *Date of Distribution*

All Distributions to Holders of Allowed Claims as of the Effective Date will be made as and when provided in the Plan and all subsequent distributions shall be paid as sufficient funds are available to make distributions as set forth in the Plan.

#### 3. *Making of Distributions*

Distributions to Holders of Allowed Claims will be made by the Debtors as provided in the Plan (a) to the last known addresses of such Holders, or (b) to the addresses set forth in any written notices of address changes delivered to the Debtors. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Debtors are notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest. Unless otherwise agreed by the Debtors, amounts in respect of undeliverable distributions made by the Debtors will be returned to the Debtors until such distributions are claimed.

All Property distributed on account of Claims must be claimed within the later of (a) one (1) year after the Effective Date or (b) one (1) year after such distribution is made to such Holder or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.05 of the Plan. All Unclaimed Property will be retained by and will vest in such funds being held for the benefit of distributions to Class 9 General Unsecured Creditors under the Plan. All full or partial payments made by the Debtors and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of Debtors pursuant to the Plan. Nothing contained in the Plan shall require the Debtors to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Debtors and any Claims filed in these cases. Pursuant to section 1143 of the Bankruptcy Code, all claims in respect of Unclaimed Property shall be deemed Disallowed under Section 5.06 of the Plan and the Holder of any Claim Disallowed under Section 5.06 of the Plan will be forever barred, expunged, estopped and enjoined from assertion in any manner against the Debtors or the Committee.

4. *Objection Procedures*

Unless otherwise ordered by the Court after notice and a hearing, under the Plan, the Debtors and the THP, Inc. Board shall have the exclusive right, on and after the Effective Date, to File objections to Claims (other than Claims specifically Allowed in the Plan) and shall serve a copy of each such objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than the latest of (a) 75 days after the Effective Date, (b) 75 days after the date on which any Claim is Filed, or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above. The foregoing deadlines may be extended by order of the Court. An objection to any Claim shall be deemed properly served on the Holder thereof if the Debtors and the Board effects service in any of the following manners: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004, (h) by first class mail, postage prepaid, on the signatory on the proof of claim or interest or other representative identified in the proof of claim or interest or any attachment thereto, or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

## F. Disposition of Executory Contracts and Unexpired Leases

1. *Contracts and Leases Deemed Rejected*

The Plan provides that all contracts and unexpired leases of the Debtors shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (b) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (c) is listed on the Schedule of Assumed Contracts attached to the Plan as Exhibit A, provided, however, that the Debtors shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Assumed Contracts or to delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant to the Plan or to add any executory contract or unexpired lease thereto, thus providing for its assumption and assignment pursuant to

the Plan. The assumption, assumption and assignment, and rejection of executory leases and unexpired contracts under this Plan shall be governed by the terms of the Plan and other orders of the Court.

2. *Cure with Respect to Assumed Contracts and Leases*

The cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Plan, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases, shall be governed by the terms and conditions of the Plan and other orders of the Court.

3. *Rejection Damages*

Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Article VI of the Plan must be filed with the Bankruptcy Court no later than the later of (a) twenty (20) days after the Effective Date, or (b) thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period shall be forever barred. The Debtors and the THP, Inc. Board shall have the right to object to any Claim arising out of the rejection of an executory contract or unexpired lease. Allowed Claims arising out of the rejection of an executory contract or unexpired lease shall be treated as a Class 9 General Unsecured Claim.

**G. Revesting of Assets; Release of Liens**

Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of each Debtors not conveyed pursuant to the terms of the Plan shall automatically vest in the Reorganized Debtors on the Effective Date.

**H. Post-Consummation Corporate Structure, Management and Operation and Implementation of Plan**

1. *The Contribution and Buildout of Northgate Phases IV and V.*

The Plan is premised in part on the buildout of the Northgate Phases IV and V Project which are not owned by the Debtors. Pursuant to a transfer and development agreement (the "TDA," a true copy of which is annexed to the Plan as Exhibit "B") among the Debtors, the Hendricks, individually, the entities that own Northgate Phases IV, V and VI, namely the Hills at Perkiomen LP ("HP") and Keystone Land Acquisition, Inc. ("KLA"), both owned by the Hendricks, and their lender and/or its affiliates, Newstream Real Estate, LLC, ("NSRE"), HP and KLA shall, by deed, on the Effective Date or on such later date as permitted or required under the TDA and pursuant to the Plan, transfer Northgate Phases IV and V and Northgate Phase VI to the Debtors, subject to all existing liens, claims and interests including those of NSRE on these phases. To the extent Lexon Insurance Co. bonded any of the Projects to be retained under the Plan, such bonds may not be transferred to any third party without the consent of Lexon Insurance Co. Pursuant to the Plan and in accordance with Bankruptcy Code section 1146, and the TDA also on the Effective Date or on such later date as permitted or required by the TDA,

