# EXHIBIT A –
# LIST OF EXECUTORY CONTRACTS TO BE ASSUMED

**TH PROPERTIES, LP AND RELATED ENTITIES**
**EXECUTORY CONTRACTS EXHIBIT**

| Project | Phase | Agreement | Party | Date Signed |
|---|---|---|---|---|
| Barton Ridge | | Winslow Township | Mr. Joseph Gallagher, Administrator<br>Winslow Township<br>125 South Route 73<br>Braddack, N.J. 18073 | |
| Barton Ridge | | Water - Winslow Township Municipal Authority | Mr. Joseph Gallagher, Administrator<br>Winslow Township<br>125 South Route 73<br>Braddack, N.J. 18073 | 3/22/05 |
| Barton Ridge | | Sewer - Winslow Township Municipal Authority | Mr. Joseph Gallagher, Administrator<br>Winslow Township<br>125 South Route 73<br>Braddack, N.J. 18073 | |
| Barton Ridge | | Cable | Comcast<br>Mr. Vincent Dicks<br>1846 Northwest Blvd.<br>Vineland, N.J. 08360 | 3/24/06 |
| Barton Ridge | | Electric | Ms. Christine Calabria<br>Atlantic City Electric/ Connectiv<br>295 North Grove Street<br>Berlin, N.J. 08009 | 3/27/06 |
| Barton Ridge | | Gas | Ms. Kathleen Clark<br>South Jersey Gas<br>142 South Main Street<br>Glassboro, NJ 08028 | 1/4/06 |
| Barton Ridge | | Telephone | Mr. Joseph Lochonick<br>Verizon<br>10 Tansboro Road, 2nd Floor<br>Berlin, NJ 08009 | 2/27/06 |
| Biltmore | | Biltmore Proprietary - Community Association | 345 Main Street, Harlesyville, PA 19438 | |
| Biltmore | | Biltmore Condos - Community Association | 345 Main Street, Harlesyville, PA 19438 | |
| Biltmore | | Agreement of Sale | Accent on Beaute, LLC, 2538 Quail Run, Lansdale, PA 19446 | |
| Biltmore Estates | | Land Development and Financial Security Agreement for Biltmore Estates | Theodore R. Locker, Jr.<br>Township Manager<br>Skippack Township<br>4089 Heckler Road<br>Box 164<br>Skippack, PA 19474 | 3/21/07 |
| Biltmore Estates | | Land Development and Financial Security Agreement for Biltmore Estates - Live/Work Units | Theodore R. Locker, Jr.<br>Township Manager<br>Skippack Township<br>4089 Heckler Road<br>Box 164<br>Skippack, PA 19474 | 2/20/08 |
| Biltmore Estates | | Main Extension Agreement No.. 1119 | Mr. Anthony J. Belitto, Jr. P.E.<br>Executive Director<br>North Penn Water Authority<br>P.O. Box 1659<br>300 Forth Foot Road<br>Lansdale, PA 19446 and<br>Mr. Wesley E. Carver, Jr.,VP<br>Fleet National Bank | 4/19/07 |

| Project | Phase | Agreement | Party | Date Signed |
|---|---|---|---|---|
| Biltmore Estates | | Financial Security Agreement | Mr. Anthony J. Belitto, Jr. P.E.<br>Executive Director<br>North Penn Water Authority<br>P.O. Box 1659<br>300 Forth Foot Road<br>Lansdale, PA 19446 and<br>Mr. Wesley E. Carver, Jr.,VP<br>Fleet National Bank | 4/24/07 |
| Biltmore Estates | | Agreement to Provide for the Maintenance of Ashland Drive | Theodore R. Locker, Jr.<br>Township Manager<br>Skippack Township<br>4089 Heckler Road<br>Box 164<br>Skippack, PA 19474 | 3/21/07 |
| Biltmore Estates | | Agreement to Provide for the Maintenance of Open Space "G" | Theodore R. Locker, Jr.<br>Township Manager<br>Skippack Township<br>4089 Heckler Road<br>Box 164<br>Skippack, PA 19474 | 3/21/07 |
| Biltmore Estates | | Agreement to Provide for the Maintenance of Open Space "O" and Open Space "G" | Theodore R. Locker, Jr.<br>Township Manager<br>Skippack Township<br>4089 Heckler Road<br>Box 164<br>Skippack, PA 19474 | 2/20/08 |
| Biltmore Estates | | Cable | Peg Daniels<br>Comcast Communications<br>1 Apollo Road<br>Plymouth Meeting, PA 19462 | 3/23/05 |
| Biltmore Estates | | Lower Perkiomen Valley Regional Sewer Authority | Barbara Ann Cepko<br>Lower Perkiomen Valley Regional Sewer Authority<br>101 Station Avenue<br>P.O. Box 279<br>Oaks, PA 19456 | 5/3/06 |
| Biltmore Estates | | PECO Energy Company, Agreement for Installation of natural Gas Facilities and Reservation of Capacity | Dorothy Pulcher<br>PECO Energy Company<br>Plymouth Service Building<br>680 Ridge Pike<br>Plymouth Meeting, PA 19462 | 2/14/08 |
| Biltmore Estates | | Building Entrance Facility & MDU Grant | Laura B. Yost<br>Verizon Pennsylvania, Inc.<br>Right of Way Department<br>1350 Welsh Road<br>North Wales, PA 19454 | 9/28/07 |
| Cliffside Manor | | Bedminster Municipal Authority, Sanitary Sewer and Water Development/Construction Agreement, Cliffside Manor Phase I | Ms, Dawn Cook<br>Land Use Manager, Municipal Authority & Planning Commission Administer, Zoning Officer<br>Bedminster Municipal Authority<br>3112 Bedminster Road<br>P.O. Box 92<br>Bedminster, PA 18910 | 10/21/04 |

| Project | Phase | Agreement | Party | Date Signed |
|---|---|---|---|---|
| **Cliffside Manor** | | Bedminster Township, Development Agreement (Cliffside Manor - Phase III) | Mr. John Terry<br>Township Manager<br>Township of Bedminster<br>3112 Bedminster Road<br>P.O. Box 92<br>Bedminster, PA 18910 | 7/8/08 |
| **Cliffside Manor** | | Right of Way Agreement | PECO / Comcast / Verizon | 5/3/05 |
| **Coddington** | | Coddington - Community Association | 345 Main Street, Harlesyville, PA 19438 | |
| **Coddington** | | Agreement of Sale | David Walsh, 138 West Street, Pottstown, PA 19464 | |
| **Normandie** | | Treatment Plant Agreement | Shelly Square, L.P. 528 Main Street<br>Suite 200<br>Harleysville, Pa. 19438 | 6/29/06 |
| **Northgate** | | Northgate Master - Community Association | 345 Main Street, Harlesyville, PA 19438 | |
| **Northgate** | | Northgate Towns Ph II - Community Association | 345 Main Street, Harlesyville, PA 19438 | |
| **Northgate** | | Agreement of Sale | Jody Schreck, 64 Arbour Court, Jeffersonville, PA 19403 | |
| **Northgate** | | Agreement of Sale | Alessandro & Lorel Toscani, 9943 Bridle Road, Philadelphia, PA 19115 | |
| **Northgate** | | Agreement of Sale | Erica Breiner, 2909 Truman Drive, Hatfield, PA 19440 | |
| **Northgate** | | Grant of Pertetual ROA, Ingress, Egress and Sanitary Sewer & Utilities Tap-in Easement | Upper Perkiomen School District<br>2229 E. Buck Road<br>Pennsburg, PA 18073 | N/A |
| **Northgate** | | Sanitary Sewer Easement Agreement | Harold M. QuinQue, President<br>Upper Perkiomen School District<br>201 West Fifth Street<br>Greenville, PA 18041 | 2/8/07 |
| **Northgate** | | PPL Encroachment Agreement | Paul A. Levash<br>Supervisor, ROW<br>PPL Electric Utilities Corp | 8/1/06 |
| **Northgate** | | PPL Encroachment Agreement | Paul A. Levash<br>Supervisor, ROW<br>PPL Electric Utilities Corp | 8/1/06 |
| **Northgate** | | Northgate Preliminary Plan Approval Resolution No. 2006-10 | Willard Kershner, Chairman<br>Upper Hanover Township BOS<br>1704 Pillsbury Road<br>P.O. Box 27<br>East Greenville, PA 18041 | 3/14/06 |
| **Northgate** | | HOP Condition Statement (Appln No. 225428) | Stanley W. Seitzinger, Jr.<br>Township Manager<br>Upper Hanover Township<br>1704 Pillsbury Road<br>P.O. Box 27<br>East Greenville, PA 18041 | 11/13/07 |
| **Northgate** | Phase 4 | Development Agreement | Upper Hanover Township<br>1704 Pillsbury Road<br>P.O. Box 27<br>East Greenville, PA 18041 | |
| **Northgate** | Phase 4 | Sewer Agreement | Upper Hanover Authority<br>1704 Pillsbury Road<br>P.O. Box 205<br>East Greenville, PA 18041 | |

| Project | Phase | Agreement | Party | Date Signed |
|---|---|---|---|---|
| Northgate | Phase 4 | Water Agreement | Upper Hanover Authority<br>1704 Pillsbury Road<br>P.O. Box 205<br>East Greenville, PA 18041 | |
| Northgate | Ott Road | Ott Road Electric ROW Agreement WR 323338 | Earl Burnside<br>PPL Electric Utilities<br>2930 State Road<br>Telford, PA 18969 | 12/22/06 |
| Northgate | Ott Road | Ott Road Electric ROW Agreement WR 323338 | PPL Electric Utilities<br>2930 State Road<br>Telford, PA 18969 | 5/4/07 |
| Northgate | Phase 1B | Singles Electric ROW Agreement WR 323338-310599 | Earl Burnside<br>PPL Electric Utilities<br>2930 State Road<br>Telford, PA 18969 | 12/22/06 |
| Northgate | Phase 1A | Towns Electric ROW Agreement WR 259126 | Earl Burnside<br>PPL Electric Utilities<br>2930 State Road<br>Telford, PA 18969 | 12/22/06 |
| Northgate | Ph 1C, 2 & 3 | Development Agreement for the Northgate Subdivision Phases 1C, 2 and 3 | Stanley W. Seitzinger, Jr.<br>Township Manager<br>Upper Hanover Township<br>1704 Pillsbury Road<br>P.O. Box 27<br>East Greenville, PA 18041 | 9/24/08 |
| Northgate | Ph 1C, 2 & 3 | Water Agreement for the Northgate Subdivision Phases 1C, 2 and 3 | Willaim F. Kalb, Jr.<br>Operations Manager<br>Upper Hanover Authority<br>1704 Pillsbury Road<br>P.O. Box 205<br>East Greenville, PA 18041 | 9/10/08 |
| Northgate | Ph 1C, 2 & 3 | Sewer Agreement for the Northgate Subdivision Phases 1C, 2 and 3 | Willaim F. Kalb, Jr.<br>Operations Manager<br>Upper Hanover Authority<br>1704 Pillsbury Road<br>P.O. Box 205<br>East Greenville, PA 18041 | 9/10/08 |
| Northgate | | Agreement [Macoby Wastewater Treatment Plant Expansion] | Willaim F. Kalb, Jr.<br>Operations Manager<br>Upper Hanover Authority<br>1704 Pillsbury Road<br>P.O. Box 205<br>East Greenville, PA 18041 | 4/11/06 |
| Northgate | | Declaration | 1704 Pillsbury Road<br>P.O. Box 27<br>East Greenville, PA 18041 | 10/11/05 |
| Northgate | Phase 2 | [Electric] Northgate Development Phase 2 | Matthew P. Connor<br>Support Engineer<br>PPL Electric Utilities<br>2930 State Road<br>Telford, PA 18969 | 6/20/08 |
| Northgate | Phase 3 | [Electric] Northgate Development Phase 3 | Wes Blewitt<br>PPL Electric Utilities Corp<br>827 Hausman Road<br>Allentown, PA 18104 | 12/10/08 |

| Project | Phase | Agreement | Party | Date Signed |
|---|---|---|---|---|
| **Northgate** | Phase 4 | [Electric] Northgate Development Phase 4 | Wes Blewitt<br>PPL Electric Utilities Corp<br>827 Hausman Road<br>Allentown, PA 18104 | 1/27/09 |
| **Northgate** | | [Electric] Right of Way Agreements | Liz Mease, ROW Agent<br>PPL Electric Utilities<br>2930 State Road<br>Telford, PA 18969 | Various |
| **Village At Wynstone** | | Preliminary Plan Approval | New Hanover Township Authority<br>2943 N. Charlotte Street<br>Gilbertsville, PA 19525 | 11/27/07 |
| **Village At Wynstone** | | EDU Purchase and Sewer Access Payment Agreement | New Hanover Township Authority<br>2943 N. Charlotte Street<br>Gilbertsville, PA 19525 | 10/19/05 |
| **Village At Wynstone** | | Agreement to Exchange Real Estate - Daminski | Darvene A. Daminski<br>2109 Horseshoe Drive<br>Pottstown, PA 19464 | 9/28/06 |
| **Village At Wynstone** | | Agreement to Exchange Real Estate - Daminski | Darvene A. Daminski<br>2109 Horseshoe Drive<br>Pottstown, PA 19464 | 9/28/06 |

