**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| TH Properties, L.P., *et al.*, | : | |
| Reorganized Debtors.[1] | : | Bankruptcy No.  09-13201-MDC |

# <u>MEMORANDUM</u>

## I.      INTRODUCTION

Pending before the Court for resolution is a motion by the law firm of Montgomery McCracken Walker & Rhoads LLP ("MMWR") to enforce a stipulation and order from January 2013 (the "Motion to Enforce") that resolved objections to its final fee application as counsel to the debtors in the above-captioned bankruptcy case (the "Final Fee Application").   The Reorganized Debtors contest the Motion to Enforce.   The Court held a two-day trial (the "Trial") on March 4 and 5, 2024, after which it took the matter under advisement.

For the reasons discussed below, the Court will grant the Motion to Enforce as provided herein.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.      Stipulation Resolving Objections to MMWR's Final Fee Application

MMWR served as bankruptcy counsel to the debtors (the "Debtors").   On August 9, 2012, MMWR filed its Final Fee Application for the period from April 30, 2009 through May

---

1 The reorganized debtors are Morgan Hill Drive, LP, Northgate Development Company, LP, TH Properties,TH Properties of New Jersey, L.P., TH Properties, Inc., TH Properties, LLC, and Wynstone Development Group, LP (the "Reorganized Debtors").

31, 2012,[2] by which it sought final approval of compensation in the amount of $2,956,387.50

and reimbursement of expenses in the amount of $191,842.71.   After crediting payment already

received in the amount of $491,978.42, the Final Fee Application stated the balance remaining

was $2,656,251.80.

The Debtors filed a limited objection to the Final Fee Application (the "Fee Objection"),[3]

asserting that (a) the amount of fees sought was excessive, (b) MMWR had not adequately and

efficiently represented the Debtors, resulting in duplication of work, and (c) the timing and

manner of payment of MMWR's fees under the Debtors' confirmed plan of reorganization (the

"Plan") was vague.   Certain creditors (the "H&K Entities")[4] filed a joinder to the Debtors' Fee

Objection (the "Fee Objection Joinder").[5]

Thereafter, MMWR, the Debtors, and the H&K Entities entered into negotiations to

resolve the objections to the Final Fee Application.   Those negotiations culminated in the entry

of an Order (the "Fee Order")[6] on January 17, 2013, approving the Final Fee Application in

accordance with a stipulation (the "Stipulation")[7] entered into by MMWR, the Debtors, and the

H&K Entities.[8]   The Court also separately approved the Stipulation itself pursuant to a "So

Ordered" entry by my former colleague, Judge Stephen Raslavich.   In addition to providing for

---

2 Bankr. Docket No. 2288.

3 Bankr. Docket No. 2305.

4 The H&K Entities are Haines & Kibblehouse, Inc. ("H&K"), Blooming Glen Contractors, Inc.,
Reading Materials Inc. and Lehigh Valley Site Contractors, Inc.

5 Bankr. Docket No. 2307.

6 Bankr. Docket No. 2390.

7 Bankr. Docket No. 2391.

8 Although irrelevant for present purposes, Timothy P. Hendricks and W. Todd Hendricks were also
parties to the Stipulation to resolve certain disputes with respect to the Plan.

the mechanics of payment to MMWR, the Stipulation provides as follows:

> MMWR will agree to reduce its total fee and cost claims against THP
> from $2.6 million for all pre-bankruptcy, bankruptcy, and post-bankruptcy
> work for THP to the total sum of $2.325 million, with the said reduction of
> $275,000 to be applied after receipt by MMWR of $2.325 million, thereby
> leaving unchanged the present agreed on base number of $2,537,683.40
> for MMWR for purposes of calculating the proportional allocation of any
> future distributions to MMWR and other Plan creditors.   And the said
> objections are hereby resolved and withdrawn with prejudice.

Stipulation at ¶1.

### B.    MMWR's Motion to Reopen to Enforce the Stipulation and Fee Order

Nearly three-and-a-half years later, MMWR filed a motion to reopen the Debtors'

bankruptcy case (the "Motion to Reopen")[9] to allow MMWR to prosecute the Motion to

Enforce, which was attached as an exhibit to the Motion to Reopen.   The Motion to Reopen

asserted that the Reorganized Debtors were in breach of the Stipulation by refusing to make

additional payments owing to MMWR.   Specifically, the Reorganized Debtors were taking the

position that approximately $680,000 in payments the Debtors made to MMWR prior to entry

into the Stipulation were to be applied as a credit against the $2.325 million to be paid to

MMWR pursuant to paragraph 1 of the Stipulation.   According to MMWR, this meritless

position contravened the Reorganized Debtors' obligation to pay MMWR an *additional* $2.325

million pursuant to paragraph 1 of the Stipulation, without credit for prior payments.   MMWR

therefore sought to reopen this bankruptcy case to enforce that obligation.

The Reorganized Debtors objected to the Motion to Reopen, arguing that the relief sought

by the Motion to Enforce conflicted with the plain language of the Stipulation, and to the extent

---

9  Bankr. Docket No. 2474.

any ambiguity existed, it had to be resolved against MMWR as the party that drafted the

Stipulation.[10]   Moreover, the Reorganized Debtors argued, the language of the Stipulation is

consistent with the intent of the Debtors and the H&K Entities in negotiating it, which was "to

reduce MMWR's fees to the maximum extent possible."   The Reorganized Debtors therefore

objected to the Court reopening the case, arguing that instead the Court could look to the plain

language of the Stipulation to find that reopening to allow prosecution of the Motion to Enforce

would be futile and a waste of judicial resources.