the Debtors will then immediately transfer Northgate Phases IV and V and Northgate Phase VI to NSRE or its designee, free and clear of all liens, other encumbrances, Claims and Interests, subject only to the permitted exceptions set forth on Exhibit C to the TDA. Thereafter, in accordance with the TDA, the Debtors shall have no further rights or interests in Northgate Phase VI or in the proceeds thereof and the Phase VI new owner may develop or otherwise dispose of Northgate Phase VI in its sole and absolute discretion. Also pursuant to the TDA, THP, Inc. shall serve as general contractor for the completion of Northgate Phases IV and V and shall hire a site contractor to complete and post bonds securing completion of the site work and site contractor shall also complete the site work and receive a first priority security interest in certain lots as set forth in the TDA. All net profits from the sale of the homes at Northgate Phase IV and V shall be contributed to the Reorganized Debtors for distribution to creditors under Section 7.12 of the Plan. The transfer of Northgate Phase IV and V and the subsequent contribution of net profits from the sale of homes at Northgate Phase IV and V to the Reorganized Debtors by the Hendricks are in exchange for the Hendricks retaining all of their Interests in the Debtors and for the interests being granted in the new general partners and shall constitute the New Value Contribution and is derived from the cash flow projections attached to the Plan as Exhibit C which show a net cash flow of $8,603,526 to the Debtors' estates for distribution under the Plan. Finally, the TDA provides that the Debtors may exercise a purchase option for Northgate phases IV and V, and also that if certain conditions arise that prevent the Debtors from completing the buildout of these phases, they will revert back to NSRE or its designee.

2. *The Buildout of the Real Property Owned by the Debtors.*

The Plan is also premised on the buildout of a number of Projects, as follows: Barton Ridge Project, Biltmore Estates Project, Coddington View Project, Kingston Hill Project, the Northgate Phase I Project (subject to Court approval), the Northgate Phase IIA Project, and the Northgate Phases II, and III Project. Additionally, once the issues regarding certain preferential transfers are either resolved or disposed of by the Bankruptcy Court with respect to the adversary proceedings commenced against ProBuild East, LLC (Adv. Pro No. 11-00354-SR) regarding property located at Keen Road, East Vincent Township, Chester County, PA, and Broc Supply Company, Inc. (Adv. Pro. No. 11-00340-SR) regarding property located at 517 Fifth Avenue, Bristol Township, Bucks County, PA, these properties shall also be developed as part of the Plan, with the net proceeds distributed in accordance with Plan Section 7.12. To the extent Lexon Insurance Co. bonded any of the Projects to be retained under the Plan, such bonds may not be transferred to any third party without the consent of Lexon Insurance Co.

3. *Project Budgets.*

The Projects shall be built out in accordance with the Project Budgets which are comprised of the global net cash flow and summary and project disclosure summaries attached to the Plan as Exhibit C. The Project Budgets have been approved by the Committee and shall govern implementation of the Plan as set forth herein.

4. *No Substantive Consolidation and New General Partners.*

The Debtors and their Estates shall not be substantively consolidated. On or before the Effective Date, four Pennsylvania limited liability companies shall be formed which shall

become the new general partners of each reorganized LP Debtor except, for the GP Debtor, which shall continue as the general partner of THP, L.P. The Hendricks shall retain all their interests in the Reorganized Debtors and either they, or their designees, shall own all interests in the new general partners to be formed. The management of each Debtor entity and the new general partners shall be controlled by the Boards, and the overall management, oversight, completion and sale of the Projects shall be controlled by the THP, Inc. Board in accordance with the provisions of the Management Agreement.

5. *Abandoned Projects.*

The Debtors and the Committee have jointly determined that the following projects (the "Abandoned Projects") have no value to the Debtors' Estates: Arbor Court in Pennsburg Borough; Stoneacre Ridge (Ellis and Leidy) in New Hanover Township; Melbourne Hill In Lower Frederick Township; Ivywood in East Coventry Township; Newport Landing (Nagdev and Sandanato) in Bristol Township; Kingston Hill (Lester) in New Hanover Township; Normandie, in Upper Salford Township; the Fleet Maintenance Building in Lower Salford Township; certain remaining lots in Kingston Hill II in New Hanover Township; Whitfield Estates I, IIA, IIB, and III in Upper Macungie Township; Berwind II in Douglass Township; Edgehill in Upper Frederick Township; Westport Farm in Franconia Township, Kingston Hill III in New Hanover Township; Village at Wynstone in New Hanover Township (subject to the Debtors' developing the Wynstone Project (as defined in the Plan) upon Court approval of the settlement described in section 3.05 of the Plan), 1104 Berkley Drive, Pennsburg; Burbank Grove in Upper Providence Township; Kingston Hill Phase IV in New Hanover Township; Stoneacre Ridge (Brusch) in New Hanover Township; and Stoneacre Ridge – Trolley Line and Melbourne Hill Sewer Plant Property, and Lots 54 through 63 at Cliffside Manor Phase II in Bedminster Township. The Abandoned Projects shall be abandoned or turned over to the Miscellaneous Secured Party with a first priority lien on the Abandoned Property, or such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Miscellaneous Secured Claim, the Debtors and the Committee, as the case may be, including a sale pursuant to Section 363 of the Bankruptcy Code with such Miscellaneous Secured Party to bear the costs of such sale.