# EXHIBIT B –
# TRANSFER AND DEVELOPMENT AGREEMENT

# TRANSFER AND DEVELOPMENT AGREEMENT

THIS TRANSFER AND DEVELOPMENT AGREEMENT (this "**Agreement**") is made as of this _____ day of ____________, 2011, by and among **TH PROPERTIES, L.P., T.H. PROPERTIES OF NEW JERSEY, L.P., NORTHGATE DEVELOPMENT COMPANY, LP, MORGAN HILL DRIVE, LP, TH PROPERTIES, INC., TH PROPERTIES, LLC, AND SWAMP PIKE LP**, (each a "**Debtor**" and collectively, the "**Debtors**"), **KEYSTONE LAND ACQUISITIONS, INC.**, a Pennsylvania corporation ("**Keystone**"), **THE HILLS AT PERKIOMEN, LP**, a Pennsylvania limited partnership ("**Perkiomen**" and together with Keystone, the "**Transferors**"), W. Todd Hendricks and Timothy P. Hendricks (jointly and severally, "**Guarantors**"), and **NEW STREAM REAL ESTATE, LLC**, a Delaware limited liability company ("**New Stream**"). The Debtors, the Transferors and Guarantors may be individually referred to herein as a "**Debtor Party**" and collectively referred to herein as the "**Debtor Parties.**"

## RECITALS

A. On April 30, 2009, the Debtors filed petitions for relief under Chapter 11 of Title 11, United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**") in the jointly administered cases styled *In re TH Properties, L.P., et al.*, Case No. 09-13201 (the "**Bankruptcy Case**"). This Agreement is entered into in connection with, and in partial implementation of, the Second Amended Joint Chapter 11 Plan of the Debtors and Debtors-in-Possession and the Official Committee of Unsecured Creditors filed in the Bankruptcy Case (as such plan may hereafter be amended or modified, the "**Plan**"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan; provided, that for purposes of this Agreement, the terms "**Claims**" and "**Interests**" shall, in addition to those claims and interests specified in the Plan, include any and all claims against or interests in the Transferors.

B. Subject to certain Claims, including mechanics liens, the Transferors hold (i) fee simple title to Phases IV, V and VI of the Northgate Development (the "**Development**") which is located in Upper Hanover Township, Montgomery County, Pennsylvania, being more particularly described on **Exhibit A** attached hereto and made a part hereof (the "**Land**"), together with any and all buildings, improvements and fixtures located thereon (the "**Improvements**" and together with the Land, the "**Real Property**") and (ii) good title to the personal property subject to the Mortgage (as defined below) as more particularly described in **Exhibit B** attached hereto and made a part hereof for all purposes (the "**Personal Property**" and together with the Real Property, the "**Mortgaged Property**").

C. In connection with the Development, a specific number of sewer and water equivalent dwelling units ("**EDUs**") were allocated to the Mortgaged Property pursuant to that certain Sewer Agreement for the Northgate Subdivision Phases 1C, 2 and 3 between the Authority, Morgan Hill Drive, L.P. and THP, dated September 10, 2008 and that certain Water Agreement for the Northgate Subdivision Phases 1C, 2 and 3 between The Upper Hanover Authority (the "**Authority**"), Morgan Hill Drive, L.P. and THP, dated September 10, 2008. Specifically, 256 sewer EDUs and 256 water EDUs have been allocated to Phases IV and V and 57 sewer EDUs and 57 water EDUs have been allocated to Phase VI of the Northgate

Development (collectively, the "**Development EDUs**"). The parties acknowledge that the Development EDUs are included in the Mortgaged Property.

D. On or about December 29, 2006, New Stream made a loan (the "**Loan**") pursuant to that certain Loan Agreement dated December 29, 2006 between the Transferors and New Stream (the "**Loan Agreement**"). The Loan is evidenced by that certain Promissory Note dated December 29, 2006 in the original principal amount of Eighteen Million Dollars ($18,000,000) made by the Transferors for the benefit of New Stream (such note, as modified and amended as of the date hereof, the "**Note**"). The Note is secured by, *inter alia*, that certain Mortgage, Security Agreement and Fixture Filing dated December 29, 2006 and recorded in Mortgage Book 12059, Page 1355 of the Office of the Recorder of Deeds in Montgomery County, Pennsylvania (such mortgage, as modified and amended as of the date hereof, the "**Mortgage**").

E. As additional security for the Loan, Guarantors guaranteed to New Stream, on a joint and several basis, the prompt payment and performance (and not merely collection) of the New Stream Claim (as defined below) pursuant to that certain Guaranty dated December 29, 2006 made by Guarantors in favor of New Stream (the "**Guaranty**").

F. All obligations due and owing by the Transferors pursuant to the Mortgage, the Note, and all other documents and agreements executed by the Debtors in connection with the Mortgage and the Note (collectively, as the same have been amended and modified, the "**Loan Documents**") are collectively referred to herein as the "**New Stream Claim.**"

G. On or about July 21, 2008, the Debtors and New Stream entered into that certain Additional Collateral Agreement (together with all other documents and agreements made in connection therewith, including, without limitation, a certain Partial Release of Mortgage, collectively, the "**Modification Documents**") pursuant to which the Transferors reduced the then outstanding Loan balance of the New Stream Claim, and in connection therewith, New Stream released certain Mortgaged Property from the lien of the Mortgage, and certain additional property was submitted to the lien of the Mortgage.

H. The New Stream Claim, as modified by the Modification Documents, matured on December 29, 2008, and remains due and outstanding, in the amount of as of August 16, 2011, of $16,951,493.92, consisting of $10,000,000.00 in principal, $6,695,000.00 in accrued and unpaid interest, and $256,493.92 in reimbursable fees and expenses.

I. The parties hereto have agreed to the resolution of the New Stream Claim and to continue construction of the Development on the terms and conditions set forth in this Agreement and the Plan.

NOW THEREFORE, subject to Bankruptcy Court approval, the conditions precedent hereinafter set forth, and the terms and conditions hereof and of the Plan, and in consideration of the mutual covenants and agreements hereinafter set forth, the Recitals (which are hereby incorporated into and shall be deemed a part of this Agreement), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed by all parties, and intending to be legally bound, the parties agree as follows:

1. **THE PLAN; MORTGAGED PROPERTY TRANSFERS; CONTINUED DEVELOPMENT.**

A. The Plan. The Plan (a) shall be filed on or before the date of execution hereof, (b) shall be confirmed on or before December 31, 2011, (c) shall have the Effective Date therefor occur on or before January 31, 2012, and (d) as filed, confirmed, and effective, shall in all material respects incorporate and conform to the terms and conditions of this Agreement. Unless otherwise agreed in writing by the Debtor Parties and New Stream, in the event that any of the foregoing conditions shall not be met, this Agreement shall be deemed null and void, and of no further force or effect.

B. Mortgaged Property Transfers. On the Effective Date, or on such later date as shall be permitted or required hereunder, and subject to such documentation and other conditions as are set forth in Section 2 of this Agreement, the Mortgaged Property shall be transferred as follows (the "**Mortgaged Property Transfers**"):

(i) the Transferors shall transfer to the Debtors (the "**Debtor Transfer**") all right title and interest of the Transferors in the Mortgaged Property, under and subject to all liens, claims, and other encumbrances, including, without limitation, the Mortgage; and

(ii) immediately following the Debtor Transfer, the Debtors shall transfer to New Stream, or its designee or designees, all of the Debtors' right, title and interest in the Mortgaged Property (as holder or holders of such title, with different designees, at New Stream's option, taking title to different parcels, collectively, the "**New Owners**"), free and clear of all liens, other encumbrances, Claims, and Interests (collectively, the "**Liens and Claims**"), subject only to the exceptions (the "**Permitted Exceptions**") set forth on **Exhibit C** hereto.

C. Development. Following the Mortgaged Property Transfers, and as hereinafter set forth in greater detail:

(i) the New Owners may develop or otherwise dispose of Phase VI of the Development in their sole and absolute discretion (except as otherwise set forth in Section 3.A. of this Agreement), and shall be entitled to all proceeds thereof, and neither the Debtor Parties nor the holders of any Claims or Interests shall be entitled to any portion thereof, whether under the Plan or otherwise;

(ii) so long as no Option Termination Event shall occur, the General Contractor (as hereinafter defined) shall hire a site contractor (the "**Site Contractor**") and other subcontractors as needed to develop Phases IV and V of the Development ("**Phases IV and V**"), and the proceeds from the sale of homes at Phases IV and V shall be distributed in accordance with this Agreement and the Plan; provided that, for the avoidance of doubt, except as set forth in Section 3 of this Agreement, which provides for certain lien rights and payment priorities to the Site Contractor, all payments due to New Stream or the New Owners from the sale of homes at Phases IV and V as set forth in this Agreement shall have priority over any payments from such sales due to the Debtor Parties, the General Contractor, or the holders of Claims or Interests under the Plan; and

(iii) upon the occurrence of any Option Termination Event (as hereinafter defined), the right of the General Contractor or the Debtors to develop Phases IV and V, and any entitlement of the Debtor Parties, the General Contractor, or the holders of any Claims or Interests to receive any further proceeds from the development or other disposition of Phases IV and V, shall immediately cease, the Debtors and the General Contractor shall relinquish possession and control over Phases IV and V in compliance with this Agreement as hereinafter set forth, and thereafter, subject to any Site Contractor Liens, New Stream and the New Owner or Owners of Phases IV and V (collectively, the "**Phases IV and V New Owner**") may develop or otherwise dispose of Phases IV and V in their sole and absolute discretion, and shall be entitled to all proceeds thereof.

2. **CLOSING OF MORTGAGED PROPERTY TRANSFERS; CERTAIN CONDITIONS TO CLOSING.**

A. Time of Closing. Closing (the "**Closing**") on the Mortgaged Property Transfers shall occur (i) immediately after the last to occur of: (1) the Effective Date (2) the Confirmation Order shall have become a Final Order, and (3) all Closing Deliverables (as hereinafter defined) have been executed and/or delivered to New Stream, as applicable, or (ii) on such other date as the parties hereto shall mutually agree in writing. All Closing costs shall be paid by the Debtor Parties, including, without limitation, recording fees and transfer taxes, if any. The parties acknowledge and agree that New Stream shall be under no obligation to complete Closing until all conditions set forth herein have been satisfied in full.

B. Debtor Closing Documents. In connection with and as a condition to the Closing, the Transferors shall deliver to the Debtors such deeds, bills of sale, affidavits, declarations, documents, consents, and other agreements, instruments, and materials as shall enable the Debtors to provide to New Stream the Closing Deliverables.

C. New Stream Closing Documents. In connection with and as a condition to the Closing, the Debtors shall deliver to New Stream three (3) special warranty deeds (the "**Deeds**"), in form and substance reasonably acceptable to New Stream, conveying good, marketable and insurable fee title to the Real Property to the New Owners, free and clear of all Liens and Claims other than Permitted Exceptions (and subject to the rights granted to the Site Contractor and the Debtor Parties under this Agreement), duly executed and acknowledged by the Debtors. In addition to the Deeds, the Debtors shall duly execute and/or cause to be delivered to New Stream or New Stream's agent or representative, the following (the Deeds, together with the following documents, are hereinafter collectively referred to as the "**Closing Deliverables**"):

(i) all necessary state and county transfer tax declarations related to the Deeds;

(ii) a bill of sale and general assignment conveying all of the Personal Property and the Development EDUs to the New Owners, free and clear of all Liens and Claims;



DMEAST #12934699 v10

(iii) any documentation, approval and/or consent required to transfer the Development EDUs to the New Owners, including without limitation, consent from the Authority;

(iv) FIRPTA Affidavits;

(v) copies of all plans, specifications, permits, licenses, contracts and other documents in the Debtors' or the Transferors' possession necessary for the development and/or operation of Mortgaged Property;

(vi) a date-down endorsement to ALTA 1992 Loan Policy (Order No. PH215904MB) issued by Commonwealth Land Title Insurance Company (the "**Title Company**"), showing fee simple title in the New Owners, in form and substance acceptable to New Stream (the "**Loan Policy Endorsement**"), subject only to the Permitted Exceptions;

(vii) evidence satisfactory to New Stream and the Title Company of the authority of the person executing this Agreement and any documents described herein on any party's behalf, as well as any affidavits required by such Title Company to issue the Loan Policy Endorsement;

(viii) all books and records with respect to the Debtor Parties' development of the Mortgaged Property in the Debtor Parties' direct or indirect possession or control;

(ix) a certified copy of the Confirmation Order, as entered by the Bankruptcy Court, in form and substance satisfactory to New Stream that, among other things, provides that (1) this Agreement and the terms and conditions hereof are authorized and approved in all respects, (2) the transfer of the Mortgaged Property to the New Owners shall be free and clear of all Liens and Claims other than Permitted Exceptions (and subject to the rights granted to the Site Contractor and the Debtor Parties under this Agreement), (3) neither New Stream nor any New Owner shall be deemed a successor to the Debtors or the Transferors, (4) all transfers effected or contemplated hereby shall be exempt from payment of any transfer or similar tax in accordance with 11 U.S.C. § 1146, and (5) all creditors and other parties are enjoined from the assertion against New Stream or the New Owners of any Claims or Interests, other than Permitted Exceptions;

(x) a collateral assignment of the Site Contractor Agreement (as hereinafter defined), and an accompanying consent by Site Contractor, each in form and substance satisfactory to New Stream (collectively, the "**Site Contractor Agreement Assignment**");

(xi) a collateral assignment of the Construction Contract (as hereinafter defined) to the Phase IV and V New Owner, and an accompanying consent by General Contractor, each in form and substance satisfactory to New Stream (collectively, the "**Construction Contract Assignment**"); and

(xii) all other certificates, instruments and documents requested to be delivered by New Stream for Closing.