    After a hearing on the Motion to Reopen and the objections thereto, Judge Raslavich

entered an order on July 13, 2016 granting the motion and reopening the bankruptcy case "for

the limited purpose of deciding a question of interpretation having to do with provisions of [the

Stipulation]."[11]   Judge Raslavich then held that the MMWR's interpretation of the Stipulation

did not accord with its terms, whereas the Reorganized Debtors' interpretation did and controlled

for purposes of payment to MMWR.

### C.    MMWR's Appeals and Remand to this Court

    MMWR appealed Judge Raslavich's decision to the District Court,[12]  which entered an

opinion and order on March 24, 2017 affirming the decision.[13]   The District Court found that the

Stipulation's terms suffered neither patent nor latent ambiguity under Pennsylvania contract law.

There was no patent ambiguity because the Stipulation "contains no defective, obscure, or

---

10 Bankr. Docket Nos. 2477.   H&K also objected, but solely on the basis that the Motion to Reopen was
untimely.   Bankr. Docket No. 2476.

11 Bankr. Docket No. 2478.

12 Dist. Court C.A. 16-4080.

13 Dist. Ct. Docket Nos. 15, 16.

4

indefinite language," but rather "clearly states at ¶1 that MMWR agrees to reduce its 'total' fee

and cost claims from $2.6 million 'for all pre-bankrutpcy, bankruptcy, and post-bankruptcy

work' to the 'total sum' of $2.325 million."   Rejecting MMWR's argument that a latent

ambiguity existed because the $2.6 million figure in paragraph 1 could not have represented

MMWR's paid and unpaid claims, given that this Court had already approved $3.1 million in

fees and expenses, the District Court reasoned that the Stipulation resolved MMWR's request for

final approval of its nine prior interim fee applications, all of which remained susceptible to

reduction until final approval by this Court.   Moreover, the District Court found that MMWR

could not offer evidence of a meaning that contradicted "the standard meaning of the terms" in

paragraph 1 of the Stipulation.[14]

   MMWR then appealed the District Court's decision to the Circuit Court.[15]   On November

28, 2018, the Circuit Court issued an opinion and judgment vacating the District Court's order.

The Circuit Court concluded that both lower courts erred in finding that the terms of the

Stipulation were unambiguous, agreeing with MMWR's argument that the term "claims" in

paragraph 1 of the Stipulation was reasonably susceptible to being understood in more than one

sense, signifying either "money owed" or money "both paid and unpaid."   Although it

acknowledged the Stipulation included words or phrases on which the District Court focused in

finding the Stipulation unambiguous, such as "total," "for all pre-bankruptcy, bankruptcy, and

post-bankruptcy work," and "total sum," the Circuit Court reasoned that none of these words or

---

14 The District Court also found that it was not error for Judge Raslavich to rule on the merits of the
Motion to Enforce without presentation and consideration of parol evidence regarding the meaning of the
Stipulation's terms, concluding that because Judge Raslavich determined that the terms of the Stipulation
were unambiguous, there was no requirement to consider extrinsic evidence to assist in interpretation.

15 Circuit Ct. Case No. 17-1922.

phrases "illuminate which potential meaning of 'claims' is correct," and there is no explicit

reference in the Stipulation to how the Debtors' prior payments of approximately $680,000

should be considered.   As such, the term "claims" as used in the Stipulation "could refer to the

amount [MMWR] was still owed when the Stipulation was negotiated, or it could account for all

of the money it was ever owed, regardless of whether [the Debtors] had previously paid or not."

Finding that the term was ambiguous because it was susceptible to multiple meanings that,

depending on which was applicable, changed the obligations of the parties to the Stipulation,

the Circuit Court remanded the matter "for further proceedings."

On December 20, 2018, the District Court entered an order referring the case back to this

Court "to determine the proper interpretation of the disputed terms of the parties' Stipulation."[16]

The Court then held the Trial on that issue.[17]

---

16 Dist. Ct. Docket No. 24.

17 While the matter was under appeal to the District Court and the Circuit Court, Judge Raslavich retired,
and the case was reassigned to my former colleague, Judge Jean FitzSimon.   Upon referral back to this
Court, Judge FitzSimon set the matter for trial to be held on April 28, 2020.   Bankr. Docket No. 2530.
Before that trial could occur, however, the outbreak of the COVID-19 pandemic disrupted all court
matters, including delaying all in-person trials.   Before trial could be rescheduled, Judge FitzSimon
retired on July 31, 2020, and this case was reassigned to the undersigned judge.   Due to no fault of the
parties, and because the case was otherwise dormant, the undersigned was unaware of the need to
schedule a trial in the matter until MMWR brought it to the Court's attention in April 2023.   The Court
thereafter held several status hearings, and on November 8, 2023 scheduled the matter for Trial on March
4 and 5, 2024.   Bankr. Docket No. 2557.

### III.    DISCUSSION[18]

#### A.    The Burden of Proof

The Stipulation was effectively a settlement agreement, resolving the Debtors' and the

H&K Entities' objections to MMWR's Final Fee Application.    Because a settlement agreement

is a form of contract, it is governed by contract law.    *See, e.g, Jacob's Limousine Trans. Inc. v.*

*City of Newark,* 688 Fed. Appx. 150, 151 (3d Cir. 2017) (citing *Plymouth Mut. Life Ins. Co. v.*

*Ill. Mid-Continent Life Ins. Co.,* 378 F.2d 389, 391 (3d Cir. 1967)).    A court must grant a motion

to enforce if it finds that the non-moving party breached a duty created by a binding agreement

and that the breach caused the moving party to suffer damages.    *Id.* (citing *Sheet Metal Workers*

*Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.,* 737 F.3d 879, 900 (3d Cir.