6. *The Board/Boards.*

In accordance with the Management Agreement, the Confirmation Order shall authorize the Debtors to take the necessary corporate action with respect to all Debtor-entities to reconstitute the existing board of directors of each Debtor and the new general partner of each Debtor limited partnership as provided by the provisions of the Management Agreement. As of the Effective Date, the board of each Debtor entity and the general partner of each Debtor limited partnership shall be, or changed so as to be, comprised of the same five (5) members as follows: Timothy P. Hendricks, W. Todd Hendricks, two Committee members, and one additional member as mutually agreed upon by each member. During the term of the Management Agreement: (a) if, Timothy P. Hendricks or W. Todd Hendricks is unable or unwilling to continue to serve on the Boards, the remaining Hendricks's board member shall have the exclusive right to appoint a successor to the Boards, or (b) if, either of the two Committee members become unable or unwilling to serve on the Boards, the remaining Committee board member shall have the exclusive right to appoint a successor to the Boards; the agreement being



2831671v5

that both the Hendricks and the Committee shall each have selected two members that are prepared to serve on the reconstituted Boards at all times during the term of this Agreement. Likewise, if the during the term of this Plan, the fifth independent member of the Boards is unable or unwilling to serve on the Boards, the Hendricks board members and the Committee board members shall jointly select a new fifth independent member to the Boards. The Hendricks, directly or indirectly, may retain all of their interests in a voting trust. The Boards may retain professionals to carry out their duties.

7. *Management Agreement.*

Pursuant to a Management Agreement to be entered into upon Plan confirmation, by and among the Debtors, Timothy Hendricks, Todd Hendricks, and the Committee, and the THP, Inc. Board shall have the responsibility for the management and oversight of the completion and sale of all the Projects. A copy of the Management Agreement is attached to the Plan as Exhibit D. The THP Inc. Board in its business judgment, prior to completion of any Project, may sell a Project if it is determined that the distribution to Class 9 General Unsecured Creditors will be maximized by such sale.

8. *Salary.*

The Project Budgets provide that after the Effective Date, W. Todd Hendricks and Timothy P. Hendricks will continue to be paid the same salary that was approved by the Committee at the commencement of Chapter 11 Cases, which is $130,000 each annually. The Management Agreement also includes a management fee (the "Management Fee") payable to the Hendricks, consisting of: (a) an annual bonus to the Hendricks if the sales projections are met and/or if the actual expenses are less than the projected expenses for that year (in a formula to be determined by the THP, Inc. Board post-confirmation); and (b) a portion of the annual net profit of each project shall be paid annually as performance bonuses to the Hendricks if certain targets (to be determined post-confirmation by the THP, Inc. Board) for (a) distributions to creditors and/or (b) sales of completed homes are met.

9. *Reconstitution of the THP, Inc. Board.*

Subject to the provisions of the Management Agreement, if annual sales or expense targets of the Project Budgets are not met as determined by the THP, Inc. Board, the THP Inc. Board may replace the Hendricks as board members and the other individual Boards may do the same, subject to paying the Hendricks all outstanding payments due them including, any accrued salary and Management Fee, and any other expenses due that have accrued but not been paid as of the termination date, after which the Hendricks shall not be entitled to any further payments.

10. *Other Projects.*

So long as THP, Inc. is performing services for the Debtor entities and is in compliance with the Budgets and sales targets, it may take on other work or projects unrelated to the Debtors. Such projects may not compete geographically with the Projects and may not affiliate or market with any Projects.

11. *Powers of the THP, Inc. Board.*

As provided by the provisions of the Management Agreement, the THP, Inc. Board shall administer the Plan and shall be responsible for, among other things, performing all acts of the Debtors necessary to carry out the Plan. From and after the Effective Date and continuing through the date of entry of a Final Decree, the THP, Inc. Board shall: (a) possess the rights of a party in interests pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court; (b) have the authority to act on behalf of the Debtors in all adversary proceedings and contested matters pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; and (c) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate, all without prior notice to or approval of the Bankruptcy Court. Professionals and personnel retained or employed by the THP, Inc. Board need not be disinterested as that term is defined in the Bankruptcy Code.