3. **DEVELOPMENT OR OTHER DISPOSITION OF MORTGAGED PROPERTY**

A. Phase VI. As set forth above, after the Closing, (i) the Debtor Parties and the holders of any Claims or Interests shall have no further rights or interests in Phase VI of the Development or in the proceeds thereof, whether under this Agreement, the Plan, or otherwise, and (ii) the Phase VI New Owner may develop or otherwise dispose of Phase VI of the Development in its sole and absolute discretion, and shall be entitled to all proceeds thereof; provided that, the Phase VI New Owner shall make a good faith effort to develop or dispose of Phase VI of the Development in such a manner as shall enable the Debtors to develop Phases IV and V with 256 units. Notwithstanding the foregoing, the Debtor Parties shall cooperate fully, and cause their respective agents, representatives, employees, consultants, architects, engineers, contractors and subcontractors to cooperate fully, with New Stream and the Phase VI New Owner in obtaining all approvals and take all other action that will perfect the Phase VI New Owner's rights to the Personal Property related to Phase VI, and allow the Phase VI New Owner to develop Phase VI in accordance with the Master Plan of Development dated March 14, 2006, and the Northgate Subdivision Plan Phase 5 approved by the Upper Hanover Township Board of Supervisors on January 13, 2009 (the "**2009 Plan**").

B. Phases IV and V.

(i) *Construction Contract.* An affiliate of the Debtors shall act as general contractor (the "**General Contractor**"), and shall develop Phases IV and V of the Development in accordance with the 2009 Plan and the Northgate Phase 4 Subdivision and Land Development Plan approved by the Upper Hanover Township Board of Supervisors on December 9, 2008 (as amended, the "**2008 Plan**") by constructing 242 multiplex units and 14 townhomes (each a "**Lot**"). The Debtors and the General Contractor shall enter into a construction and development contract consistent with the terms hereof and otherwise in form and substance satisfactory to New Stream (the "**Construction Contract**"), which sets forth the terms by which Phases IV and V will be developed. The rights of the Debtors under the Construction Contract shall be assigned to the Phases IV and V New Owner at the Closing.

(ii) *Site Contractor.* General Contractor shall hire Site Contractor to complete all site work in accordance with the 2008 Plan and the 2009 Plan pursuant to an agreement consistent with the terms hereof and otherwise in form and substance satisfactory to New Stream (the "**Site Contractor Agreement**"). Without limiting the generality of the foregoing, the Site Contractor Agreement shall, among other terms and conditions, incorporate the provisions of Sections 3.B.(iii) and (iv) of this Agreement. The rights of the General Contractor under the Site Contractor Agreement shall be assigned to the Phased IV and V New Owner at the Closing.

(iii) *Bonds and Site Contractor Collateral.* Site Contractor shall post the following bonds in favor of Upper Hanover Township and the Upper Hanover Authority, in each case at the times and in the amounts required by such township and such authority in accordance with that certain Amended Development Agreement, Water Agreement and Sewer Agreement for the Northgate Subdivision, dated May 27, 2011, among the Township of Upper Hanover , the Upper Hanover Authority, TH Properties, L.P., Morgan Hill Drive, L.P.,

the Hills at Perkiomen, L.P. and Lehigh Valley Site Contractors, Inc. (the "**Bonding Requirements**"):

(1) Site Contractor shall post payment and performance bonds for the first phase of the site work on Phases IV and V, consisting of the construction of the site improvements for 80 Lots (the "**Phase IV/V-1 Lots**"), and in connection therewith receive a first lien (the "**Site Contractor IV/V-1 Lien**") on eight (8) of the Phases IV/V -1 Lots and the associated Development EDUs (consisting of eight (8) water EDUs and eight (8) sewer EDUs).

(2) Site Contractor shall post payment and performance bonds for the second phase of the site work on Phases IV and V, consisting of the construction of the site improvements for up to 88 Lots (the "**Phase IV/V-2 Lots**") and receive a first lien (the "**Site Contractor IV/V-2 Lien**") on twenty (20) of the Phase IV/V-2 Lots and the associated Development EDUs (consisting of twenty (20) water EDUs and twenty (20) sewer EDUs).

(3) Site Contractor shall post payment and performance bonds for the third phase of the site work on Phases IV and V, consisting of the construction of the site improvements for up to 88 lots (the "**Phase IV/V-3 Lots**" and, with the Phase IV/V-1 Lots and the Phase IV/V-2 Lots, the "**Phase IV/V Lots**") and receive a first lien (the "**Site Contractor IV/V-3 Lien**" and, with the Site Contractor IV/V-1 Lien and the Site Contractor IV/V-2 Lien, the "**Site Contractor Liens**") on twenty (20) of the Phase IV/V-3 Lots and the associated Development EDUs (consisting of twenty (20) water EDUs and twenty (20) sewer EDUs).

(iv) *Sale Proceeds and Site Contractor Lien Release*. Unless an Option Termination Event shall occur, the sale proceeds of Phases IV and V shall be distributed and the Site Contractor Liens shall be released as follows:

(1) At settlement for the first eight Phase IV/V-1 Lots sold, and so long as the Site Contractor is not in material default under the Site Contractor Agreement, Site Contractor shall receive all of the sales proceeds, less closing costs and costs of construction (the "**Net Proceeds**"), and General Contractor shall release or cause to be released (a) the Site Contractor IV/V-1 Lien from either (i) the applicable Phase IV/V-1 Lot being sold and the associated Development EDUs, if subject to such lien, or (ii) another unsold Phase IV/V-1 Lot subject to such lien and the associated Development EDUs, if such Phase IV/V-1 Lot is not subject to such lien, and (b) any other mechanics' similar liens. At settlement for each of the remaining 72 Phase IV/V-1 Lots, the Phases IV and V New Owner shall receive the Applicable Percentage (as hereinafter defined) of the sale proceeds (without deduction of closing costs and costs of construction; the "**Gross Proceeds**") of such Phase IV/V Lot, with the balance of the proceeds, if any, after payment of all taxes and other similar charges, distributed to the General Contractor for disposition in accordance with Section 7 of the Plan. For the avoidance of doubt, after the eighth Phase IV/V-1 Lot has been sold, no Phase IV/V-1 Lots or Phase IV/V-1 Development EDUs shall be subject to the Site Contractor Phase IV/V-1 Lien.

(2) At settlement for the first twenty Phase IV/V-2 Lots sold, and so long as the Site Contractor is not in material default under the Site Contractor Agreement, Site Contractor shall receive all of the Net Proceeds, and the General Contractor

shall release or cause to be released (a) the Site Contractor Phase IV/V-2 Lien from either (i) the applicable Phase IV/V-2 Lot being sold and the associated Development EDUs, if subject to such lien, or (ii) another unsold Phase IV/V-2 Lot subject to such lien and the associated Development EDUs, if such Phase IV/V-2 Lot is not subject to such lien, and (b) any other mechanics' similar liens. At settlement for each of the remaining Phase IV/V-2 Lots, the Phases IV and V New Owner shall receive the Applicable Percentage of the Gross Proceeds of such Phase IV/V-2 Lot, with the balance of the proceeds, if any, after payment of all taxes and other similar charges, distributed to General Contractor for disposition in accordance with Section 7 of the Plan. For the avoidance of doubt, after the twentieth Phase IV/V-2 Lot has been sold, no Phase IV/V-2 Lots or Phase IV/V-2 Development EDUs shall be subject to the Site Contractor IV-2 Lien.

(3) At settlement for the first twenty Phase IV/V-3 Lots sold, and so long as the Site Contractor is not in material default under the Site Contractor Agreement, Site Contractor shall receive all of the Net Proceeds, and the General Contractor shall release or cause to be released (a) the Site Contractor Phase IV/V-3 Lien from either (i) the applicable Phase IV/V-3 Lot being sold and the associated Development EDUs, if subject to such lien, or (ii) another unsold Phase IV/V-3 Lot subject to such lien and the associated Development EDUs, if such Phase IV/V-3 Lot is not subject to such lien, and (b) any other mechanics' similar liens. At settlement for each of the remaining Phase IV/V-3 Lots, the Phases IV and V New Owner shall receive the Applicable Percentage of the Gross Proceeds of such Phase IV/V-3 Lot, with the balance of the proceeds, if any, after payment of all taxes and other similar charges, distributed to General Contractor for disposition in accordance with Section 7 of the Plan. For the avoidance of doubt, after the twentieth Phase IV/V-3 Lot has been sold, no Phase IV/V-3 Lots or Phase IV/V-3 Development EDUs shall be subject to the Site Contractor IV/V-3 Lien.

(4) Notwithstanding anything herein to the contrary, unless previously released in accordance with the foregoing, the Site Contractor Liens, and the extent, validity and priority thereof, shall survive any Option Termination Event.

(5) For purposes hereof, **"Applicable Percentage,"** as to any particular Phase IV/V Lot model, shall mean (i) 24%, if such Phase IV/V Lot model sells for a price less than or equal to the Threshold Amount for such model reflected on Schedule 1 attached hereto, and (ii) 25%, if such Phase IV/V Lot model sells for a sales price in excess of such Threshold Amount.

(v) *Conveyance of Phases IV and V Lots; Reconveyance of Phases IV and V.* So long as the Option (as hereinafter defined) has not been exercised and no Option Termination Event has occurred:

(1) at settlement by the General Contractor on completed Phases IV and V Lots, the Phases IV and V New Owner shall execute and deliver to third party purchasers the deeds to such lots, in form and substance acceptable to New Stream; and

(2) at such time as 144 Phase IV/V Lots unencumbered by the Site Contractor Liens have been sold to third party purchasers, and provided that in

connection therewith the Debtors have paid to the Phase IV and V New Owner the Applicable Percentage of the Gross Proceeds of each such Lot in accordance with the terms of this Agreement (collectively, the "**New Stream Proceeds**"), New Stream shall convey all of its interest in the Phases IV and V New Owner to the Debtors or their designee (the "**Equity Conveyance**") and, after such conveyance, the Debtors shall have sole ownership in the entity or entities that hold title to the unsold Lots in Phases IV and V. Prior to any Equity Conveyance, the Phase IV and V New Owner shall have distributed to New Stream or New Stream's designee the New Stream Proceeds, and the Debtors and New Stream shall have entered into a sale of interest agreement, in form and substance satisfactory to New Stream, pursuant to which New Stream shall transfer its ownership interest in the Phases IV and V New Owner to the Debtors or their designee without representation, warranty, or recourse of any kind or nature.

4. **OPTION TO PURCHASE PHASES IV AND V.**

A. Option to Purchase. At any time prior to the date that is twenty eight (28) months from the date of this Agreement (the "**Option Period**"), and provided that an Equity Conveyance has not occurred, the Debtors shall have the option to purchase the equity interest in the Phases IV and V New Owner (the "**Option**") by paying an amount equal to $5,900,000 less the aggregate amount of all proceeds theretofore paid to the Phases IV and V New Owner in accordance with Section 3(B)(iv) of this Agreement (the "**Exercise Price**"). In the event the Debtors desire to exercise the Option, (i) the Debtors shall provide written notice of such exercise (an "**Exercise Notice**") no later than the last day of the Option Period, (ii) the Debtors and New Stream shall enter into a sale of interest agreement (an "**SIA**"), in form and substance satisfactory to New Stream, pursuant to which New Stream shall transfer its ownership interest in the Phases IV and V New Owner to the Debtors or their designee, without representation, warranty, or recourse of any kind or nature, and (iii) the Debtors shall pay to New Stream the Exercise Price by the closing date specified in such SIA, which in no event shall be later than 30 days after the date of the Exercise Notice (an "**Option Closing Date**").

B. Termination of Option. The Option shall terminate upon the occurrence of any of the following (an "**Option Termination Event**"):

(i) the Debtors or the General Contractor fail to comply, or to cause the Site Contractor to comply, with the Bonding Requirements and/or to market and develop the Phase IV/V Lots in accordance with the Construction Contract;

(ii) the Debtors, with the written consent of the Site Contractor, give written notice to New Stream that they do not intend to exercise the Option;

(iii) the Debtors or the General Contractor fail to observe or perform any other obligation of either thereof hereunder or under any SIA; or

(iv) the Debtors or the General Contractor fail to exercise the Option by the end of the Option Period.