2013)).    The moving party bears the burden of providing proof sufficient for the court to find by

a preponderance of evidence that the non-moving party breached a duty under the terms of the

settlement agreement.    *Id.*    As such, MMWR was required to prove by a preponderance of

evidence that the term "claims" as used in paragraph 1 of the Stipulation meant money owed,

and therefore did not account for amounts the Debtors already paid MMWR prior to entry into

the Stipulation.    In this case, where MMWR asserts that the term meant "money owed" because

the Debtors and the H&K Entities knew or had reason to know that is what MMWR understood

---

18 The Court pauses here to address and resolve the awkward procedural posture in which this matter
currently sits as a result of Judge Raslavich simultaneously ruling on the Motion to Reopen and on the
substance of the proposed Motion to Enforce, which had not actually been filed as a separate docket entry
but rather was attached to the Motion to Reopen as an exhibit.    The net result of the Circuit Court
vacating and remanding the matter for interpretation of the Stipulation is that this Court was tasked with
conducting the Trial on that issue without the Motion to Enforce ever having been filed.    Clearly,
however, both parties have had an opportunity to be heard on the merits of that motion.    The Court will
therefore treat the Motion to Enforce as being part and parcel of the Motion to Reopen, such that the
Court may grant or deny the Motion to Enforce as if it had been separately filed on the docket.

the term to mean, it has the burden of proving that knowledge or reason to know by a preponderance of the evidence. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.,* 247 F.3d 79, 99-100 (3d Cir. 2001) ("[I]t is a central principle of contract interpretation that if a party knew or had reason to know of the other parties' interpretation of terms of a contract, the first party should be bound by that interpretation.") (citing *Emor, Inc. v. Cyprus Mines Corp.,* 467 F.2d 770, 775 (3d Cir. 1972)). If MMWR satisfied that burden, it follows that the Reorganized Debtors are in breach of the Stipulation to the extent they have not paid MMWR an additional $2.325 million following entry into the Stipulation, and instead claiming a credit for the approximately $680,000 the Debtors paid MMWR before entry into the Stipulation.

> **B.    The Unrebutted Evidence at Trial Overwhelmingly Supports MMWR's Interpretation of the Term "Claims" to Mean Money MMWR Was Owed as of Entry Into the Stipulation, Not Money Paid and Unpaid**

At Trial,[19]  MMWR presented the testimony of two witnesses: (a) Leonard Busby ("Mr. Busby"), the attorney with MMWR who negotiated the Stipulation on MMWR's behalf to resolve the objections to the Final Fee Application, and (b) Craig Scher ("Mr. Scher"), a collections manager with MMWR who assisted Mr. Busby during his negotiation of the Stipulation.   Both MMWR witnesses were shown and questioned regarding various documents that were admitted into evidence.   The Reorganized Debtors relied on the testimony of Joseph LaFlamme ("Mr. LaFlamme"), who at the time of the Stipulation served as outside counsel to the H&K Entities.   Like the MMWR witnesses, Mr. LaFlamme was shown and questioned regarding various documents admitted into evidence.

---

19  The March 4 and March 5 Trial transcripts are docketed at numbers 2559 and 2560.   Citations herein to the testimony will be referenced as "Day 1 Tr. Trans. at …" and "Day 2 Tr. Trans. at …".

The Court finds that the testimony of Mr. Busby and Mr. Scher, together with the documentary evidence, makes clear (a) that Mr. Busby, on behalf of MMWR, understood the term "claims" in paragraph 1 of the Stipulation to mean the money MMWR was owed and that was outstanding for all "pre-bankruptcy, bankruptcy, and post-bankruptcy work," as of entry into the Stipulation, with all amounts the Debtors had previously paid to MMWR already having been credited, and (b) that Mr. Busby's understanding was known or should have been known to the only two individuals with whom Mr. Busby was negotiating the Stipulation, *i.e.* Thomas Bielli ("Mr. Bielli"), on behalf of the Debtors, and Albert Ciardi ("Mr. Ciardi"), on behalf of the H&K Entities.   The testimony of Mr. LaFlamme, who was not a direct participant in the negotiation of the Stipulation, did not rebut the credible testimony of Mr. Busby and Mr. Scher, which was supported by the documentary evidence.

### 1.    The Evidence Established that the Only People Who Negotiated the Stipulation's Terms Were Mr. Busby, Mr. Bielli, and Mr. Ciardi

The Court starts with identifying who the relevant individuals are for aiding the Court in interpreting what the term "claims" means.

Mr. Busby testified that, although he was not involved in MMWR's representation of the Debtors during the bankruptcy case, he was asked by the firm's former chair in late-August 2012 to handle the Final Fee Application as a collection matter.   Day 1 Tr. Trans. at 35:21-25.   He thereafter negotiated the Stipulation "for months" with Mr. Bielli and Mr. Ciardi, aided by Mr. Scher's analysis of MMWR's fees and expenses and how and when those would be paid under a settlement.   Id. at 44:11-13; 68:2-7; 76:9-16.   He negotiated with Mr. Bielli and Mr. Ciardi because those two individuals represented the respective objectors to the Final Fee Application. Id. at 131:19-22.   Mr. Busby testified that he did not negotiate with Mr. LaFlamme; rather, he

9

talked to Mr. LaFlamme on a number of occasions, and acknowledged that Mr. LaFlamme was

"physically present" at December 19, 2012 settlement discussions with Mr. Bielli, Mr. Ciardi,

and certain others that occurred in the courthouse, but was adamant that he did not "negotiate the

numbers with Mr. LaFlamme at all.   I told Mr. LaFlamme my position, and I said things out

loud in his presence, but I wasn't negotiating with him."   Id. at 131:22 – 132:3.   Rather, Mr.