12. *Disbursement of Proceeds from the Projects.*

As provided by Section 5.02 of the Management Agreement, THP, Inc. with the services of any of the third party subcontractors and vendors selected by its Board shall complete the Barton Ridge Project, Biltmore Estate Project, Coddington View Project, Kingston Hill Project, Northgate Phase I Project (upon Court approval), Northgate Phases IIA, II and III Project, and the Northgate Phase IV and V Project. The proceeds from these Projects shall be used to pay the following amounts in the following order of priority: (i) first, to the extent applicable, to pay all amounts due in accordance with the Court approved settlement agreements referenced in Classes 2 and 4 of the Plan; (ii) second, to pay the Project Specific Expenses and General Overhead identified in the Project Budgets; (iii) third, the next six million dollars ($6,000,000.00) of proceeds generated, (a) Seventy Five per cent (75%) to pay Administrative Claims, and General Unsecured Claims, (b) fifteen per cent (15%) to THP, L.P. and (c) ten percent (10%) to the Hendricks as the Management Fee; (iv) fourth, the next four million dollars ($4,000,000.00) of proceeds generated, (a) sixty per cent (60%) to pay Administrative Claims and General Unsecured Claims, (b) thirty percent (30%) to THP, L.P., and (c) ten per cent (10%) to the Hendricks as the Management Fee; and (v) fifth, the remainder of proceeds generated, (a) forty per cent (40%) to pay Administrative Claims and General Unsecured Claims and (b) fifty per cent (50%) to THP, L.P. and ten percent (10%) to the Hendricks as the Management Fee. In connection with the agreements and Plan treatment set forth in section 3.05 above, and pursuant to agreement between TE and the Debtors (subject to court approval) the Reorganized Debtors are to develop the Wynstone Project in New Hanover Township. The Debtors and New Hanover Township disagree as to the status of the existing permits and approvals with respect to the Wynstone Project. Pursuant to the Management Agreement, all gross proceeds generated from the Wynstone Project shall be divided fifty per cent (50%) to pay Administrative Claims and General Unsecured Claims and forty per cent (40%) to THP, L.P. and ten percent (10%) to the Hendricks as the Management Fee. It is understood and agreed that the proceeds distributed

under sub-sections 5.02(iii)(a), 5.02(iv)(a), 5.02(v)(a) of the Management Agreement and any additional projects added as provided by section 5.02 of the Management Agreement, shall be paid first, on a pro-rata basis, to the holders of Allowed Administrative Claims until the Allowed Administrative Claims are paid in full and then, on a pro-rata basis to holders of Allowed General Unsecured Claims.

13. *Project Budgets.*

Each Project shall have a Project Budget. As provided by the Management Agreement, THP, Inc. shall continue to act as the common paymaster for all the Debtors and may maintain one concentration bank account into which proceeds from all Projects will be deposited and from which all Project Specific Expenses, General Overhead expenses including, vendor invoices, overhead expenses, costs for labor and materials, and transfers for gross payroll shall be paid; provided, however THP, Inc. shall maintain separate books and records for each Debtor and shall account for each Debtor's deposits into, and disbursements from, the concentration bank account. In addition, THP, Inc. may also maintain one payroll account from which gross payroll shall be paid; provided, however THP, Inc. shall allocate the payroll expenses among each Debtor, as may be applicable. The THP, Inc. Board shall retain the right to modify the common paymaster business model including, the single concentration bank account and single payroll account as it deems appropriate in its sole business judgment, in order, to allow THP, Inc. to operate in the most efficient and cost effective manner. The payment to THP, Inc. for overhead under the Management Agreement at each closing shall not exceed twenty percent (20%) of the net sales price (gross sale price less closing costs, commissions, real estate taxes and promotions) of each home and shall be capped at $17,000.00 per condominium unit and $20,000.00 per single family home; provided, however, the maximum General Overhead for each month shall not exceed $200,000 and the THP, Inc. Board shall retain the right to increase this amount as it deems appropriate in its sole business judgment. Additionally, the Project Specific Expenses of each of the Projects shall include a pro-ration of funds up to $500,000 in the aggregate as determined to be necessary by the THP, Inc. Board to address (in no particular order of priority) (a) warranty, maintenance work on homes sold prior to the petition date, including driveway toppings, and other customer service items in any non-dedicated Project; and (b) mechanics liens on homes that were conveyed by any of the Debtors to a buyer prior to the Petition Date.

14. *Completion of Projects and Option to Purchase Projects.*

Upon completion (or if applicable, the abandonment of any portion) of the Projects and the disbursements of the funds from these Projects in accordance with the Management Agreement and the Plan, the Debtors and the Hendricks will be released and discharged of any and all further obligations under the Plan and the Management Agreement and the Management Agreement shall terminate, all the board members appointed by the Committee shall resign from all the Boards and full control of the Boards will be relinquished to the Hendricks. At anytime prior to the completion of all the Projects, Hendricks shall have the option to purchase the Projects by paying an amount equal to the sale price determined by the THP, Inc. Board for the Projects less the aggregate amount of all prior distributions paid under the Management Agreement and Plan (the "Purchase Price"). Subject to the Purchase Price being paid and distributed under the provisions of the Management Agreement and Plan, the Debtors and the Hendricks will be released and discharged of any and all further obligations under the Plan and

the Management Agreement and the Management Agreement shall terminate, all the board members appointed by the Committee shall resign from all the Boards and full control of the Boards will be relinquished to the Hendricks.