C. Effect of Termination of Option. In the event that as a result of an Option Termination Event, the Option shall terminate hereunder:

(i) the right of the Debtors and the General Contractor to develop Phases IV and V, and any entitlement of the General Contractor, the Debtor Parties, or the holder of any Claims or Interests to receive any further proceeds from the development or other disposition of Phases IV and V shall immediately cease;

(ii) the Debtors and the General Contractor, at their sole cost and expense, shall (i) take such steps, deliver such materials and other information, and execute such instruments, agreements, or other documents as New Stream shall reasonably request in order to effect the prompt and orderly transfer (a "**Transfer**") of possession, custody, and control of Phases IV and V and all improvements thereon to New Stream or its designee, and (ii) satisfy all mechanics' or similar liens, and all liens for taxes that are then due and owing, that encumber Phases IV and V or the improvements thereon as of the date of such transfer;

(iii) the Phases IV and V New Owner may develop or otherwise dispose of Phases IV and V in its sole and absolute discretion, and shall be entitled to all proceeds thereof, subject to the rights of the Site Contractor as set forth in Section 3 of this Agreement; and

(iv) New Stream may exercise all of its rights and remedies under the Construction Contract Assignment and the Site Contractor Agreement Assignment.

Notwithstanding the foregoing, unless previously released in accordance with Section 3.B.(iv) of this Agreement, the Site Contractor Liens, and the extent, validity, and priority thereof, shall survive any Option Termination Event.

5. **REPRESENTATIONS AND WARRANTIES.**

Subject to entry of the Confirmation Order, each of the Debtor Parties represents and warrants to New Stream as follows:

A. Each of the Debtors and each of the Transferors is a corporation or limited partnership, duly organized and presently subsisting under the laws of its state of formation.

B. The execution and delivery by each Debtor Party of this Agreement and the instruments contemplated hereby and the performance of its obligations hereunder and thereunder have been duly authorized and shall constitute legal, valid and binding obligations of such Debtor Party.

C. The execution and delivery of this Agreement and the instruments contemplated hereby, and compliance with the provisions hereof and thereof, will not conflict with or constitute a breach of, or a default under the agreements forming any Debtor Party or any applicable law, rule, regulation or order of any court, administrative agency, or other governmental entity.

6. **RELEASES.**

A. <u>Releases by Debtor Parties</u>. Effective upon Closing, and other than as to any obligations to be performed under this Agreement, the Plan, and the instruments, agreements, and other documents executed pursuant hereto and thereto, each Debtor Party, for

itself and its past, present and future, heirs, agents, executors, successors, assigns, officers, directors, shareholders, partners, partnerships, principals, managers, members, employees, parents, subsidiaries and affiliates, and all persons, corporations and other entities which might claim by, through or under them (collectively, the "**Debtor Party Releasors**"), hereby releases, acquits and forever discharges New Stream, New Owners and their respective past, present and future agents, attorneys, executors, successors, assigns, officers, directors, shareholders, partners, partnerships, principals, managers, members, employees, parents, subsidiaries and affiliates, and all persons, corporations and other entities which might be claimed to be jointly or severally liable with them (collectively, the "**New Stream Releasees**"), from and of any and all actions and causes of action, damages, suits, debts, dues, accounts, bonds, agreements, contracts, covenants, fiduciary obligations, confidentiality duties, promises, judgments, costs, attorneys' fees, expenses, compensation, claims and demands whatsoever, of every nature, kind and description, known or unknown, arising from the beginning of the world until the date hereof, which the Debtor Party Releasors had, now have or claim to have against the New Stream Releasees, or any of them, for, upon or by reason of any matter, act or thing whatsoever.

B. Releases by New Stream. Effective upon Closing, and other than as to any obligations to be performed under this Agreement, the Plan, and the instruments, agreements, and other documents executed pursuant hereto and thereto, New Stream and New Owners for themselves and their respective past, present and future agents, executors, successors, assigns, officers, directors, shareholders, partners, partnerships, principals, managers, members, employees, parents, subsidiaries and affiliates, and all persons, corporations and other entities which might claim by, through or under them (collectively, the "**New Stream Releasors**"), hereby release, acquit and forever discharge each of the Guarantors and his past, present and future heirs, agents, attorneys, executors, successors, and assigns (collectively, the "**Guarantor Releasees**"), from and of any and all actions and causes of action, damages, suits, debts, dues, accounts, bonds, agreements, contracts, covenants, fiduciary obligations, confidentiality duties, promises, judgments, costs, attorneys' fees, expenses, compensation, claims and demands whatsoever, of every nature, kind and description, known or unknown, arising from the beginning of the world until the date of such release, which the New Stream Releasors had, now have or claim to have against the Guarantor Releasees, or any of them, for, upon or by reason of any matter, act or thing whatsoever.

7. **INDEMNIFICATION.** Each Debtor Party agrees to defend, indemnify, and hold New Stream, the New Owners, and their respective successors, assigns, members, officers, and participants harmless from and against any claims or liabilities pertaining to the Mortgaged Property arising prior to the Closing, including, without limitation, any and all Claims and Interests.

8. **ABSOLUTE CONVEYANCE.** The Debtor Parties hereby acknowledge and agree that the conveyance of the Mortgaged Property to the New Owners according to the terms of this Agreement, will be an absolute conveyance of all of the Mortgaged Property in fact, as well as form, and is not intended as a mortgage, trust conveyance, deed of trust or security instrument of any kind; that the consideration for such conveyance is exactly as recited herein; and that after the date of Closing and except as specifically set forth herein, no Debtor Party shall have any further interest (including rights of redemption) or claims in and to the Mortgaged Property or to the proceeds and profits that may be derived therefrom. The Debtor Parties hereby agree that the conveyance of the Mortgaged Property shall include, and that New Stream

or the New Owners shall be entitled to retain, any tax, insurance or other escrows or deposits established in connection with the Loan Documents or otherwise posted with any third parties with respect to the Mortgaged Property or its operation.

9. **COVENANT AS TO FURTHER ASSURANCES.** Each Debtor Party covenants that it will, at Closing, execute and deliver such further instruments and take such further action as may be reasonably requested by New Stream to carry out the purposes of this Agreement.

10. **WAIVER OF AUTOMATIC STAY.** The Debtor Parties hereby agree that, in consideration for New Stream's agreement to enter into and accept this Agreement, if any Debtor Party shall (i) have commenced by or against it a proceeding under any chapter of the Bankruptcy Code (other than the Bankruptcy Case); (ii) have commenced by or against it any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any other present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors; or (iii) seek, consent to, or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator, then New Stream and the New Owners shall thereupon be entitled to file a motion to seek relief from the automatic stay imposed by 11 U.S.C. § 362, or from any other stay of, on, or against the exercise of the rights and remedies otherwise available to New Stream as provided in this Agreement or under applicable law with respect hereto, and the Debtor Parties hereby irrevocably consent to and agree to stipulate to such relief and irrevocably waive their rights to object thereto. This covenant is a material inducement for New Stream to enter into and accept this Agreement.

11. **WAIVER OF JURY TRIAL.** THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, THE PLAN, THE DOCUMENTS DELIVERED FOR CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF SUCH PARTIES WITH RESPECT THERETO. THIS PROVISION SETS FORTH THE MUTUAL DESIRE OF THE PARTIES HERETO TO AVOID DELAYS IN THE RESOLUTION OF DISPUTES INVOLVING THIS AGREEMENT. THE PARTIES HERETO ACKNOWLEDGE AND AGREE THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR NEW STREAM TO ENTER INTO THIS AGREEMENT.

12. **NOTICES.** Any notice, demand, request or other communication which any party hereto may be required or may desire to give under this Agreement shall be in writing and may be delivered by hand, first class or certified mail return receipt requested, overnight delivery service or by electronic communication. Any such notice shall be deemed to have been properly given (i) if hand delivered (effective upon delivery), (ii) if mailed (effective three (3) days after mailing) by United States registered or certified mail, postage prepaid, return receipt requested, (iii) if sent by a nationally recognized overnight delivery service (effective one (1) day after delivery to such courier), (iv) if sent by facsimile or e-mail (effective upon confirmation of transmission; provided that such notice is also delivered in accordance with clause (ii) or (iii) above), in each case addressed as follows:

If to the Debtors or the Transferors:

TH Properties, Inc.
345 Main Street
Harleysville PA 19438
Facsimile Number:__________________
E-mail:_________________________

If to Guarantors:

W. Todd Hendricks
Timothy P. Hendricks
345 Main Street
Harleysville, PA 19438
Facsimile Number:__________________
E-mail:_________________________

If to New Stream or any New Owner:

New Stream Real Estate, LLC
38C Grove Street
Ridgefield, CT 06877
Facsimile Number:__________________
E-mail:_________________________

13. **SEVERABILITY OF PROVISIONS**. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision hereof, and any determination that the application of any provision of this Agreement to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

14. **BINDING EFFECT**. The terms, provisions, representations and warranties herein contained shall inure to the benefit of, and bind, the parties hereto and their respective heirs, devisees, representatives, successors and assigns.

15. **LEGAL FEES**. Each party hereto shall pay its own legal fees and other third party expenses incurred in connection with the completion and/or enforcement of the obligations referenced herein.

16. **SUCCESSORS AND ASSIGNS**. This Agreement shall inure to the benefit of and constitute binding obligations upon the parties hereto, their respective heirs, administrators, successors and permitted assigns. Without limiting the generality of the foregoing, New Stream, without the consent of the Debtor Parties, may assign this Agreement and all of its rights hereunder to any purchaser of the Mortgaged Property or of the New Owners, as the case may be, subject only to the agreement of such purchaser to be bound by the terms and conditions hereof.

17. **AMENDMENTS.** No change, modification or waiver of any provision of this Agreement shall be valid or binding upon the parties hereto, unless such change, modification or waiver shall be in writing and signed by the parties hereto.

18. **GOVERNING LAW.** This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of Commonwealth of Pennsylvania.

19. **CONSTRUCTION.** The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments thereto. Within this Agreement, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural, unless the context otherwise requires. Captions in this Agreement are intended for convenience only and are not to be considered in interpreting the provisions hereof. The parties agree that time is of the essence with respect to this Agreement.

20. **CONFLICT WITH PLAN.** In the event of any conflict between the terms of this agreement and the terms of the Plan, this Agreement shall control.

21. **COUNTERPARTS.** This Agreement may be executed via telecopy or by electronic mail and in any number of counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[SIGNATURE PAGE IMMEDIATELY FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have hereunto caused this Agreement to be executed the date first above written.

**NEW STREAM:**

**New Stream Real Estate, LLC**, a Delaware limited liability company

By:______________________________
Name:____________________________
Title:_____________________________

**DEBTORS:**

**TH Properties, L.P.,**
a __________ limited partnership

By: ______________________________
a ___________ corporation, as its general partner

By:______________________________
Name:____________________________
Title:_____________________________

**TH Properties of New Jersey, L.P.,**
a __________ limited partnership

By: ______________________________
a ___________ corporation, as its general partner

By:______________________________
Name:____________________________
Title:_____________________________

**Northgate Development Company, LP,**
a ___________ limited partnership

By: ____________________________
a ____________ corporation, as its
general partner

By:________________________________
Name:______________________________
Title:_______________________________

**Morgan Hill Drive, LP,**
a ___________ limited partnership

By: ____________________________
a ____________ corporation, as its
general partner

By:________________________________
Name:______________________________
Title:_______________________________

**TH Properties, Inc.,**
a _______________ corporation

By:_______________________________________
Name:_____________________________________
Title:______________________________________

**TH Properties, LLC,**
a _______________ limited liability corporation

By:_______________________________________
Name:_____________________________________
Title:______________________________________

**Swamp Pike, LP,**
a ___________ limited partnership

By: ____________________________
a ____________ corporation, as its
general partner

By:________________________________
Name:______________________________
Title:_______________________________

**TRANSFERORS:**

**Keystone Land Acquisitions, Inc.**,
a Pennsylvania corporation

By:________________________________
Name:______________________________
Title:_______________________________

**The Hills at Perkiomen, LP,**
a Pennsylvania limited partnership

By: Keystone Land Acquisitions, Inc.
a Pennsylvania corporation, as its
general partner

By:__________________________
Name:________________________
Title:_________________________

**GUARANTORS:**

______________________________
W. Todd Hendricks

______________________________
Timothy P. Hendricks

# EXHIBIT A

## Legal Description of Land

[To be inserted]

# EXHIBIT B

## Description of Personal Property

All of the Debtors' right, title and interest, whether now or hereafter acquired, whether located in, on, pertaining to, used or intended to be used in connection with or resulting or created from the ownership, development, management, or operation of the Real Property, in and to the following:

1. All materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by the Debtors and now or hereafter attached to, installed in or used in connection with any of the Improvements or the Land, and water, gas, electrical, storm and sanitary sewer facilities and all other utilities whether or not situated in easements (the "**Fixtures**");