Busby testified, Mr. LaFlamme's role was "behind the scenes," and while he and Mr. Busby did

have a "debate and argument over an interpretation of the plan, [Mr. Busby] did not negotiate the

numbers with him that appear in the stipulation in paragraph 1 at all." Id. at 133:21-25.[20]

As the Court will address further *infra,* neither Mr. Bielli nor Mr. Ciardi testified at the

Trial.   It is therefore unrebutted that they were the individuals with whom Mr. Busby negotiated

the terms of the Stipulation, and specifically for present purposes, the terms of paragraph 1.   The

Reorganized Debtors instead relied on Mr. LaFlamme as their sole witness.   Mr. LaFlamme's

testimony, however, all but corroborated Mr. Busby's that he did not negotiate the Stipulation.

When asked on direct examination whether he was involved in the negotiation, his response

signaled, if not admitted, that he was not: "There were drafts of the stipulation that were

provided to me through, if I remember correctly, Al Ciardi.   And as H&K's general counsel, I

reviewed it and would have discussed it with my clients so they understood what they were

potentially agreeing to."   Day 2 Tr. Trans. 73:10 - 14.   Mr. LaFlamme not only failed to affirm

that he negotiated the terms of the Stipulation, but his response reflects a more attenuated role to

---

20  When asked who participated in drafting the Stipulation, Mr. Busby included Mr. LaFlamme as
having "requested additional language in other paragraphs [from paragraph 1] to the best of my
recollection."   Id. at 117:3 to 117:11.   This inclusion does not contradict Mr. Busby's testimony that Mr.
LaFlamme did not personally negotiate the Stipulation with him, as such a request could just as easily
have come through Mr. Ciardi as the H&K Entities' bankruptcy counsel, and in any event clearly
excludes paragraph 1's language that the Court is tasked with interpreting.

the point where he was not certain from whom he was even receiving drafts of the document.
He effectively confirmed his role as being limited to reviewing the negotiated terms, rather than
negotiating them, when Mr. Busby asked him whether he ever communicated to Mr. Busby his
position that previously paid amounts were to be offset against the $2.325 million amount
MMWR was agreeing to be paid under paragraph 1 of the Stipulation: "The language in
paragraph 1 was drafted by you – it was prepared by you, **forwarded to me**.   I read the
language.   I agreed with the language.   My practice when **I review documents** and when I
agree with the language, **I don't see a need to talk to the person who drafted the language**,
because I understood it as it was drafted."   Id. at 108:8-17 (emphasis added).

Mr. LaFlamme again failed to confirm his direct involvement in the negotiations when
questioned by the Court about his interpretation that MMWR was agreeing to be paid $2.325
million for any work it had done for the Debtors:

| | |
|---|---|
| **The Court**: | So your understanding was that 2.3 included the monies that were paid prepetition? |
| **The Witness**: | Yes, ma'am. |
| **The Court**: | That was your understanding -- |
| **The Witness**: | Yes, ma'am. |
| **The Court**: | -- and that was negotiated?   That was negotiated? |
| **The Witness**: | As part of the two million three, that all monies were part of that – |
| **The Court**: | My question is, is that what **you believe that you negotiated?** |
| **The Witness**: | That's what I believe **was negotiated**; yes, ma'am. |

Id. at 80:12-24 (emphasis added).   Although this may seem to be an exercise in parsing words,

the Court believes Mr. LaFlamme's carefully worded responses to direct questions about his own involvement in the negotiation of the Stipulation with Mr. Busby were closer to non-responsive in nature, which the Court interprets as reflective of his non-involvement.    Further evidence of this is found in his admissions that he was not certain whether he saw all drafts of the Stipulation or attended all negotiation meetings between the parties, both of which the Court would expect to have been the case had he been actively negotiating the Stipulation's terms.   Id. at 74:7-25.[21]

Given his limited role in reviewing the Stipulation's negotiated terms, rather than directly taking part in their negotiation with Mr. Busby, it is not surprising that he did not know the factual basis for his belief that MMWR's "total fee and costs claims" of $2.6 million represented all paid and unpaid work performed for the Debtors, for which MMWR would accept $2.325 million:

> **The Court**: What was your understanding of the word 'claims'?   Did it include paid and unpaid fees?
>
> **The Witness**: It would have included everything, including paid and unpaid, Your Honor.
>
> ***
>
> **Mr. Busby**: Now, how much had been paid and unpaid for work done by Montgomery McCracken, as of the time this was negotiated?
>
> **The Witness**: I have no recollection what that number was.
>
> ***

---

21  Even Mr. Bielli, acting as counsel to the Reorganized Debtors at the Trial, could not provide unqualified confirmation, when asked directly by the Court, that Mr. LaFlamme had a role in the negotiations, notwithstanding that Mr. Bielli *himself* was one of the lead parties in the negotiations and that Mr. LaFlamme was the only witness the Reorganized Debtors called to support their interpretation of the term "claims" in the Stipulation.   See id. at 79:6-10 ("The Court: Well, let me ask you this, did [Mr. LaFlamme] negotiate – did he – was he involved in the negotiations?   Mr. Bielli: **I believe he was**.   The Court: And he, directly, was involved? Mr. Bielli: Yes.") (emphasis added).