15. *The Release by the Debtors, the Estates and the Committee of Hendricks and the Affiliated Entities.*

Upon the Effective Date of the Plan, each Debtor, each Estate, and the Committee for itself and its past, present and future successors and assigns (collectively, the "Releasors") hereby release, acquit and forever discharge each of the Hendricks and his past, present and future agents, heirs, successors and assigns and each of the Affiliated Entities and each of their past, present and future agents, heirs, successors, assigns, officers, directors, and members (collectively, the "Hendricks Released Parties") from and of any and all Causes of Action, Avoidance Actions, damages, suits, debts, dues, accounts, bonds, agreements, contracts, covenants, promises, judgments, costs, attorneys' fees, claims and demands whatsoever, of every nature, kind and description, known or unknown, arising from the beginning of the world until the date of such release, which the Releasors had, now have or claim to have against the Hendricks Released Parties, or any of them, for, upon or by reason of any matter, act or thing whatsoever. In addition, within seven (7) days after the Effective Date, the Debtors, the Estates and the Committee shall take whatever action is necessary to cause all Causes of Action and Avoidance Actions previously filed against the Hendricks Release Parties to be dismissed with prejudice.

16. *Corporate Action.*

The entry of the Confirmation Order shall constitute authorization for the Debtors to take or to cause to be taken all limited liability company actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, the execution and delivery of all documents in connection therewith. Subject to the terms and conditions of the Plan, all such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors. On the Effective Date, the appropriate officers and managers of the Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan in the name and on behalf of the Debtors.

17. *Income Taxes.*

Income Taxes and/or tax savings generated by the operations of the Debtors shall be allocated to the Hendricks. This is subject to further review by tax professionals on the structure of the transaction and as deemed appropriate by the Board.

18. *Revesting of Assets.*

Except as otherwise expressly provided in the Plan (and subject to Plan Section 10.09), pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of each Debtor shall automatically vest in the Debtors, free and clear of

all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished except as otherwise provided in the Plan.

### I. Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

#### 1. *Requirements for Confirmation of the Plan*

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed (a) the identity and affiliations of (i) any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the successor to the Debtors under the Plan, (ii) any affiliate of the Debtors participating in a joint plan with the Debtors or (iii) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individuals) is consistent with the interests of Claim and Interest Holders and with public policy), and (b) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. See Section X.D.

- The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the Holder of any such Claim has agreed to a different treatment.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors and the Committee believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

Further, even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Debtors must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the plan "not discriminate unfairly" and be "fair and equitable" with respect to such class. The Debtors do not anticipate that any Class of Claims will vote to reject the Plan. However, in the event any Class votes to reject the Plan, the Debtors and the Committee believe they will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting class.

2. *Conditions to Confirmation Date and Effective Date*

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part by the Debtors and the Committee, without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

The conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) the form and substance of the Confirmation Order, as well as any amendments to the Plan, shall have been approved by the Debtors; (b) the Confirmation Order shall authorize the transactions contemplated by the Plan; and (c) the Confirmation Order shall provide that the provisions of the Confirmation Order are non-severable and mutually dependent.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Confirmation

Order shall have been entered and shall not be stayed by order of a court of competent jurisdiction; (b) all documents and agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered by the parties thereto; (c) the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors and to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents created, amended, supplemented, modified or adopted in connection with the Plan; (d) all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained; and (e) no order of a court of competent jurisdiction shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan.

### J. Releases, Discharge, Injunctions, Exculpation and Indemnification[4]

#### 1. *Releases by Debtors in Favor of Third Parties*

The Plan provides for certain releases to be granted by the Debtors on and as of the Effective Date. Specifically, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; provided, however, that no Releasee shall be released or discharged from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors.

The Debtors do not believe that there are any valid claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that they hold against any of the persons to be released pursuant to this provision. The Debtors reasonably believe that the acceptance of the Plan by these Classes is sufficient consideration for the release of such claims and causes of action.

As to the Debtors' directors, officers and employees, the consideration for such release is the service rendered by such individuals during the pendency of the Chapter 11 Cases and the

---

[4] It should be noted that the release, discharge injunctive and indemnification provisions of the plan shall be subject to any and all Final Orders entered in the Bankruptcy Cases that have fixed certain parties rights. All such Final Orders and/or any agreements that they reference or approve shall remain unchanged under the Plan, unless otherwise specifically addressed in the Plan.

need for their continued dedication after the Effective Date to fully consummate a successful reorganization. The Debtors will be hampered in their consummation efforts if their directors, officers and employees are subject to claims and potential litigation that will distract their attention from operational and other business matters.