2. All right, title and interest of the Debtors in and to all goods, accounts, general intangibles, instruments, documents, chattel paper and all other personal property of any kind or character, including such items of personal property as defined in the Uniform Commercial Code of Connecticut, now owned or hereafter acquired by the Debtors and now or hereafter affixed to, placed upon, used in connection with, arising from or otherwise related to the Land and Improvements or which may be used in or relating to the planning, development, financing or operation of the Real Property, including, without limitation, furniture, furnishings, equipment, machinery, money, insurance proceeds, accounts, contract rights, trademarks, goodwill, chattel paper, documents, trade names, licenses and/or franchise agreements, rights of the Debtors under leases of Fixtures or other personal property or equipment, inventory, all refundable, returnable or reimbursable fees, deposits or other funds or evidences of credit or indebtedness deposited by or on behalf of the Debtors with any governmental authorities, boards, corporations, providers of utility services, public or private, including specifically, but without limitation, all refundable, returnable or reimbursable tap fees, utility deposits, commitment fees and development costs (the "**Personalty**");

3. All reserves, escrows or impounds required under the Loan Agreement;

4. All plans, specifications, shop drawings and other technical descriptions prepared for construction, repair or alteration of the Improvements, and all amendments and modifications thereof (the "**Plans**");

5. All leases, subleases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect) which grant a possessory interest in, or the right to use, all or any part of the Real Property, together with all related security and other deposits (the "**Leases**");

6. All of the rents, revenues, income, proceeds, profits, security and other types of deposits, and other benefits paid or payable by parties to the Leases other than the Debtors for using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying the Real Property (the "**Rents**");

7. All other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service

contracts, permits, licenses, certificates and entitlements in any way relating to the development, construction, use, occupancy, operation, maintenance, enjoyment, acquisition or ownership of the Real Property (the "**Property Agreements**");

8. All rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, and all right, title and interest, if any, of the Debtors in and to any streets, ways, alleys, strips or gores of land adjoining the Land or any part thereof;

9. all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof;

10. All insurance policies, unearned premiums therefore and proceeds from such policies covering any of the above property now or hereafter acquired by the Debtors;

11. All mineral, water, oil and gas rights now or hereafter acquired and relating to all or any part of the Real Property; and

12. All of the Debtors' right, title and interest in and to any awards, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made by any governmental authority pertaining to the Land, Improvements, Fixtures or Personalty.

Without limiting the foregoing, all of the Debtors' right, title and interest in and to the following:

(a) All approvals, recommendations, permissions, licenses, variances, special exceptions, conditional uses, etc., given by Upper Hanover Township (the "**Township**"), the Upper Hanover Township Planning Commission, the Montgomery County Planning Commission, the Upper Hanover Township Zoning Hearing Board (the "**Zoning Board**"), the Upper Hanover Authority (the "**Authority**"), the Upper Perkiomen School District (the "**School District**") or otherwise required in connection with the Real Property (the "**Governmental Approvals**");

(b) Final Subdivision and Land Development Approval for Phase 4 of Northgate, granted December 9, 2008 by the Township, as evidenced by a letter from Stanley W. Seitzinger, Jr., Township Manager, to Benjamin Goldthrop.

(c) Recommendation of Preliminary/Final Subdivision and Land Development Approval for Phase 4 of Northgate, as evidenced by a letter from John P. Sartor, P.E. to the Township Planning Commission, dated December 3, 2008, together with any Township Resolution Granting Preliminary/Final, or Preliminary, or Final, singularly, Approval).

(d) Final Subdivision and Land Development Approval for Phase 5 of Northgate, granted January 13, 2009, as evidenced by both a letter from Stanley W. Seitzinger, Jr., Township Manager, to Benjamin Goldthrop and a certain Township Resolution No. 2009-05, dated January 13, 2009;

(e) Recommendation of Final Subdivision and Land Development Approval for Phase 5 of Northgate, as evidenced by a letter from John P. Sartor, P.E. to the Township Planning Commission, dated December 23, 2008;

(f) Recommendation of Final Subdivision and Land Development Approval for Phase 5 of Northgate, as evidenced by a letter from Charles L. Guttenplan, AICP to the Township Planning Commission, dated December 23, 2008;

(g) Transfer of Development Density from Phases 5 and 6 to Phase 4, allowing for construction of 242 multiplex units and 14 townhouse units on the Phase 4 Property (1 Devon Lane, 0 Otts Road, and 2348 Otts Road, assessors parcel numbers 57-00-00969-009, 57-00-02662-008, and 57-00-02659-002), as authorized by a certain "Northgate/Elementary School Agreement" between the Township, the School District, Morgan Hill Drive, L.P., the Hills at Perkiomen, L.P., and Keystone Land Acquisitions, dated November 17, 2008 (the "**Density Transfer**");

(h) The Development EDUs;

(i) Any and all recommendations given by the County Planning Commission relating to the Real Property or the development thereof;

(j) Any and all environmental approvals given by Montgomery County Conservation District or the Pennsylvania Department of Environmental Protection relating to the Real Property or the Development thereof; and

(k) Any and all Highway Occupancy Permits or Traffic Signal Plan approvals given by the Pennsylvania Department of Transportation relating to the Real Property or the Development thereof. The Debtors have advised New Stream that the Debtors' are unaware of any of the foregoing with respect to Phases IV, V, or VI.

# EXHIBIT C

## Permitted Exceptions

1. Unrecorded easements, discrepancies or conflicts in boundary lines, shortages in area and encroachments which an accurate and complete survey would disclose.

2. Possible additional assessments for taxes for new construction or for any major improvements pursuant to provisions of Acts of Assembly relating thereto.

3. Rights granted to American Telegraph & Telephone Company in Deed Book 3523 page 276, Deed Book 3532 page 1025, Deed Book 3536 page 804, Deed Book 3568 page 122 and Deed Book 3576 page 412. (As to Premises A)

4. Easement over portion of premises as condemned as of CP-71-11418 and Declaration of Taking recorded in Deed Book 3700 page 174. (As to Premises A)

5. Deed of Dedication in Deed Book 4515 page 23, Deed Book 4467 page 472 and Deed Book 5214 page 370. (As to Premises A)

6. Rights granted to PP & L, Inc. in Deed Book 5221 page 2247. (As to Premises A)

7. Conditions disclosed by survey made by Brian J. Nixon and Associates dated 1-16-1997 as revised and recorded in Plan Book A-57 page 306: 1.) requirement of building set back lines, 2.) easement of storm water drainage easement, 3.) easement of estimated 100 year Flood line and calculated 100 year Flood line through premises, 4.) easement of AT & T post, 5.) easement of 30 feet wide AT & T right of way through premises, and 6.) Notes. (As to Premises A)

8. Rights of the public and others entitled thereto in and to the use of that portion of the premises within the bounds of Ott Road (Premises B, C, D).

9. Rights granted to Pennsylvania Power & Light Company in Deed Book 2109 page 202 and Deed Book 5000 page 480. (Premises C)

10. Grant of Easement in Deed Book 4092 page 328. (Premises C)

11. Declaration in Deed Book 5577 page 1075.

12. Rights granted to Pennsylvania Power & Light Company as in Deed Book 2057 page 1, Deed Book 2069 page 264, Deed Book 3440 page 205, Deed Book 2059 page 200, Deed Book 4937 page 121 and Deed Book 2109 page 202. (Premises D)

13. Rights granted to Upper Montgomery Joint Authority as in Deed Book 3218 page 367. (Premises D)

14. Conditions as in Deed Book 1657 page 514. (Premises D)

15. Deed of Easement as in Deed Book 4831 page 1567. (Premises D)

16. Declaration of Talking filed in Montgomery County on 9/23/1971 CP 71-11418 (Highway) and excerpt recorded in Deed Book 3700 page 174. (Premises D:)

17. Declaration in Deed Book 5577 page 1075. (Premises B & D)

18. PPL Electric Utilities - Deed of Easement as in Deed Book 5612 page 0761. (Premises C, D)

# SCHEDULE 1

| Model | Threshold Amount |
|---|---|
| Princeton - A | $154,990.00 |
| Manning - A | $162,490.00 |
| Princeton - B | $157,490.00 |
| Manning - B | $162,490.00 |
| Princeton - C | $162,490.00 |
| Manning - C | $139,990.00 |
| Athen | $174,990.00 |
| Brandon | $184,990.00 |
| Brandon II | $184,990.00 |
| Carmon | $191,990.00 |
| Carmon II | $191,990.00 |

# EXHIBIT C – BUDGETS

## *Global Net Cash Flow Summary*

| Subdivision Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Biltmore Estates | $ 344,668.64 | $ 2,830,173.08 | $ 1,000,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 4,174,841.72 |
| Barton Ridge | $ 120,000.00 | $ 1,405,967.31 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,525,967.31 |
| Northgate 1B/2A | $ 89,200.00 | $ 697,607.61 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 786,807.61 |
| Northgate 2/3 Remainder | $ 88,868.53 | $ 2,222,244.37 | $ 2,871,823.50 | $ 1,709,418.75 | $ 820,521.00 | $ - | $ - | $ - | $ - | $ - | $ 7,712,876.15 |
| Northgate 4 | $ - | $ 1,145,974.50 | $ 1,307,981.14 | $ 1,259,896.12 | $ 1,151,162.48 | $ 2,452,486.94 | $ 1,286,025.26 | $ - | $ - | $ - | $ 8,603,526.44 |
| **Total Net Cash Flow Before Overhead** | $ 642,737.17 | $ 8,301,966.87 | $ 5,179,804.64 | $ 2,969,314.87 | $ 1,971,683.48 | $ 2,452,486.94 | $ 1,286,025.26 | $ - | $ - | $ - | $ 22,804,019.23 |
| Village at Wynstone | $ (75,000.00) | $ 575,000.00 | $ 4,275,000.00 | $ 4,135,000.00 | $ 3,960,000.00 | $ 2,175,000.00 | $ 840,000.00 | $ 840,000.00 | $ 840,000.00 | $ 560,000.00 | $ 18,125,000.00 |
| **Total Net Cash Flow Before Overhead** | $ (75,000.00) | $ 575,000.00 | $ 4,275,000.00 | $ 4,135,000.00 | $ 3,960,000.00 | $ 2,175,000.00 | $ 840,000.00 | $ 840,000.00 | $ 840,000.00 | $ 560,000.00 | $ 18,125,000.00 |
| Singles/Towns Settled: | 9 | 148 | 189 | 134 | 108 | 39 | 24 | 24 | 24 | 16 | 715 |
| Condo/Multiplex Settled: | 6 | 86 | 76 | 72 | 72 | .70 | 20 | 0 | 0 | 0 | 402 |
| | 15 | 234 | 265 | 206 | 180 | 109 | 44 | 24 | 24 | 16 | 1117 |
| Overhead (All Other Projects) | $ 200,000.00 | $ 2,400,000.00 | $ 2,400,000.00 | $ 1,816,000.00 | $ 1,296,000.00 | $ 816,000.00 | $ 340,000.00 | $ - | $ - | $ - | $ 9,268,000.00 |
| Wynstone Overhead | $ - | $ 522,000.00 | $ 2,088,000.00 | $ 2,088,000.00 | $ 2,088,000.00 | $ 1,154,000.00 | $ 480,000.00 | $ 480,000.00 | $ 480,000.00 | $ 320,000.00 | $ 9,700,000.00 |
| Completion of Prepetition Homes | $ - | $ - | $ 500,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 500,000.00 |
| Net Cash Flow After Overhead/Completion of Homes | $ 442,737.17 | $ 5,901,966.87 | $ 2,279,804.64 | $ 1,153,314.87 | $ 675,683.48 | $ 1,636,486.94 | $ 946,025.26 | $ - | $ - | $ - | $ 13,036,019.23 |
| Net Cash Flow After Overhead - Wynstone | $ (75,000.00) | $ 53,000.00 | $ 2,187,000.00 | $ 2,047,000.00 | $ 1,872,000.00 | $ 1,021,000.00 | $ 360,000.00 | $ 360,000.00 | $ 360,000.00 | $ 240,000.00 | $ 8,425,000.00 |
| **Total Net Cash Flow After Overhead/Completion of Homes** | $ 367,737.17 | $ 5,954,966.87 | $ 4,466,804.64 | $ 3,200,314.87 | $ 2,547,683.48 | $ 2,657,486.94 | $ 1,306,025.26 | $ 360,000.00 | $ 360,000.00 | $ 240,000.00 | $ 21,461,019.23 |
| Appl of Sale Proceeds § 7.12 (ii) a | $ 332,052.88 | $ 4,167,947.12 | $ - | $ - | $ - | $ - | $ - | | | | $ 4,500,000.00 |
| Appl of Sale Proceeds § 7.12 (ii) b | $ 110,684.29 | $ 1,389,315.71 | $ - | $ - | $ - | $ - | $ - | | | | $ 1,500,000.00 |
| Appl of Sale Proceeds § 7.12 (iii) a | $ - | $ 206,822.43 | $ 1,367,882.78 | $ 691,988.92 | $ 133,305.87 | $ - | $ - | | | | $ 2,400,000.00 |
| Appl of Sale Proceeds § 7.12 (iii) b | $ - | $ 137,881.62 | $ 911,921.86 | $ 461,325.95 | $ 88,870.58 | $ - | $ - | | | | $ 1,600,000.00 |
| Appl of Sale Proceeds § 7.12 (iv) a | $ - | $ - | $ - | $ - | $ 181,402.81 | $ 654,594.78 | $ 378,410.10 | $ - | $ - | $ - | $ 1,214,407.69 |
| Appl of Sale Proceeds § 7.12 (iv) b | $ - | $ - | $ - | $ - | $ 272,104.22 | $ 981,892.16 | $ 567,615.16 | $ - | $ - | $ - | $ 1,821,611.54 |
| Appl of Sale Proceeds § 7.12 (iv) b (add'l projects) | $ (37,500.00) | $ 26,500.00 | $ 1,093,500.00 | $ 1,023,500.00 | $ 936,000.00 | $ 510,500.00 | $ 180,000.00 | $ 180,000.00 | $ 180,000.00 | $ 120,000.00 | $ 4,212,500.00 |
| Appl of Sale Proceeds § 7.12 (iv) b (add'l projects) | $ (37,500.00) | $ 26,500.00 | $ 1,093,500.00 | $ 1,023,500.00 | $ 936,000.00 | $ 510,500.00 | $ 180,000.00 | $ 180,000.00 | $ 180,000.00 | $ 120,000.00 | $ 4,212,500.00 |
| **Administrative and Unsecured Consolidated Cash Flow** | $ 294,552.88 | $ 4,401,269.55 | $ 2,461,382.78 | $ 1,715,488.92 | $ 1,250,708.68 | $ 1,165,094.78 | $ 558,410.10 | $ 180,000.00 | $ 180,000.00 | $ 120,000.00 | $ 12,326,907.69 |
| Administrative Claims | $ 294,552.88 | $ 3,205,447.12 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,500,000.00 |
| Unsecured Claims | $ - | $ 1,195,822.43 | $ 2,461,382.78 | $ 1,715,488.92 | $ 1,250,708.68 | $ 1,165,094.78 | $ 558,410.10 | $ 180,000.00 | $ 180,000.00 | $ 120,000.00 | $ 8,826,907.69 |