**Mr. Busby**: Did you know what the paid amount was, Mr. LaFlamme?

**Mr. LaFlamme**: No, I did not.   I don't recall what that number was, but I did know it.

**Mr. Busby**: Did you know what the unpaid amount was?

**Mr. LaFlamme**:   No, I had no reason to know what they're – other than what was in the [tenth] fee application … but I don't recall what those numbers were.

***

**Mr. Busby**: Did you know what the unpaid was?

**Mr. LaFlamme**: I did not know what the paid or unpaid amounts were.

Id. at 86:20-23; 87:19-22; 95:17-23; 98:2-3.   Although the Court can appreciate that the Stipulation was negotiated over a decade ago, and memories fade over time, Mr. Scher's admitted lack of recollection or knowledge of the basis for the figures used in paragraph 1, together with his unwillingness to state under oath that he took part in the negotiation of the Stipulation, evidences to the Court that he was not involved.   This is particularly so when contrasted with the detailed testimony the Court heard from Mr. Busby and Mr. Scher.

The Court concludes, based on the evidence presented at Trial, that the only three individuals who negotiated the terms of the Stipulation were Mr. Busby, Mr. Bielli, and Mr. Ciardi.   The testimony of Mr. LaFlamme regarding his understanding of the term "claims" as used in the Stipulation was not based on discussions or negotiations with Mr. Busby, and in fact was never even communicated to Mr. Busby.   Id. at 108:8-17; 113:8-18.[22]   It is therefore

---

[22]  Moreover, because Mr. LaFlamme's interpretation was based on the other language in paragraph 1 such as "all pre-bankruptcy, bankruptcy, and post-bankruptcy work," it does not aid this Court in answering the question before it given that the Circuit Court has already held that the other language in paragraph 1 does not establish the meaning of "claims".

13

irrelevant and unhelpful to the Court in determining the meaning of the term "claims" as used in

paragraph 1 of the Stipulation.   Having no testimony from Mr. Bielli or Mr. Ciardi, the two

individuals who *did* negotiate paragraph 1 on behalf of the Debtors and the H&K Entities, the

Court turns to whether the testimony of Mr. Busby and Mr. Scher, together with the documents

admitted into evidence, aid the Court in deriving the term's meaning.

> **2.    The Evidence Established that the Term "Claims" in Paragraph 1 Means "Moneys Owed" to MMWR as of Entry Into the Stipulation**
>
> **a.    When Negotiating the Stipulation with Mr. Busby, Mr. Bielli and Mr. Ciardi Knew or Should Have Known that MMWR's Claim for Outstanding Amounts Owed by the Debtors Was $2.6 Million, After Applying Payments Already Received**

The Final Fee Application stated that a balance of $2,656,251.80 remained for the period

of April 30, 2009 through May 31, 2012.[23]   The Debtor and the H&K Entities objected, and in

connection with attempting to reach a resolution, MMWR tasked Mr. Scher with verifying the

accuracy of the figures in the Final Fee Application.   Day 2 Tr. Trans. 8:1-6.   That verification

process revealed that the balance owing to MMWR through May 31, 2012 was $2,537,683.40,

approximately $118,500 less than the $2,656,251.80 figure stated in the Final Fee Application.

Id. at 12:9 – 13:8.   This amount credited the Debtors for approximately $681,000 in payments

MMWR had already received from the Debtors.   Id. at 36:10-21.   Mr. Scher informed Mr.

Busby upon discovering that the figure in the Final Fee Application was incorrect.   Id. at 28:11-

13.   Not included in the Final Fee Application, however, was MMWR's invoice for fees and

expenses incurred for the period of June 1, 2012 through July 31, 2012, in the total amount of

---

23  Exhibit D-3.

$62,193.75.   Id. at 13:21 – 14:9.[24]   Adding that amount to the corrected figure for work through May 2012, MMWR determined that its account receivable as of the fall of 2022 was slightly less $2.6 million.   Id. at 38:1-9.

Mr. Busby then used that figure in subsequent negotiations with Mr. Bielli and Mr. Ciardi during the months of September and October 2012 regarding the outstanding amount owed to MMWR.   Day 1 Tr. Trans. at 118:9 to 118:18.   On October 31, 2012, Mr. Busby sent a letter to Mr. Bielli and Mr. Ciardi, attaching MMWR's analysis of the amount due to the firm as of August 31, 2012, based on the Debtors' sale of residential lots in the Debtors' developed or projected communities.[25]   In calculating the percentage of sale proceeds to which MMWR was entitled based on its fees and expenses, that analysis reflected outstanding invoices through May 31, 2012 of $2,537,683.40.   As noted, when this amount is added to the $62,193.75 in fees and expenses billed for August 2012, it totals just shy of $2.6 million.   Furthermore, the analysis reflects that MMWR was accounting for a payment received from the Debtors on February 22, 2012, in the amount of $221,091.56.[26]   It therefore should have been clear to Mr. Bielli and Mr. Ciardi from MMWR's analysis not only what MMWR was claiming was owed, but also that the figure incorporated the crediting of payments already received.

---

24 *See also* Exhibit M-12.

25 *See* Exhibit M-9.