2. *Releases by Creditors of Claims Against Third Parties*

In furtherance of the release provisions of the Plan, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of the Persons set forth below under the Plan and, if applicable, the Cash, securities, contracts, releases and other agreements or documents to be delivered in connection with the Plan, each Holder of a Claim or Interest and any Affiliate of any such Holder (as well as any trustee or agent on behalf of each such Holder shall be deemed to have forever waived, released and discharged (i) the Debtors, (ii) and (iii) the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan. The releases set forth in this paragraph are effective only as to those creditors who cast a ballot voting to accept the Plan. Creditors who cast a vote to reject the Plan or who do not cast a vote at all are not bound by these release provisions.

3. *Discharge and Discharge Injunction*

Confirmation of the Plan affects a discharge of all Claims against the Debtors. To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), and except as otherwise provided in the Plan or in the Confirmation Order all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims. Upon the Effective Date, and except as expressly contemplated in the Plan, the Debtors, and each of them, shall (a) be deemed discharged and released under section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, debts (as such term is defined in section 101(12) of the Bankruptcy Code), Liens, security interests, and encumbrances of and against all Property of the respective Estates, or the Debtors that arose prior to the Effective Date, including without limitation, all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) such Claim has been Allowed pursuant to section 502 of the Bankruptcy Code, or (ii) the Holder of such Claim has voted to accept the Plan and (b) terminate all Interests. Further, as of the Effective Date, all entities, including, without limitation, all Holders of Claims or Interests, shall be barred and enjoined from asserting against the Debtors or the Committee, their successors or their property any other or further Claims, debts, rights, Causes of Action, liabilities or Interests relating to the

Debtors based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date, except for those obligations expressly created by, or reserved in, the Plan. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge and termination shall void any judgment obtained against the Debtors or the Committee, to the extent that such judgment relates to a discharged Claim or terminated Interest.

In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security Holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following actions against the Debtors or their property, or the Committee on account of any such discharged Claims, debts or liabilities or such terminated Interests or rights: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or enforcing in any manner directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors or the Committee; and (e) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

4. *Exculpation Relating to Chapter 11 Cases*

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Cases. Specifically, the Plan provides that, none of the Debtors, the Committee or Exculpated Persons shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in good faith in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all prepetition activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases, provided, however, that the exculpation will not apply to any act of gross negligence willful misconduct, criminal conduct or acts of intentional fraud.

### K. Preservation of Rights of Action

Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by the Plan, nothing, including, but not limited to, the failure of the Debtors to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors with respect to any Claim or Interest, including, but not limited to, all rights of the Debtors to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the holder thereof. Additionally, the Debtors retain the right to pursue and/or dismiss the Avoidance Actions or any other adversary proceeding pending at the time of Plan confirmation; provided, however, if the Class 9 General Unsecured Claims, votes to accept this Plan and this Plan is confirmed by the Court, then, upon the occurrence of the Effective Date of the Plan, the Debtors, their Estates and the THP, Inc. Board may abandon and choose not to pursue some or all of the Avoidance Actions.

### L. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

- classify, re-classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim or Interest pursuant to the Plan;

- grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

- determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

- ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

- construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including,

without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

- determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

- hear any application of the Debtors or the Committee's to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and the Plan or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

- determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

- enter a final decree closing the Chapter 11 Cases;

- determine and resolve any and all controversies relating to the rights and obligations of the Debtors and the Committee in connection with the Chapter 11 Cases;

- allow, disallow, determine, liquidate, reduce, re-classify or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

- permit the Debtors to recover all assets of the Debtors and Property of their respective Estates, wherever located;

- hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Debtors thereafter, including Avoidance Actions, proceedings with respect to the rights of the Debtors to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Debtors may have; and

- hear any other matter not inconsistent with the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above, nothing in the Plan shall prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

### M. Amendment, Alteration and Revocation of Plan

The Debtors and/or the Committee may alter, amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors and the Committee may, so long as the treatment of Holders

of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

The Debtors and the Committee reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan. If the Plan is withdrawn or if the Confirmation Date does not occur, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, the Committee, or any other Person or to prejudice in any manner the rights of the Debtors, the Committee, or any Person in any further proceedings involving the Debtors.

### N. Plan Implementation Documents

The documents necessary to implement the Plan include the following: Budgets, Management Agreement and the Transfer and Development Agreement.

## VII. CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Class 9 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A. General Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors. See Section VI.D of this Disclosure Statement entitled "Classification and Treatment of Claims and Interests" for a description of the treatments of each class of Claims and Interests. Certain Claims and Interests receive no distributions pursuant to the Plan.

### B. Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, (see Section X.A), and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Section X.D. Although the Debtors and the Committee believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix B for a liquidation analysis of the Debtors.