## Biltmore Cash Flow Summary

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Totals |
|---|---|---|---|---|---|---|---|---|
| ***Revenue:*** | $ 2,079,941.48 | $ 18,656,280.00 | $ 5,488,750.00 | $ - | $ - | $ - | $ - | $ 26,224,971.48 |
| ***Expenses:*** | | | | | | | | |
| Construction Cost | $ 732,462.10 | $ 8,120,215.40 | $ 2,539,265.55 | $ - | $ - | $ - | $ - | $ 11,391,943.05 |
| Real Estate Taxes | $ 1,800.00 | $ 14,400.00 | $ 5,000.00 | $ - | $ - | $ - | $ - | $ 21,200.00 |
| Realtor | $ 124,796.49 | $ 1,119,376.80 | $ 329,325.00 | $ - | $ - | $ - | $ - | $ 1,573,498.29 |
| Transfer Tax | $ 20,799.41 | $ 186,562.80 | $ 54,887.50 | $ - | $ - | $ - | $ - | $ 262,249.71 |
| Other Closing Costs | $ 10,399.71 | $ 93,281.40 | $ 27,443.75 | $ - | $ - | $ - | $ - | $ 131,124.86 |
| Miscellaneous Costs | $ - | $ 1,997,388.37 | $ 102,611.63 | $ - | $ - | $ - | $ - | $ 2,100,000.00 |
| Mechanics Liens | $ 105,331.36 | $ 769,826.92 | $ 1,430,216.57 | $ - | $ - | $ - | $ - | $ 2,305,374.85 |
| Bank Repayment | $ 739,683.77 | $ 3,525,055.23 | $ - | $ - | $ - | $ - | $ - | $ 4,264,739.00 |
| Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Expenses** | $ 1,735,272.84 | $ 15,826,106.92 | $ 4,488,750.00 | $ - | $ - | $ - | $ - | $ 22,050,129.76 |
| **Net Cash Flow:** | $ 344,668.64 | $ 2,830,173.08 | $ 1,000,000.00 | $ - | $ - | $ - | $ - | $ 4,174,841.72 |

* Bank Repayment includes interest on the loan and their fee

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| Singles Settled | 3 | 36 | 7 | 0 | 0 | 0 | 0 |
| Multi/Condo Settled | 6 | 36 | 18 | 0 | 0 | 0 | 0 |

## Barton Ridge Cash Flow Summary

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Totals |
|---|---|---|---|---|---|---|---|---|
| ***Revenue:*** | $ 330,000.00 | $ 3,184,000.00 | $ - | $ - | $ - | $ - | $ - | $ 3,514,000.00 |
| ***Expenses:*** | | | | | | | | |
| Construction Cost | $ 190,000.00 | $ 1,584,592.69 | $ - | $ - | $ - | $ - | $ - | $ 1,774,592.69 |
| Real Estate Taxes | $ 200.00 | $ 2,400.00 | $ - | $ - | $ - | $ - | $ - | $ 2,600.00 |
| Realtor | $ 18,150.00 | $ 175,120.00 | $ - | $ - | $ - | $ - | $ - | $ 193,270.00 |
| Transfer Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Closing Costs | $ 1,650.00 | $ 15,920.00 | $ - | $ - | $ - | $ - | $ - | $ 17,570.00 |
| Miscellaneous Costs | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Mechanics Liens | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Bank Repayment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Expenses** | $ 210,000.00 | $ 1,778,032.69 | $ - | $ - | $ - | $ - | $ - | $ 1,988,032.69 |
| **Net Cash Flow:** | $ 120,000.00 | $ 1,405,967.31 | $ - | $ - | $ - | $ - | $ - | $ 1,525,967.31 |
| Singles Settled | 1 | 12 | 0 | 0 | 0 | 0 | 0 | |
| Multi/Condo Settled | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

## Northgate 1B and 2A Cash Flow Summary

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Totals |
|---|---|---|---|---|---|---|---|---|
| ***Revenue:*** | $ 479,222.00 | $ 3,980,880.00 | $ - | $ - | $ - | $ - | $ - | $ 4,460,102.00 |
| ***Expenses:*** | | | | | | | | |
| Construction Cost | $ 115,240.39 | $ 1,728,142.08 | $ - | $ - | $ - | $ - | $ - | $ 1,843,382.47 |
| Real Estate Taxes | $ 400.00 | $ 2,800.00 | $ - | $ - | $ - | $ - | $ - | $ 3,200.00 |
| Realtor | $ 26,357.21 | $ 218,948.40 | $ - | $ - | $ - | $ - | $ - | $ 245,305.61 |
| Transfer Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Closing Costs | $ 2,396.11 | $ 19,904.40 | $ - | $ - | $ - | $ - | $ - | $ 22,300.51 |
| Miscellaneous Costs | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Mechanics Liens | $ 212,205.94 | $ 181,400.00 | $ - | $ - | $ - | $ - | $ - | $ 393,605.94 |
| Lender Repayment | $ 24,123.62 | $ 1,091,724.77 | $ - | $ - | $ - | $ - | $ - | $ 1,115,848.38 |
| Interest | $ 9,298.74 | $ 40,352.74 | $ - | $ - | $ - | $ - | $ - | $ 49,651.47 |
| **Total Expenses** | $ 390,022.00 | $ 3,283,272.39 | $ - | $ - | $ - | $ - | $ - | $ 3,673,294.39 |
| **Net Cash Flow:** | $ 89,200.00 | $ 697,607.61 | $ - | $ - | $ - | $ - | $ - | $ 786,807.61 |
| Singles/Towns Settled | 2 | 14 | 0 | 0 | 0 | 0 | 0 | |
| Multi/Condo Settled | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

## *Northgate 2/3 Remainder Cash Flow Summary*

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Totals |
|---|---|---|---|---|---|---|---|---|
| ***Revenue:*** | $ 774,970.00 | $ 15,209,350.00 | $ 18,861,160.00 | $ 12,268,500.00 | $ 5,286,093.33 | $ - | $ - | $ 52,400,073.33 |
| ***Expenses:*** | | | | | | | | |
| Construction Cost | $ 258,214.00 | $ 7,793,049.76 | $ 9,923,221.04 | $ 6,188,823.29 | $ 2,839,151.22 | $ - | $ - | $ 27,002,459.30 |
| Real Estate Taxes | $ 600.00 | $ 13,000.00 | $ 16,800.00 | $ 10,000.00 | $ 4,800.00 | $ - | $ - | $ 45,200.00 |
| Realtor | $ 42,623.35 | $ 836,514.25 | $ 1,037,363.80 | $ 674,767.50 | $ 290,735.13 | $ - | $ - | $ 2,882,004.03 |
| Transfer Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Closing Costs | $ 3,874.85 | $ 76,046.75 | $ 94,305.80 | $ 61,342.50 | $ 26,430.47 | $ - | $ - | $ 262,000.37 |
| Miscellaneous Costs | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Mechanics Liens | $ 380,789.27 | $ 4,268,494.87 | $ 4,917,645.87 | $ 3,624,147.97 | $ 1,304,455.52 | $ - | $ - | $ 14,495,533.48 |
| Bank Repayment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Expenses** | $ 686,101.47 | $ 12,987,105.63 | $ 15,989,336.50 | $ 10,559,081.25 | $ 4,465,572.33 | $ - | $ - | $ 44,687,197.18 |
| **Net Cash Flow:** | $ 88,868.53 | $ 2,222,244.37 | $ 2,871,823.50 | $ 1,709,418.75 | $ 820,521.00 | $ - | $ - | $ 7,712,876.15 |
| Singles Settled | 3 | 65 | 84 | 50 | 24 | 0 | 0 | |
| Multi/Condo Settled | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

# Northgate 4 Cash Flow Summary

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Totals |
|---|---|---|---|---|---|---|---|---|
| ***Revenue:*** | $ - | $ 6,556,060.00 | $ 7,734,020.00 | $ 7,124,020.00 | $ 7,155,020.00 | $ 7,155,020.00 | $ 2,981,800.00 | $ 38,705,940.00 |
| ***Expenses:*** | | | | | | | | |
| Construction Cost | $ - | $ 3,353,847.33 | $ 3,968,543.31 | $ 3,638,957.41 | $ 3,659,999.51 | $ 3,659,999.51 | $ 1,525,230.24 | $ 19,806,577.31 |
| Real Estate Taxes | $ - | $ 8,800.00 | $ 9,600.00 | $ 9,600.00 | $ 9,600.00 | $ 9,600.00 | $ 4,000.00 | $ 51,200.00 |
| Realtor | $ - | $ 311,412.85 | $ 367,365.95 | $ 338,390.95 | $ 339,863.45 | $ 339,863.45 | $ 141,635.50 | $ 1,838,532.15 |
| Transfer Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Closing Costs | $ - | $ 32,780.30 | $ 38,670.10 | $ 35,620.10 | $ 35,775.10 | $ 35,775.10 | $ 14,909.00 | $ 193,529.70 |
| Miscellaneous Costs | $ - | $ 415,731.42 | $ 612,385.90 | $ 417,731.42 | $ 814,856.26 | $ 657,295.00 | $ 10,000.00 | $ 2,928,000.00 |
| Mechanics Liens | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Bank Repayment | $ - | $ 1,287,513.60 | $ 1,429,473.60 | $ 1,423,824.00 | $ 1,143,763.20 | $ - | $ - | $ 5,284,574.40 |
| Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Expenses** | $ - | $ 5,410,085.50 | $ 6,426,038.86 | $ 5,864,123.88 | $ 6,003,857.52 | $ 4,702,533.06 | $ 1,695,774.74 | $ 30,102,413.56 |
| **Net Cash Flow:** | $ - | $ 1,145,974.50 | $ 1,307,981.14 | $ 1,259,896.12 | $ 1,151,162.48 | $ 2,452,486.94 | $ 1,286,025.26 | $ 8,603,526.44 |
| Singles/Towns Settled | 0 | 0 | 14 | 0 | 0 | 0 | 0 | |
| Multi/Condo Settled | 0 | 44 | 34 | 48 | 48 | 48 | 20 | |

## *Village at Wynstone Cash Flow Summary*

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ***THP Management Fee*** | $ - | $ 990,000.00 | $ 3,960,000.00 | $ 3,960,000.00 | $ 3,960,000.00 | $ 2,175,000.00 | $ 840,000.00 | $ 840,000.00 | $ 840,000.00 | $ 560,000.00 | $ 18,125,000.00 |
| ***Carry and Dev Cost Recoup*** | $ - | $ 135,000.00 | $ 540,000.00 | $ 250,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 925,000.00 |
| ***Expenses:*** | | | | | | | | | | | |
| Carrying Cost | $ 75,000.00 | $ 300,000.00 | $ 225,000.00 | $ 75,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 675,000.00 |
| Development Expenses | $ - | $ 250,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 250,000.00 |
| **Total Expenses** | $ 75,000.00 | $ 550,000.00 | $ 225,000.00 | $ 75,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 925,000.00 |
| **Net Cash Flow:** | $ (75,000.00) | $ 575,000.00 | $ 4,275,000.00 | $ 4,135,000.00 | $ 3,960,000.00 | $ 2,175,000.00 | $ 840,000.00 | $ 840,000.00 | $ 840,000.00 | $ 560,000.00 | $ 18,125,000.00 |
| Singles Settled | 0 | 21 | 84 | 84 | 84 | 39 | 24 | 24 | 24 | 16 | |
| Multi/Condo Settled | 0 | 6 | 24 | 24 | 24 | 22 | 0 | 0 | 0 | 0 | |