26 Mr. Scher, who prepared the analysis attached to Mr. Busby's letter, stated that he mistakenly labeled that payment as "received as of 2/22/12" when it should have been labeled "received on 2/22/12."   Day 2 Tr. Trans. at 40:5-10.   Clearly MMWR had received more than $221,091.56 as of February 22, 2012, as the Final Fee Application, later discovered to have under-accounted for payments received, still applied another $270,846.36 in payments received from the Debtors.   *See* Exhibit D-3 at 4-6.   However, even with the mislabeling of the payment, which arguably could have confused Mr. Bielli and Mr. Ciardi as to why MMWR was accounting for only some of the payments received from the Debtor, it still would have indicated to them that MMWR was crediting payment received from the Debtors in determining what invoiced amounts were still outstanding.

Moreover, Mr. Busby was not alone in representing that MMWR was owed approximately $2.6 million in the fall of 2022.   On September 25, 2012, Mr. Bielli sent a letter to Mr. Busby, forwarding correspondence to Mr. Bielli from his client that contained an analysis of future payments to professionals, including MMWR.   That analysis reflected a balance owing to MMWR of $2,672,655.04.[27]   Therefore, although Mr. Bielli did not testify and therefore provided no explanation or context for his letter to Mr. Busby or his client's letter to him, the undisputed evidence reflects that in the fall of 2012 Mr. Bielli conveyed to Mr. Busby, without qualification or objection, his client's analysis reflecting approximately $2.6 million still owing to MMWR.

The Court finds that the undisputed testimony of Mr. Busby and Mr. Scher, supported by documents admitted into evidence, establishes that in the fall of 2012 when Mr. Busby was negotiating the amount owing to MMWR with Mr. Bielli and Mr. Ciardi, they knew or should have known that MMWR's claim for outstanding amounts owed was approximately $2.6 million, after accounting for payments already received from the Debtors.

> **b.**     **When Negotiating the Stipulation with Mr. Busby, Mr. Bielli and Mr. Ciardi Knew or Should Have Known that MMWR Was Agreeing to Accept $2.325 Million in Additional Payments to Satisfy its $2.6 Million Accounts Receivable Claim**

Mr. Busby testified that, after establishing that MMWR was owed $2.6 million, he, Mr. Bielli, and Mr. Ciardi then turned, "primarily in December," to negotiating a discount that MMWR was willing to accept.   Id. at 118:18 to 119:24.

---

27 Referencing the schedule reflecting the balance owing to MMWR, the letter states "As per the attached schedule, MMWR is approx [sic] 80.73% of admin professional amounts and based upon this percentage can anticipate a total distribution of approximately $87,188.40 per quarter."   *See* Exhibit M-9.

On December 7, 2012, Mr. Bielli sent Mr. Busby and Mr. Ciardi an email attaching a document titled "MMWR Settlement Proposal."[28]   The structure of that proposal is telling: it contemplated that MMWR would be paid a total of $2.3 million from the future sale of lots remaining in the Debtor's residential communities as of January 1, 2013.   Id. at 45:22 – 46:8.   Mr. Bielli's own proposal therefore was premised on an *additional* $2.3 million being paid to MMWR, without accounting for, crediting, or even noting payments MMWR already received.

Mr. Busby responded to Mr. Bielli and Mr. Ciardi the following day, on December 8th, with a detailed, multi-paragraph proposal on the mechanics of payment to MMWR.[29]   With respect to a discount on MMWR's outstanding receivable from the Debtors, Mr. Busby stated as follows:   "MMWR will agree to reduce its total fee and cost claim from $2.6 million to $2.325 million, with the said reduction to be applied after receipt by MMWR of $2.325 million, thereby leaving unchanged the present base number for MMWR for purposes of calculating the proportional allocation with other creditors." (the "Busby Fee Reduction Proposal").

Mr. Bielli responded to Mr. Busby, copying Mr. Ciardi, on December 11th.[30]   Other than a proposal to handle monthly accounting by MMWR of distributions made from lot sales, Mr. Bielli did not have further comments to Mr. Busby's proposal, including the Busby Fee Reduction Proposal.   Mr. Bielli then followed on December 12th with another email to Mr. Busby, again copying Mr. Ciardi, again attaching the same settlement proposal he had attached to his December 7th email.[31]   Mr. Busby testified that at no point between December 7th and

---

28  *See* Exhibit M-3.

29  *See* Exhibit M-2.

30  *See* Exhibit M-4.

31  *See* Exhibit M-5.

17

December 12th did Mr. Bielli or anyone else from the Debtors or the H&K Entities suggest that the $2.3 million proposed to be paid to MMWR under Mr. Bielli's proposal was subject to a $680,000 reduction or credit.   Id. at 58:5-16.

On December 14th, Mr. Busby sent a letter to only Mr. Bielli, attaching, among other things, Mr. Busby's analysis of Mr. Bielli's December 12th settlement proposal.[32]   That analysis centered on the feasibility of and payout from the projected sales that would fund payment to MMWR.   Mr. Busby expressed his concern that there would be a shortfall of sale proceeds from lots at the Debtors' communities on which Mr. Busby wanted to rely for payment.   Mr. Busby further stated that, with respect to the other three communities proposed to serve as a source of payment to MMWR, he was "determined to have [them] as insurance and a cushion for full payment, but I am not prepared to have them as a necessity in order to generate payment of $2,325,000 to MMWR."   Mr. Busby testified that his position was steeped in concern that those communities would not be built.   Id. at 60:23 – 61:24.   He also confirmed that the source of funds being used to pay $2.235 million to MMWR were future sales.   Id. at 61:25 – 62:14.[33]

On December 18th Mr. Busby emailed Mr. Bielli with further analysis of the payouts MMWR needed from the future sale of lots, including that sales from certain communities would be substantially more than would the average payout "from each of the remaining 273 units [in

---

32 *See* Exhibit M-6.