### C. Claims Estimations

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

### D. Conditions Precedent to Consummation

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### E. Inherent Uncertainty of Financial Projections

The Budgets annexed as Exhibit C to the Plan have been prepared by management of the Debtors and cover the projected operations of the successor to the Debtors through fiscal year 2011. These Budgets are based on numerous assumptions that are an integral part of the Budgets, including confirmation and consummation of the Plan in accordance with its terms, realization of the operating strategy of the Debtors, industry performance, no material adverse changes in applicable legislation or regulations, or the administration thereof, or regulations, exchange rates or generally accepted accounting principles, general business and economic conditions, competition, retention of key management and other key employees, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters. The projections set forth in the Budgets are based on the Debtors' performance while in chapter 11 over the past two years. The Budgets annexed to the Plan at Exhibit C take into account the costs to construct homes, the estimated sales prices at levels current in this market and are based on selling 100 homes per year. All of these factors take into account the current market conditions and the Debtors' performance in the market during their bankruptcy cases. Moreover, these projections are based upon a "bottom" market as is currently the case in the housing industry in general. Accordingly, if anything, they should increase in the future as markets improve.

Although the Budgets are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Budgets are subject to business, economic and competitive uncertainties and contingencies. Accordingly, the Budgets are only the Debtors' educated, good faith estimates and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Budgets will not be realized and that actual results will vary from the Budgets, which variations may be material and may increase over time. The projected financial information contained herein should not be regarded as a guaranty by the Debtors or any other Person that the Budgets

can or will be achieved. However, the Debtors believe that the Budgets are credible and that there is a reasonable likelihood that the results set forth in the Budgets can be achieved.

### F. Certain Tax Considerations

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Neither the Debtors nor the Committee are opining as to any of these implications and parties in interest are urged to consult their counsel regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan.

## VIII. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A. Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors, with comment from the Committee, have prepared and relied upon the Budgets with respect to the Debtors' business post-confirmation as enabling them to consummate the Plan.

The Plan will be funded by a waterfall distribution of the proceeds from the build out of the Projects. The Debtors believe that the Project Budgets attached to the Plan are reasonable and reflect the value of the Debtors' assets that are likely to be realized for the benefit of creditors and no further financial restructuring will be necessary. The Debtors should have sufficient cash to fund their activities contemplated by the Plan. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Budgets and Projections were developed by THP, Inc.'s management. Collectively, management possesses decades of experience in the Debtors' industry, and the Project Budgets rely, in part, on the judgment developed through that experience. In addition, they are based on management's knowledge of the Debtors' businesses and customers, and by reference to publicly available projections for industry revenue growth.

The Project Budgets, however, are based upon numerous assumptions that are an integral part of the Project Budgets, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, industry performance, no material adverse changes in applicable legislation or regulations, or the administration thereof, generally accepted accounting principles, general business and economic conditions, competition, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters. To the extent that the assumptions inherent in the Project Budgets are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtors, the assumptions and estimates underlying the Project Budgets are subject to business, economic and competitive uncertainties and contingencies. Accordingly, the Project Budgets are

only an educated, good faith estimate and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Project Budgets will not be realized and that actual results will vary from the Project Budgets, which variations may be material and may be adverse. The Project Budgets should therefore not be regarded as a guaranty by the Debtors or any other Person that the results set forth in the Project Budgets will be achieved. The Project Budgets were prepared by the Debtors, and not by any of their creditors, and the Debtors' creditors make no representations concerning the reasonableness of the Project Budgets. In light of the foregoing, readers are cautioned not to place undue reliance on the Project Budgets. The projected financial information contained in the Project Budgets should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Project Budgets can or will be achieved. The Project Budgets should be read together with the assumptions set forth in the Budgets and information in Article VII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Project Budgets. The Debtors, however, believe that the Project Budgets are credible and that there is a reasonable likelihood that the results set forth in the Project Budgets can be achieved.

The Debtors do not intend to update or otherwise revise the Project Budgets, including any revisions to reflect events or circumstances existing or arising after the date of the Project Budgets or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Project Budgets to reflect changes in general economic or industry conditions.

**B. Acceptance of the Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in Classes 9 will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

**C. Best Interests Test**

As noted above even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtors in their chapter 11 cases that are allowed in the chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**D. Liquidation Analysis**

For purposes of the best interests test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as ***Appendix B*** ***(the "Liquidation Analysis"), which concludes that in the event of a liquidation of the Debtors' assets under chapter 7, the aggregate value to be realized by the Debtors' estates would be approximately $15,201,253.00. In the event this occurs, all such value would be distributed to either each pre-petition and/or DIP Lender in repayment of either their claims (in the estimated net amount of $83,224,049.17), and no other Holder of a Claim, including unpaid Administrative Claims incurred during the administration of the Debtors' Chapter 11 Cases (other than the DIP Financing Facility), would receive a distribution.*** These conclusions are premised upon the assumptions set forth in the Liquidation Analysis which the Debtors believe are reasonable.