# EXHIBIT D – MANAGEMENT AGREEMENT

# MANAGEMENT AGREEMENT

**BY AND AMONG**

**TH PROPERTIES, L.P,
TH PROPERTIES OF NEW JERSEY, L.P.
NORTHGATE DEVELOPMENT COMPANY, LP
MORGAN HILL DRIVE, LP
TH PROPERTIES, INC.
TH PROPERTIES LLC
SWAMP PIKE, L.P.**

**(COLLECTIVELY, THE "DEBTORS")**

**W. TODD HENDRICKS AND TIMOTHY P. HENDRICKS**

**(COLLECTIVELY, THE "HENDRICKS")**

**AND**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
(THE "COMMITTEE")**

**Dated as of
___________ __, 2011**

# MANAGEMENT AGREEMENT

This Management Agreement (this "Agreement"), dated as of July ______, 2011 (the "Effective Date"), is by, between and among TH Properties, L.P. ("THP"), TH Properties of New Jersey ("THPNJ"), Northgate Development Company, LP ("Northgate"), Morgan Hill Drive, LP ("Morgan Hill"), TH Properties, Inc. ("THP, Inc."), TH Properties, LLC ("THPLLC") and Swamp Pike, LP ("Swamp Pike") (THP, THPNJ, Northgate, Morgan Hill, THP, Inc., THPLLC and Swamp Pike, each a "Debtor" and collectively, the "Debtors"), W. Todd Hendricks and Timothy P. Hendricks (collectively, the "Hendricks") and The Official Committee of Unsecured Creditors (the "Committee").

## BACKGROUND

In connection with the implementation of the First Amended Joint Chapter 11 Plan of Debtors and Debtors-in-Possession and the Committee to the United Stated Bankruptcy Court for the Eastern District of Pennsylvania filed by the Debtors and the Committee (the "Plan"), the parties are entering into this Agreement to permit THP, Inc. to manage and oversee the completion and sale of the Projects (defined herein) as more fully set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, consideration and covenants set forth herein, and intending to be mutually bound, the parties hereto agree as follows.

## ARTICLE I

## DEFINITIONS

"Barton Ridge Project" shall mean the project commonly referred to as Barton Ridge and located in Winslow Township, New Jersey.

"Biltmore Estates Project" shall mean the project commonly referred to as Biltmore Estates and located in Skippack Township, Pennsylvania.

"Board" or "Boards" shall mean the board of directors of each Debtor, and the new general partner of each Debtor limited partnership, which as of the Effective Date shall be, or reconstituted so as to be comprised of the five (5) following members, Timothy P. Hendricks, W. Todd Hendricks, two Committee members (to be selected by the Committee), and one additional member to be mutually agreed upon by each member of the Boards. "Chapter 11 Cases" shall mean the cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors commenced in the Court on the respective Petition Dates.

"Cliffside Manor Phase II Project" shall mean the remaining units in the project commonly known as Cliffside Manor Phase II and located in Bedminster Township, Pennsylvania.

"Coddington View Project" shall mean the 14 units in the project commonly known as Coddington View and located in Upper Pottsgrove Township, Pennsylvania.

"Court" shall mean the United States Bankruptcy Court for the Eastern District of Pennsylvania.

"Drawings and Specifications" shall mean all blueprints, schematic renderings, architect's drawings, specifications, written descriptions and similar items for the Projects, all related drawings, plans and data, including all building codes (and all supplements and amendments thereto) relating to the design, construction, equipping and furnishing of the Projects, as and when approved by the Board.

"General Overhead" shall mean the general and administrative costs including, rent, payroll, insurance, office expenses and related expenses associated with the operation of the businesses of THP, Inc. and the other reorganized debtors that are not included in the Project Specific Expenses.

"GP Debtor" shall mean TH Properties, LLC, the general partner of TH Properties, L.P.

"Hendricks" means W. Todd Hendricks and Timothy P. Hendricks

"Insurance Requirement" shall mean all terms of any insurance policies covering or applicable to each Project, all requirements of the issuer of any such policy and all orders, rules, regulations and other requirements of any insurance, regulatory or governing body applicable to a Project.

"Kingston Hill Project" shall mean Lot 105 of the project commonly known as Kingston Hill and located in New Hanover Township, Pennsylvania.

"Law" or "Laws" shall mean any judicial decision, statute, constitution, ordinance, resolution, regulation, rule, administrative order or other requirement of any municipal, county, state, federal or other governmental agency or authority having jurisdiction over the Parties or the Projects in effect on the date of this Agreement or at any time during the Term.

"Northgate Phase IIA, II and III Project" shall mean the project commonly known as Northgate Phases IIA, II and III and located in Upper Hanover Township, Pennsylvania.

"Northgate Phase IV and V Project" shall mean the projects commonly known as Northgate Phases IV and V and located in Upper Hanover Township, Pennsylvania.

"Parties" shall mean the Hendricks, the Debtors and the Committee.

"Petition Dates" mean April 30, 2009, the date on which THP, THPNJ, Northgate, Morgan Hill, and THP, Inc. filed their respective petitions for relief, April 20, 2010, the date on which THPLLC filed its petition for relief; and September 14, 2010, the date on which Swamp Pike filed its petition for relief.

"Project Budget" shall mean the budget prepared by THP, Inc. for each Project that details the estimated projected revenue for the Project, the estimated Project Specific Expenses, the estimated allocation of General Overhead to the Project and the estimated net cash flow from the Project.

"Projects" shall mean collectively, the Biltmore Estates Project, the Coddington View Project, Northgate Phase IIA, II and III Project, the Northgate Phase IV and V Project, the Kingston Hill Project and the Barton Ridge Project.

"Project Specific Expenses" shall mean (a) the costs associated with the development, construction, marketing and sale of homes at a Project including, construction costs, real estate taxes, broker/realtor commissions, transfer taxes, closing costs, and other related miscellaneous costs, and (b) payments required to satisfy the Allowed Mechanic Lienholders Claims (as defined in the Plan) applicable to the respective Project, if any, and to satisfy the Allowed Secured Lender Claims (as defined in the Plan), applicable to the respective Project, if any.

"THP, Inc. Board" means the Board of Directors of THP, Inc.

"THP, LP" means TH Properties, L.P.

## ARTICLE 2

## MANAGEMENT

Section 2.1 Management. Subject to the terms and conditions set forth herein, on behalf of the Debtors, the THP, Inc. Board shall perform all site and general management related services relating to the Projects (collectively, the "Services") including, without limitation the following in accordance with the terms of this Agreement:

(a) Serve as the Debtors' representative in the development, construction, management and sale of the Projects in accordance with the terms of the Plan;

(b) Use reasonable efforts to procure (to the extent reasonably available) all necessary governmental authorizations, building permits and other permits, licenses and approvals for the Projects, including granting or dedication of such rights-of-way, easements, licenses or other rights as shall be necessary or appropriate to provide utility or other services or facilities for the Projects;

(c) Establish procedures for the processing and payment of applications for payment, including reviewing all applications for payment submitted by contractors, subcontractors or other parties hired by the THP, Inc. Board in connection with the construction of the Projects;

(d) Direct, coordinate, monitor and supervise the performance of all contractors and other professionals providing services in connection with the construction, completion and development of the Projects, and use reasonable efforts to cause such activities and Services

provided by such parties to be in accordance with the terms of their applicable agreement, the Drawings and Specifications, the applicable Project Budget and all agreements including, without limit thereto, any loan agreement executed by Debtors in connection with a DIP financing (the "DIP Financing");

(e) Inspect the Projects on a regular basis, consult with the contractors and other professionals and stop work or reject any work which fails to conform with the Drawings and Specifications;

(f) Attend any and all public meetings which may be held concerning the Projects and negotiate all contracts for the furnishing of utilities to the Projects in capacities adequate for the intended use of each such Project;

(g) Prepare the Project Budgets;

(h) Review and periodically update the Project Budgets;

(i) Prepare and, assemble materials required in connection with submission of applications for payment under any DIP Financing agreements pursuant to which funds are provided for the Projects and work directly with the applicable lender's construction inspector;

(j) Take such actions on behalf of the Debtors as may be required to obtain any certificates of occupancy or equivalent documents required to permit the occupancy of the homes in the Projects;

(k) Where necessary, procure any certifications addressed to the Debtors that the respective Drawings and Specifications for each of the Projects comply with the design and technical requirements for the Project set forth in the zoning and building codes and laws applicable to the Project;

(l) Maintain insurance on all Projects;

(m) Prepare of Debtors' tax returns or related tax schedules;

(n) Prepare of reports, statements, and other information necessary for the completion of each Project;

(o) Assist real estate brokers, as needed with respect to the marketing and sale of the homes in each Project; and

(p) Administer the Plan and be responsible for, among other things, performing all acts of the Debtors necessary to carry out the Plan. From and after the Effective Date and continuing through the date of entry of a Final Decree, the THP, Inc Board shall: (i) possess the rights of a party in interests pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall

(A) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (B) be entitled to notice and opportunity for hearing on all such issues, (C) participate in all matters brought before the Bankruptcy Court, and (D) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court; (ii) have the authority to act on behalf of the Debtors in all adversary proceedings and contested matters pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; and (iii) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors, realtors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate, all without prior notice to or approval of the Bankruptcy Court.

Section 2.2 Authority of the THP, Inc. Board. The THP, Inc. Board shall have the authority, acting alone or through others, in the exercise of commercially reasonable business judgment, to take those actions on behalf of Debtors specifically set forth herein as well as in the Debtors Plan of Reorganization (the "Plan") to perform its duties under this Agreement and the Plan. In no event shall the THP, Inc. Board take any actions which are not consistent with this Agreement, confirmed and authorized in the Plan. The THP, Inc. Board is authorized and empowered to execute and deliver in the name and on behalf of the Debtors all documents and instruments necessary in order to perform its duties with respect to the management of the Projects in accordance with this Agreement and the Plan.

Section 2.3 Service Contracts. The THP, Inc. Board shall execute on behalf of the Debtors those contracts necessary to complete the Projects, provided that: (a) all contracts shall be in writing; (b) all contracts shall be at generally prevailing market rates, with qualified, independent experienced service providers; and (c) no contract shall be entered into unless the contract involves expenditures for the contemplated services to the Debtors contemplated by the Plan and the Project Budgets.

Section 2.4 Election of New Board Members. During the term of this Agreement, (a) if, Timothy Hendricks P. Hendricks or W. Todd Hendricks is unable or unwilling to continue to serve on the Boards, the remaining Hendrick's board member shall have the exclusive right to appoint a successor to the Boards, or (b) if, either of the two Committee members become unable or unwilling to serve on the Boards, the remaining Committee board member shall have the exclusive right to appoint a successor to the Boards; the agreement being that both the Hendricks and the Committee shall each have selected two members that are prepared to serve on the reconstituted Boards at all times during the term of this Agreement. Likewise, if the during the term of this Agreement, the fifth independent member of the Boards is unable or unwilling to serve on the Boards, the Hendricks board members and the Committee board members shall jointly select a new fifth independent member to the Boards. The Hendricks, directly or indirectly, may retain all of their interests in a voting trust.

Section 2.5 New General Partners. On or before the Effective Date of the Plan, four Pennsylvania limited liability companies shall be formed which shall become the new general partner of each reorganized Debtor limited partnership except, for the GP Debtor, which shall continue as the general partner of THP, LP. The Hendricks shall retain all their interests in the

Reorganized Debtors and either they, or their designees, shall own all interests in the new general partners to be formed.

Section 2.6 Option to Purchase Projects. At anytime prior to the completion of all the Projects, Hendricks shall have the option to purchase the Projects by paying an amount equal to the sale price determined by the THP, Inc. Board for the Projects less the aggregate amount of all distributions paid under Section 5.02 of the Management Agreement and corresponding Section 7.12 of the Plan (the "Purchase Price"). Subject to the Purchase Price being paid and distributed under the provisions of the Management Agreement and Plan, the Debtors and the Hendricks will be released and discharged of any and all further obligations under the Plan and the Management Agreement and the Management Agreement shall terminate, all the board members appointed by the Committee shall resign from all the Boards and full control of the Boards will be relinquished to the Hendricks. all the board members appointed by the Committee shall resign from the Boards

## ARTICLE 3

## INSURANCE

Section 3.1 The THP, Inc. Board Insurance. The THP, Inc. Board shall, on behalf of the Debtors maintain worker's compensation insurance as required by law and commercially reasonable insurance coverages with respect to: (a) employer's liability; (b) commercial general liability insurance; bodily injury and property damage; and (c) comprehensive crime insurance (including employee dishonesty).