33 Mr. Busby clarified that the payment was to come from future sales "with one caveat.   We were debating a start date for when the sales would have to occur.   And you'll see in things I sent to Mr. Bielli, at one point, we proposed a start date of November 1, 2012.   And at another time, the final document reflects a start date of December 1, 2012.   And those were not future sales, per se, but they were sales that had already occurred, and we had been paid nothing.   And the agreement was that retroactively, Montgomery McCracken would be paid specified amounts for those sales, as it turns out, starting December 1."   Id.; *see also* id. at 67:17 – 68:1.

18

other communities] in order to generate payment to MMWR of $2.325 million."[34]    Then on

December 19th, hours before a scheduled hearing on the Final Fee Application and objections,

Mr. Busby sent another email to Mr. Bielli and Mr. Ciardi outlining the settlement terms he was

authorized to accept, including guaranteed minimum payments to MMWR in the years 2013 to

2016 "all with no reduction in payments from future sales.    These guaranteed minimums should

add up to $2.325 million."[35]    Mr. Busby explained this term at Trial: "I was telling them in

advance [of settlement negotiations later that day in the courthouse] what I needed to do to get

this deal done from my client's perspective, because that's all the authority I had.    I had to get

2.325 million in some future amount.    I had to get guarantees that would add up to that."    Id. at

72:2-8.

        Following all of the written correspondence and negotiations outlined above, on

December 19th Mr. Busby, Mr. Bielli, and Mr. Ciardi negotiated further at the courthouse in an

attempt to resolve the Final Fee Application without a contested hearing.    Id. at 65:5 – 66:18.

While the record is unclear as to who else was in attendance, it is enough to say that additional

representatives of MMWR, the Debtors, and the H&K Entities were there.    Id.    At Trial, Mr.

Busby was steadfast that during those negotiations, the amount of future payment to MMWR of

$2.325 million never changed, and at no point did Mr. Bielli, Mr. Ciardi, or any other

representative of the Debtors or the H&K Entities communicate to him anything about offsetting

$680,000 in prior payments from the future payments: "But all the time that I was in the room,

we were arguing over how much money would be paid from individual lots and for what

---

34 *See* Exhibit M-7.

35 *See* Exhibit M-8.

amounts and [what] number.    And we went back and forth for an hour or more on this.    The

number was always being added up to 2.325 million … [W]hat we were doing in that room

amongst the parties was adding up to 2.325 million in future payments to Montgomery

McCracken.    Everybody knew it.    Everybody was there.    Nobody said a word to me about

offsetting $680,000.    And that's what we were doing."    Id. at 66:24 – 67:12; *see also* id. at

68:11- 14 ("Mr. Moffa:    And no representative from the debtor or H&K said to you, no, we

think we're entitled to a credit of $680,000 against that number?    Mr. Busby:    No one ever said

that to me, ever.").

When faced with the documentary evidence and testimony set forth above, the

Reorganized Debtors offered virtually nothing to rebut it.    As noted above, Mr. LaFlamme's

interpretation of the terms of the Stipulation are irrelevant, and in what the Court views as an

inexplicable strategy, neither Mr. Bielli nor Mr. Ciardi were called to testify as to what they

understood with respect to the amount of future payments MMWR would receive or the

application of a credit for past payments.    The Court can only speculate as to the reasoning for

that decision, but the Reorganized Debtors also did not introduce a single document or

communication made during the negotiation of the Stipulation that even suggests the

contemplation of a $680,000 setoff against the $2.325 million in future payments MMWR was to

receive.    Rather, the record reflects not only silence from Mr. Bielli and Mr. Ciardi in response

to Mr. Busby's repeated statements that MMWR needed future payments totaling $2.325

million, but more importantly, settlement proposals from Mr. Bielli, on which Mr. Ciardi was

copied, that expressly contemplated $2.3 million in payments to MMWR generated from the

future sales of the Debtors' residential lots <u>with no mention</u> of a setoff or credit for past

20

payments.

The only document the Reorganized Debtors *did* offer in feeble support of their position was the February 29, 2016 letter from Mr. Bielli's partner, David Klauder ("Mr. Klauder"), to Mr. Busby advising him of the Reorganized Debtors' position that, accounting for the approximately $680,000 in payments the Debtor made to MMWR pre-dating the Stipulation (as well as an enclosed check for approximately $3,700 as final payment), the Reorganized Debtors had satisfied their obligation under paragraph 1 of the Stipulation.[36]   This correspondence from Mr. Klauder, an individual who no party has suggested had any involvement in negotiation of the Stipulation, provided absolutely no help to the Court in ascertaining the meaning of its terms.   It was written years after the Stipulation's negotiation, is not supported by any document contemporaneous with those negotiations, and assumes the answer to the question the Court is tasked with ascertaining.   Mr. Klauder's letter is the reason the Motion to Enforce was filed, not evidence as to why the Reorganized Debtors' position should prevail.   At the close of Trial, the Court pressed Mr. Bielli on what evidence the Reorganized Debtors had produced regarding the parties' understanding of the meaning of the term "claims"; Mr. Bielli pointed only to Mr. LaFlamme's testimony and Mr. Klauder's letter.   The Court finds neither of them to be of any evidentiary value in answering the question, particularly when viewed against the testimony and documentary evidence MMWR produced.