The Debtors and the Committee believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a sale of assets and/or business units,

as well as the amount of Claims that would ultimately become Allowed Claims. The estimates as to asset values are based upon: (1) comparable properties in proximity to those of the Debtors; and (2) with respect to notes receivable, the potential collectability given numerous factors such as age and the financial condition of the obligors. Claims estimates are based solely upon the Debtors' books and records. Except as specifically stated therein, no order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

### E. Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation

It is impossible to determine with certainty the value each Holder of a Claim will receive under the Plan as a percentage of any Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors band the Committee believe that the financial disclosures and projections contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

### F. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In the event any Class of Impaired Claims rejects the Plan, the Debtors and the Committee may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors and the Committee believe the Plan does not discriminate unfairly with respect to the Claims and Interests identified in the Plan.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code.

# IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims in Class 9 the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## A. Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors and the Committee believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

## B. Liquidation Under Chapter 7

If no plan is confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. However, the Debtors and the Committee believe that the Prepetition Secured Lenders would assert that they held security interests in substantially all assets to be liquidated, likely resulting in nothing to distribute to any other Class of Claims or Interests.

The Debtors believe that a liquidation under chapter 7 would cause a substantial diminution in the Debtors' Estates given the substantial premium in the enterprise value of their businesses over the liquidation value of their assets, and the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees. The assets available for distribution to Creditors would be

reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, conversion to a chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most chapter 7 trustees are disinclined to continue operations.

## X. THE SOLICITATION; VOTING PROCEDURES

### A. Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### B. Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims in Class 9 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1 through 8 and Classes 10 and 12 are deemed to have accepted the Plan and Classes 11 and 13 are deemed to have rejected the Plan and, therefore, none of the Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

### C. Solicitation Order

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation

Order through the Bankruptcy Court's electronic case filing system, or by making written request upon the Debtors' counsel.

### D. Waivers of Defects, Irregularities, Etc.

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Debtors' counsel prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to seek rejection of any and all ballots not in proper form. The Debtors further reserve the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

### E. Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to Debtors' counsel at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the Voting Agent in a timely manner via regular mail or overnight courier as follows: Montgomery, McCracken, Walker & Rhoads, LLP, 123 South Broad Street, 24th floor, Philadelphia, PA 19109, Attn.: Joseph O'Neil, Jr., Esquire. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by Debtors' counsel will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to Debtors' counsel prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

### F. Voting Rights of Disputed Claimants

Holders of Claims in Class 9 whose Claims are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Distribution Record Date or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim are

not permitted to vote on the Plan. (collectively, the "Disputed Claims"). Creditors holding Claims in Classes 1 through 8, and 10 and 13 who believe their Claims have been erroneously classified as well as Disputed Claims, pursuant to the procedures outlined in the Solicitation Order, may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed and served upon the Debtors' counsel no later than 5:00 p.m. (Eastern time) on the fourteenth (14th) day after the later of (i) service of the Debtors' Notice Non-Voting Status under the Plan; (ii) service of Notice of Entry of the Order Approving the Debtors' Disclosure Statement; or (iii) the date of service of an objection, if any, to a Claim. The ballot of any creditor filing such a motion, will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing prior to the Voting Deadline. Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan. Nothing herein affects the Debtors' right to object to any Proof of Claim after the Distribution Record Date. With respect to any such objection, the Debtors may request that any vote cast by the Holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met.

### G. Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact following:

Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109
Phone: (215) 772-1500
Fax: (215) 772-7620
Attn.: Joseph O'Neil, Jr., Esquire
Email: joneil@mmwr.com

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors and the Committee believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors and the Committee urge all Holders of Claims in Class 9 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before January 13, 2012, at 5:00 p.m. prevailing Eastern time.

Dated: December 8, 2011

**TH PROPERTIES, L.P.**

By: *<u>/s/ Timothy P. Hendricks</u>*
Name: Timothy P. Hendricks
Title: Member

**T.H. PROPERTIES OF NEW JERSEY, L.P.**

By: *<u>/s/ Timothy P. Hendricks</u>*
Name: Timothy P. Hendricks
Title: Member

**NORTHGATE DEVELOPMENT COMPANY, LP,**

By: *<u>/s/ Timothy P. Hendricks</u>*
Name: Timothy P. Hendricks
Title: Member

**MORGAN HILL DRIVE, LP,**

By: *<u>/s/ Timothy P. Hendricks</u>*
Name: Timothy P. Hendricks
Title: Member

**TH PROPERTIES, INC.**

By: *<u>/s/ Timothy P. Hendricks</u>*
Name: Timothy P. Hendricks
Title: Member

**TH PROPERTIES, LLC**

By: *<u>/s/ Timothy P. Hendricks</u>*
Name: Timothy P. Hendricks
Title: Member

**SWAMP PIKE LP**

By: _/s/ Timothy P. Hendricks_
Name: Timothy P. Hendricks
Title: Member

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _/s/ Steven Nelson_
Company: Reading Materials, Inc.

*Chairperson of the Committee*