## ARTICLE 4

## RECORDS

Section 4.1 Maintenance of Records. The THP, Inc. Board shall maintain on a current basis a system of accounts and a document filing system with respect to each Project which systems shall be in compliance with any applicable governmental requirements. All records shall be maintained at the address specified in this Agreement Each of the Debtors shall have full access to such records.

Section 4.2 Debtors' Property. All records received or maintained by the THP, Inc. Board are and shall remain the property of each of the applicable Debtors and, upon termination or expiration of this Agreement for any reason, shall be promptly turned over to such Debtor; provided that the THP, Inc. Board may retain copies of such records so long as they are kept confidential and shall disclose such records to third parties solely if and to the extent obligated to do so as a matter of law or judicial or administrative order.

## ARTICLE 5

## MANAGEMENT FEE, DISBURSEMENTS

Section 5.01. Management Fee. A management fee (the "Management Fee") shall be payable to the Hendricks (the "Management Fee") in the form of: (a) an annual bonus to the Hendricks if the sales projections are met and/or if the actual expenses are less than the projected expenses for that year (in a formula to be determined post-confirmation by the THP, Inc. Board); and (b) a portion of the annual net profit of each project shall be paid annually as performance bonuses to the Hendricks if certain targets (to be determined post-confirmation by the THP, Inc. Board) for (a) distributions to creditors and/or (b) sales of completed homes are met.

Section 5.02. Disbursements. THP, Inc. with the services of any of the third party subcontractors and vendors selected by its Board shall complete the Barton Ridge Project, Biltmore Estate Project, Coddington View Project, Kingston Hill Project, Northgate Phases IIA, II and III Project, Northgate Phase IV and V Project, and to the extent included after disposition of the Gehringer Plumbing adversary proceeding, Cliffside Manor Phase II Project. The proceeds from these Projects shall be used to pay the following amounts in the following order of priority (i) first, to the extent applicable, to pay all amounts due in accordance with the Court approved settlement agreements referenced in Classes 2 and 4 of the Plan, (ii) second, to pay the Project Specific Expenses and General Overhead identified in the Project Budgets , (iii) third, the next six million dollars ($6,000,000.00) of proceeds generated, (a) Seventy Five per cent (75%) to pay Administrative Claims, and General Unsecured Claims and (b) fifteen per cent (15%) to THP, LP and ten percent (10%) to the Hendricks as the Management Fee; (iv) fourth, the next four million dollars ($4,000,000.00) of proceeds generated, (a) sixty per cent (60%) to pay Administrative Claims and General Unsecured Claims and (b) thirty percent (30%) to THP, LP and ten per cent (10%) to the Hendricks as the Management Fee; and (v) fifth, the remainder of proceeds generated, (a) forty per cent (40%) to pay Administrative Claims and General Unsecured Claims and (b) fifty per cent (50%) to THP, LP and ten percent (10%) to the Hendricks as the Management Fee. If any additional projects are added to the Reorganized Debtors, all gross proceeds generated shall be divided fifty per cent (50%) to pay Administrative Claims and General Unsecured Claims and forty per cent (40%) to THP, LP and ten percent (10%) to the Hendricks as the Management Fee. It is understood and agreed that the proceeds distributed under sub-sections 5.02(iii)(a), 5.02(iv)(a), 5.02(v)(a) and any additional projects added as provided by section 5.02, shall be paid first, on a pro-rata basis, to the holders of Allowed Administrative Claims until the Allowed Administrative Claims are paid in full and then, on a pro-rata basis to holders of Allowed General Unsecured Claims.

## ARTICLE 6

## BUDGETS

Section 6.1 Budgets. Each Project shall have a Project Budget. THP, Inc. shall continue to act as the common paymaster for all the Debtors and, may maintain one concentration bank account into which proceeds from all Projects will be deposited and from which all Project Specific Expenses, General Overhead expenses including, vendor invoices, overhead expenses, costs for labor and materials, and transfers for gross payroll shall be paid; provided, however THP, Inc. shall maintain separate books and records for each Debtor and shall account for each Debtor's deposits into, and disbursements from, the concentration bank account. In addition, THP, Inc. may also maintain one payroll account from which gross payroll shall be paid; provided, however THP, Inc. shall allocate the payroll expenses among each Debtor, as may be applicable. THP, Inc. Board shall retain the right to modify the common paymaster business model including, the single concentration bank account and single payroll account as it deems appropriate in its sole business judgment, in order, to allow THP, Inc to operate in the most efficient and cost effective manner. The payment to THP, Inc. for overhead under the Management Agreement at each closing shall not exceed twenty percent of the net sales price (gross sale price less closing costs, commissions, real estate taxes and promotions) of each home and shall be capped at $17,000.00 per condominium unit and $20,000.00 per single family home; provided, however, the maximum General Overhead for each month shall not exceed $200,000 and the THP, Inc. Board shall retain the right to increase this amount as it deems appropriate in its sole business judgment. Additionally, the Project Specific Expenses of each of the Project shall include a pro-ration of funds up to $500,000 in the aggregate as determined to be necessary by the THP, Inc. Board to address (in no particular order of priority) (a) warranty, maintenance work on homes sold prior to the petition date, including driveway toppings, and other customer service items in any non-dedicated Project; and (b) mechanics liens on homes that were conveyed by any of the Debtors to a buyer prior to the Petition Date. The Budgets shall also include a reasonable salary for the Hendricks which shall be the same as agreed to with Committee at the commencement of Chapter 11 Cases.

**ARTICLE 7**

**ABANDONED PROJECTS**

Section 7.01 Abandoned Projects. The Debtors and the Committee have jointly determined that the following projects (the "Abandoned Projects") have no value to the Debtors' Estates: Arbor Court in Pennsburg Borough; Stoneacre Ridge (Ellis and Leidy) in New Hanover Township; Melbourne Hill In Lower Frederick Township; Ivywood in East Coventry Township; Newport Landing (Nagdev and Sandanato) in Bristol Township; Kingston Hill (Lester) in New Hanover Township Normandie, in Upper Salford Township and the Fleet Maintenance Building in Lower Salford Township; certain remaining lots in Kingston Hill II in New Hanover Township; Whitfield Estates I, IIA, IIB, and III in Upper Macungie Township; Berwind II in Douglass Township; Edgehill in Upper Frederick Township; Westport Farm in Franconia Township, Kingston Hill III in New Hanover Township; Village at Wynstone in New Hanover Township; 1104 Berkley Drive, Pennsburg; Burbank Grove in Upper Providence Township; Kingston Hill Phase IV in New Hanover Township; Stoneacre Ridge (Brusch) in New Hanover Township; Stoneacre Ridge – Trolley Line and Melbourne Hill Sewer Plant Property. The

Abandoned Projects shall be abandoned or turned over to the secured party with a first priority lien on the Abandoned Property, or such other treatment on such other terms and conditions as may be agreed upon in writing, as the case may be. The Abandoned Projects shall not be completed in accordance with this Agreement and shall be treated in section 7.05 of the Plan.

## ARTICLE 8

## TERM, EVENTS OF DEFAULT & REMEDIES

Section 8.1 Term. The term of this Agreement shall commence on the Effective Date of the Plan and, unless extended or sooner terminated as herein provided, shall end on the earliest to occur of: (a) upon the completion (or, if applicable, the abandonment of any portion) of the Projects and the disbursement of funds from the Projects in accordance with the Plan; or (b) notice from one of the Parties following an Event of Default based on the acts or omissions of another party. Upon completion (or if applicable, the abandonment of any portion of a Project) of the Projects and the disbursements of the funds from the Projects in accordance with this Agreement and the Plan, the Debtors and Hendricks will be released and discharged of any and all further obligations under the this Agreement and the Plan and this Agreement shall terminate, all the board members appointed by the Committee shall resign from all the Boards and full control of the Boards will be relinquished to the Hendricks.

Section 8.2 Events of Default. The occurrence of any of the following events may constitute an event of default ("Event of Default") hereunder on the part of the party to this Agreement with respect to whom such event occurs (the "Defaulting Party"):

(a) should there occur default in performance of, or failure to comply with, any agreements, obligations or undertakings of a party herein contained, which default or failure continues for 30 days; or

(b) if the sales projections or expense targets as contained in the approved Budgets for any Project not met, and the THP, Inc. Board does not approve necessary modifications to address and/or adjust the missed sales and expense targets.

Section 8.3 Remedies on Default. Upon the occurrence and during the continuance of any Event of Default for more than 45 days, the Parties may be entitled to do any or all of the following: (a) cause the termination of this Agreement (b) terminate this Agreement specifically with respect any or each of the Projects only and continue the Agreement with respect to the other Projects; (c) if the Event of Default is due to sales or expense targets set forth in the annual approved budgets not being met (as determined by the THP, Inc. Board), the THP, Inc. Board may replace the Hendricks as THP, Inc. Board members and the individual Boards may do the same, subject to paying the Hendricks all outstanding payments due them including accrued salary and the Management Fee, and any other expenses due that have accrued but not been paid as of the termination date, after which the Hendricks shall not be entitled to any further payments.

Section 8.4 Remedies Not Exclusive. The rights and remedies under this Agreement shall not be mutually exclusive. The exercise of one or more of the rights and remedies under this Agreement shall not preclude the exercise of any other right or remedy.

## ARTICLE 9

## MISCELLANEOUS

Section 9.1 Notices.

(a) Any and all notices, demands, consents, approvals, offers, elections and other communications required or permitted under this Agreement (collectively, "notices") shall be deemed adequately given if in writing and the same shall be delivered either in hand, by telecopier with written acknowledgment of receipt, or by mail or Federal Express or similar expedited commercial carrier, addressed to the recipient of the notice, postpaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier). All notices shall be deemed to have been given for all purposes of this Agreement upon the date of acknowledged receipt, in the case of a notice by telecopier, and, in all other cases, upon the date of actual delivery.

(b) Subject to each party's right to change such addresses at any time by written notice to the other party, all notices shall be addressed to the following:

TH Properties
345 Main Street
Harleysville, PA 19438
Attn: Timothy P. Hendricks

With a copy to:

Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
Attn.: Natalie D. Ramsey

With a copy to:

Paul R. Ober & Associates
234 North Sixth Street
Reading, PA 19601
Attn.: Joseph A. La Flamme

Section 10.5 Successors and Assigns. Whenever in this Agreement any of the parties

hereto is referred to, such reference shall be deemed to include the successors and assigns of such party and all covenants and agreements which are contained in this Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

Section 10.6 Remedies. Each of the parties recognizes and agrees that the remedies at law for any material breach of the provisions of this Agreement would be inadequate and that the other party shall, in addition to such other remedies as may be available at law or in equity or as provided in this Agreement, be entitled to injunctive relief, to require an accounting and to enforce its rights by an action for specific performance, all to the full extent permitted by applicable law.

Section 10.9 Severability. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby, but this Agreement shall be reformed and construed and enforced to the maximum extent permitted by applicable law.

Section 10.10 Entire Contract; Survival. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and shall supersede and take the place of any other instruments purporting to be an agreement of the parties hereto relating to the subject matter hereof. Notwithstanding the foregoing, nothing contained in this Agreement shall alter or amend the Plan or any of the orders of the Court entered in the Debtors jointly administered bankruptcy cases (under case no. 09-13201 (SR)), including any and all agreements approved in connection therewith.

Section 10.11 Headings; Counterparts. Headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument, and in pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one of such counterparts.

Section 10.12 Applicable Law. EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE COMMONWEALTH OF PENNSYLVANIA.

Section 10.14 Counterparts. This Agreement may be executed in any number of separate

counterparts, each of which shall together be deemed an original, but the several counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

DEBTORS:

TH PROPERTIES, L.P.,
TH PROPERTIES OF
NEW JERSEY, L.P.
NORTHGATE DEVELOPMENT
COMPANY, L.P., MORGAN HILL
DRIVE, LP, TH PROPERTIES, INC.,
and SWAMP PIKE, L.P.

By: ______________________
Name: Timothy P. Hendricks
Title: Member

TH PROPERTIES, INC.:

By:______________________
Name: Timothy P. Hendricks, Vice-President

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:______________________
Name: Steven Nelson
Title: Committee Chair

# EXHIBIT E
# NOTICE OF RELEASE IN ACCORDANCE WITH CONFIRMED CHAPTER 11 PLAN

**IN THE COURT OF COMMON PLEAS OF ____________ COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

:
:
Vs. : File No.________________
: Parcel No(s)_____________
:
:
:

## PRAECIPE FOR SATISFACTION AND/OR TERMINATION

TO THE PROTHONOTARY/CLERK OF SAID COURT:

You are hereby authorized, empowered, and directed to enter, as indicated, the following on the records thereof:

The within judgment/mechanics' lien is satisfied and the within matter is settled, discontinued and ended with prejudice.

Date:__________________________ ________________________________
Signature of authorizing party

Witness (if signer is other than a registered Attorney)

______________________________
Attorney or Notary

________________________________
Print or type name of above signer