Considering the overwhelmingly one-sided evidentiary record, the Court concludes that Mr. Bielli and Mr. Ciardi knew or should have known during negotiations with Mr. Busby of paragraph 1 of the Stipulation that MMWR was agreeing to discount its $2.6 million claim, for

---

36 *See* Exhibit M-10.

outstanding receivables the Debtors still owed, to $2.325 million in additional future payments, without any setoff or credit for the approximately $680,000 MMWR had already received from the Debtors.

> **c.     Paragraph 1 of the Stipulation Provided for Reduction of MMWR's $2.6 Million Claim for Moneys Owed in Exchange for $2.325 in Additional Future Payments from the Reorganized Debtors**

Given the findings above based on the evidence presented at Trial, the Court concludes that the Stipulation provided for MMWR's $2.6 million claim, for moneys still owed to it for all pre-bankruptcy, bankruptcy, and post-bankruptcy work for the Debtors, to be reduced by $275,000, in exchange for future additional payments totaling $2.325 million, without offset or credit of any kind for payments MMWR received from the Debtors prior to entry into the Stipulation.

## C.     MMWR's Motion to Enforce Shall Be Granted

MMWR has established by a preponderance of the evidence that the Reorganized Debtors, by not paying MMWR an additional $2.325 million after entry into the Stipulation, and instead claiming a credit for the approximately $680,000 the Debtors paid MMWR before entry into the Stipulation, are in breach of the terms of paragraph 1 of the Stipulation.   MMWR is therefore entitled to the entry of an order directing the Reorganized Debtors to comply with the Stipulation by paying MMWR the total sum of $684,140.00 (the "Outstanding Stipulation Debt"), which consists of (a) $680,789.68 the Reorganized Debtors claimed as a credit to be applied against the $2.325 million to be paid to MMWR under the Stipulation,[37] and (b)

---

[37] It is undisputed that the Debtors made payments to MMWR prior to entry into the Stipulation totaling $680,789.68, which the Reorganized Debtors then applied as a credit.   *See* Joint Pretrial Statement, Bankr. Docket No. 2527, at ¶16; Exhibit M-10 at attachment titled "MMWR $2.235 mm Payment

$3,370.02, the amount of the check Mr. Klauder included with his February 29, 2016 letter to

MMWR as purported final payment, which MMWR did not cash.[38]    MMWR is also entitled to

an accounting of the Reorganized Debtors' sales of units after December 1, 2012 at the

communities identified in the Stipulation (the "Unit Sales Accounting").

MMWR is further entitled to payment of interest on the Outstanding Stipulation Debt

(the "Interest Component").[39]   The Motion to Enforce seeks simple annual interest at a rate of

6%.   It does not provide any basis for that rate or state the date or dates from which interest shall

be calculated.   The Court therefore declines to apply that rate.   The Stipulation provides that

MMWR was to be paid $2.325 million through the payment "at closing" of varying amounts of

sale proceeds from units in certain of the Reorganized Debtors' developed or planned

communities.[40]   The Court finds that MMWR is entitled to payment of simple interest on the

Outstanding Stipulation Debt, calculated by reference to the effective federal funds rate (the

"EFFR") on the closing date (the "Applicable Closing Dates") for each of the said units for

which MMWR was to be paid a portion of the sale proceeds under the terms of the Stipulation,

but was not.[41]   However, because Trial with respect to the Motion to Enforce was delayed

---

Detail".

38 *See* Joint Pretrial Statement at ¶17; *see also* Exhibit M-10.

39 *See Ambromovage v. United Mine Workers of Am.,* 726 F.2d 972, 982 (3d Cir. 1984) (concluding that there was no difference between application of federal law and Pennsylvania law with respect to the award of pre-judgment interest, and holding that in the absence of legislative directive, the awarding of prejudgment interest is comitted to the trial court's discretion, and "'given in response to considerations of fairness, … denied when its exaction would be inequitable.'") (citing *Bd. of Commr's of Jackson County, Kansas v. U.S.,* 308 U.S. 343 (1939)).

40 *See* Stipulation at ¶¶3, 5-7.   The amount MMWR was to be paid varied by the community in which the sale occurred.

41 Historical EFFR data is available from the New York Federal Reserve Bank's website at https://www.newyorkfed.org/markets/reference-rates/effr.

through no fault of the Reorganized Debtors from April 28, 2020 until March 4, 2024 (the "Trial Delay Period"), and because the position the Reorganized Debtors took was supportable, if not ultimately meritorious, the Interest Component owed on the Outstanding Stipulation Debt shall be calculated to commence on the Applicable Closing Dates through April 28, 2020, thereby excluding the Trial Delay Period.   Using this formula, however, the Interest Component is not calculable at this time absent the information to be contained in the Unit Sales Accounting, and therefore must be the subject of further proceedings.

The Court will not grant the Motion to Enforce's request to impose sanctions against the Reorganized Debtors.   The conclusion of Judge Raslavich, affirmed by the District Court, that the language of paragraph 1 of the Stipulation supported the Reorganized Debtors' interpretation leads this Court to conclude that their action in not paying the Outstanding Stipulation Debt is not sanctionable.   The Third Circuit may have ultimately found the language ambiguous, and the Reorganized Debtors have failed to support their interpretation with evidence after Trial, but those subsequent results do not render what was found to be supportable in 2016 sanctionable now.

## IV.    CONCLUSION

For the reasons set forth *supra*, the Court will grant the Motion to Enforce, except to the extent it seeks sanctions against the Reorganized Debtors.

An order consistent with this Memorandum shall be entered.

Dated:   July 29, 2024

_____
MAGDELINE D. COLEMAN
U.S. BANKRUPTCY JUDGE

24