## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TH PROPERTIES; TH PROPERTIES, LP; TH PROPERTIES OF NEW JERSEY, LP; TH PROPERTIES, INC.; TH PROPERTIES, LLC; MORGAN HILL DRIVE, LP; NORTHGATE DEVELOPMENT COMPANY, LP; and, WYNSTONE DEVELOPMENT GROUP, LP.,** | **CIVIL ACTION** |
| **Appellants,** | **NO. 24-4143** |
| **v.** | |
| **MONTGOMERY MCCRACKEN WALKER & RHOADS LLP,** | |
| **Appellee.** | |

### MEMORANDUM OPINION

Montgomery McCracken Walker & Rhoads LLP ("MMWR"), a law firm based in Philadelphia, represented TH Properties, L.P. and several other reorganized debtors (collectively, the "Reorganized Debtors")[1] in their Chapter 11 bankruptcy proceedings. A fee dispute regarding MMWR's final fee application resulted in a stipulation (the "Stipulation") between MMWR and the Reorganized Debtors regarding the amount due to the firm. Unfortunately, the Stipulation did not end that dispute. When the Reorganized Debtors submitted what they viewed as their final payment in satisfaction of their obligations under the Stipulation, MMWR filed a Motion to Enforce in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"), arguing that the Reorganized Debtors breached the terms of the agreement because they still owed the firm approximately $680,000. The Bankruptcy Court, in a July 29, 2024 Opinion and Order, granted MMWR's Motion. This appeal followed.

---

[1] The Reorganized Debtors are TH Properties; TH Properties, LP; TH Properties of New Jersey, LP; TH Properties, Inc.; TH Properties, LLC; Morgan Hill Drive, LP; Northgate Development Company, LP; and, Wynstone Development Group, LP.

For the reasons set forth below, the Bankruptcy Court's Opinion and Order shall be affirmed, and this action shall be remanded to the Bankruptcy Court for any further proceedings.

## I.     BACKGROUND

### A.     Factual Background

In 2009, the Reorganized Debtors—several property development companies—filed for bankruptcy and retained MMWR as counsel. Over the next three years, MMWR represented the entities in their Chapter 11 proceedings, and, in so doing, filed nine interim applications for fees and costs. In August 2012, MMWR submitted its tenth and final application (the "Final Fee Application"), which, after crediting $680,000 in payments that the Reorganized Debtors had already made to the firm, sought approximately $2.6 million in fees and costs.[2]

Shortly thereafter, however, the Reorganized Debtors retained new counsel and filed several objections to the Final Fee Application. They argued that the firm's requested fees were excessive; that it had failed to adequately and efficiently handle their case; and, that the timing and manner of payment under the Chapter 11 reorganization plan was vague. To resolve that dispute, the Parties subsequently negotiated and entered into the Stipulation, which, of relevance here, included a provision that reduced the $2.6 million figure asserted in the Final Fee Application to $2.325 million. It stated:

> MMWR will agree to reduce its total fee and cost claims against [the Reorganized Debtors] from $2.6 million for all pre-bankruptcy, bankruptcy, and post-bankruptcy work for [the Reorganized Debtors] to the total sum of $2.325 million, with the said reduction of $275,000 to be applied after receipt by MMWR of $2.325 million, thereby leaving unchanged the present agreed on base number of $2,537,683.40 for MMWR for purposes of calculating the proportional allocation of any future distributions to MMWR and other Plan creditors. And the said objections are hereby resolved and withdrawn with prejudice.

---

[2] Initially, the Final Fee Application only credited $491,978.42 in payments that the Reorganized Debtors made to MMWR. But the firm subsequently verified the accuracy of the figures included therein and discovered that the Reorganized Debtors had, in fact, paid $680,000.

The Reorganized Debtors were to generate the $2.325 million figure asserted in the Stipulation from, among other sources, the sale of residential lots in their developed or projected communities.

The Bankruptcy Court approved the Stipulation in January 2013, after which the Reorganized Debtors made several timely payments to MMWR in the ensuing years.  Then, in February 2016, counsel for the Reorganized Debtors sent a letter to the firm enclosing what it characterized as a final payment in satisfaction of the Reorganized Debtors' obligations under the Stipulation.  The Reorganized Debtors posited that the plain language of the Stipulation—specifically, the clause pertaining to "*total* fee and cost claims . . . for *all* pre-bankruptcy, bankruptcy, and post-bankruptcy work"—contemplated that their prior payments of $680,000 to MMWR should be credited against the $2.325 million figure.

### B.      Procedural History

After receiving the Reorganized Debtors' letter, MMWR disputed that it had been paid in full and filed Motions to Reopen the Bankruptcy Case and Enforce the Stipulation.  In those Motions, and at oral argument before the Bankruptcy Court, MMWR asserted that the Parties intended the $2.325 million figure referenced in the Stipulation to only cover *outstanding* payments at the time the Stipulation was executed—not payments *already made* by the Reorganized Debtors.  So, according to MMWR, the Reorganized Debtors had not fulfilled their obligations because they should not have set off $680,000 against the $2.325 million figure agreed upon in the Stipulation.  Thus, the firm asserted that the Reorganized Debtors still owed it $680,000.

Following oral argument, the Bankruptcy Court granted MMWR's Motion to Reopen the Bankruptcy Case "for the limited purpose of deciding a question of interpretation having to do with provisions of [the Stipulation]."  It then determined that "the interpretation of the Parties'

3

agreement advanced by" the Reorganized Debtors "shall control for purposes of payment to

MMWR for legal fees and costs" because it "accords with the terms of the parties' Stipulation."

Thus, under that interpretation, the Reorganized Debtors had satisfied their obligations, as the

Stipulation "expressly and unambiguously provide[s] that the payment of $2.325 million would

satisfy in full [their] liability to [MMWR] for all its legal fees and costs."

MMWR appealed that decision to this Court pursuant to 28 U.S.C. § 158(a)(1), arguing

that the Stipulation was ambiguous.  This Court affirmed the Bankruptcy Court's decision,

concluding that the terms did not suffer from any patent or latent ambiguities under Pennsylvania

law.  See Montgomery, McCracken, Walker & Rhoads, LLP v. H&K Grp., Inc., 2017 WL

1333243, at *2 (E.D. Pa. Mar. 24, 2017).  Patent ambiguities are those that "appear[] on the face

of the contract and [are] a result of defective or obscure language," *Krizovensky v. Krizovensky*,

624 A.2d 638, 643 (Pa. Super. 1993) (citation omitted), while latent ambiguities "arise[] from

extraneous or collateral facts which make the meaning of a written agreement uncertain although

the language thereof, on its face, appears clear and unambiguous," *Duquesne Light Co. v.

Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (citation omitted).

With respect to patent ambiguity, the Court found that the Stipulation contains "no

defective, obscure, or indefinite language," as it states "MMWR agrees to reduce its 'total' fee

and cost claims from $2.6 million 'for all pre-bankruptcy, bankruptcy, and post-bankruptcy

work' to the 'total sum' of $2.325 million." *Montgomery, McCracken*, 2017 WL 1333243 at *3.

That clause, the Court reasoned, demonstrated that the Stipulation "explicitly covers the

payments [the Reorganized Debtors] made to MMWR prior to [its] execution[.]" *Id.*  MMWR's

argument regarding latent ambiguity—that "the $2.6 million figure could not have represented

[the Reorganized Debtors'] total outstanding claims against MMWR" because the Bankruptcy

Court had already approved $3.1 million in fees and expenses—fared no better.  *Id.*  That was

because the latter figure represented the sum total of the nine *interim* awards—"all of which,

whether paid or not, remained susceptible to modification" by the Bankruptcy Court.  *Id.*

Undeterred, MMWR attempted to offer parol evidence to bolster its argument, but this Court

rejected its submission as impermissible under Pennsylvania law because such evidence would

"contradict the standard meaning of the terms" of the Stipulation.  *Id.* at *4 (citing *Bohler-

Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 96 (3d Cir. 2001)).

MMWR then appealed to the Third Circuit, which, over a dissent, held that "the District

Court and the Bankruptcy Court erred in concluding that the language of the Stipulation was

unambiguous."  *In re TH Props.*, 752 F. App'x 127, 129 (3d Cir. 2018).  The Third Circuit

explained, in relevant part:

> On appeal, [MMWR] argues that the Stipulation is ambiguous because it is
> "reasonably susceptible" to being understood in "more than one sense."
> Specifically, [MMWR] focuses on the word "claims" and asserts that it can be
> understood to signify "money owed" or money "both paid and unpaid."  We agree.
>
> The District Court focused its analysis on the words and phrases "total," "for all
> pre-bankruptcy, bankruptcy, and post-bankruptcy work," and "total sum," but it
> neglected to consider the word "claims."  As [MMWR] asserts, "claims" could refer
> to the amount that [MMWR] was still owed when the Stipulation was negotiated,
> or it could account for all of the money it was ever owed, regardless of whether [the
> Reorganized Debtors] had previously paid or not.  Although the Stipulation does
> include the words that the District Court focused on, like "total" and "all," as well
> as others, none of them illuminate which potential meaning of "claims" is correct.
> Furthermore, there is no explicit reference in the Stipulation to [the Reorganized
> Debtors'] previous $680,789 payment and how it should be considered.  Black's
> Law Dictionary, which defines "claim" as "any right to payment," also does not
> provide us with a clear answer because it does not clarify whether the payments
> that [the Reorganized Debtors] had already made were to count towards the $2.325
> million [they] owed [MMWR].
>
> Accordingly, we conclude that "claims" is susceptible to multiple meanings.
> Because the parties' obligations change based on which proposed definition of
> "claims" is used, we conclude that the Stipulation is ambiguous.

*Id.* at 130-31. For those reasons, the Third Circuit vacated this Court's Order and remanded the

matter for further proceedings. *Id.* at 131.

This Court then entered an Order referring the matter to the Bankruptcy Court "to

determine the proper interpretation of the disputed terms of the parties' Stipulation" in the

context of MMWR's Motion to Enforce. After a two-day trial on that issue, the Bankruptcy

Court found that the "unrebutted evidence at trial overwhelmingly support[ed] MMWR's

interpretation of the term." *In re TH Props., L.P.*, 2024 WL 3579019, at \*3 (Bankr. E.D. Pa.

July 29, 2024). Thus, when negotiating and executing the Stipulation, the Reorganized Debtors

knew or should have known that "MMWR was agreeing to discount its $2.6 million claim, for

outstanding receivables [the Reorganized Debtors] still owed, to $2.325 million in additional

future payments, without any setoff or credit for the approximately $680,000 MMWR had

already received from [them]." *Id.* at \*9.

Accordingly, the Bankruptcy Court granted MMWR's Motion to Enforce and directed

the Reorganized Debtors to "comply with the Stipulation" by paying the outstanding amounts

owed to MMWR. *Id.* at \*10. It also held that MMWR was due payment of pre-judgment

interest on those amounts, which would be calculated by reference to the "effective federal funds

rate." *Id.* That calculation was to exclude, however, a roughly four-year period during which the

trial was delayed due to the COVID-19 pandemic and other administrative delays (the "Trial

Delay Period"). *Id.*

The Reorganized Debtors timely filed a Notice of Appeal of the Bankruptcy Court's

decision on August 9, 2024. On that same date, MMWR timely filed a Motion for

Reconsideration regarding the calculation of the applicable pre-judgment interest, which Motion

the Bankruptcy Court granted on October 23, 2024. It first determined that it "erred in awarding

pre-judgment interest at the effective federal funds rate rather than the 6% statutory rate

applicable in contract actions under Pennsylvania law." *See* 41 P.S. § 202; *see also Fernandez v.*

*Levin*, 548 A.2d 1191, 1193 (Pa. 1988); *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 590 (Pa.

Super. 2003).  It then found that it "erred in suspending the accrual of pre-judgment interest

during the Trial Delay Period," as it "lacked the discretion" to do so under Pennsylvania law—

even where the trial "was significantly delayed through no fault of the Parties."  *See, e.g., id.*;

*Palmgreen v. Palmer's Garage, Inc.*, 117 A.2d 721, 722-23 (Pa. 1955); *Getting v. Mark Sales &*

*Leasing, Inc.*, 274 A.3d 1251, 1262 (Pa. Super. 2022).  Accordingly, the Bankruptcy Court

modified the relevant provision of its July 29, 2024 Order granting MMWR's Motion to Enforce

to read as follows:

> MMWR shall be entitled to simple annual interest at the rate of 6% on the
> Outstanding Stipulation Debt, with such Interest Component to have commenced
> accrual on the closing date for each of the sold units for which MMWR was to be
> paid a portion of the sale proceeds under the terms of the Stipulation, but was not,
> and without any exclusion of the Trial Delay Period.  Calculation of this Interest
> Component shall be the subject of further proceedings after production of the Unit
> Sales Accounting, to be addressed at the Judgment Enforcement Hearing.

It did not, however, modify its earlier Order with respect to its interpretation of the term "claims"

and its direction for the Reorganized Debtors to pay MMWR $680,000.

## II.      JURISDICTION & STANDARD OF REVIEW

This Court has jurisdiction to consider the Reorganized Debtors' appeal of the

Bankruptcy Court's decisions pursuant to 28 U.S.C. § 158(a)(1).  In reviewing those decisions,

the Bankruptcy Court's legal determinations must be analyzed *de novo*, its findings of fact for

clear error, and its exercises of discretion—including evidentiary rulings—for abuse thereof.  *See*

*In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998); *In re McCabe*, 588 B.R. 428,

435 (E.D. Pa. 2018).  The "clear error standard means that a finding of fact 'may only be

overturned' if it is 'completely devoid of credible evidentiary basis or bear[s] no rational

relationship to the supporting data.'" *Novartis Pharms. Corp. v. Adesanya*, 645 B.R. 733, 752

(E.D. Pa. 2022) (quoting *In re Mauz*, 672 F. App'x 176, 177 (3d Cir. 2017)); *see also In re*

*Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (same).  Abuse of discretion occurs

only when a ruling is "founded on an error of law or a misapplication of law to facts."  *Novartis*

*Pharms. Corp.*, 645 B.R. at 752 (citation omitted).

### III.    DISCUSSION

On appeal, the Reorganized Debtors argue that the Bankruptcy Court erred in: (1)

"determining that MMWR's interpretation of the Stipulation was correct"; and, (2) "amending its

order to award MMWR 6% interest" and include the "Trial Delay Period" as calculable time.

#### A.    Waiver of Pre-Judgment Interest Issue

As a threshold matter, MMWR argues that the Reorganized Debtors waived their right to

appeal the Bankruptcy Court's October 23, 2024 Order granting MMWR's Motion for

Reconsideration as to the pre-judgement interest issue because the Reorganized Debtors failed to

file an amended notice of appeal.  Federal Rule of Bankruptcy Procedure 8003 states that "[a]n

appeal under 28 U.S.C. §158 (a)(1) . . . from a bankruptcy court's judgment, order, or decree to a

district court . . . may be taken only by filing a notice of appeal with the bankruptcy clerk . . . ."

Rule 8002(b)(3) further states: "A party intending to challenge an order disposing of a motion

listed in [subsection (b)](1)—or an alteration or amendment of a judgment, order, or decree made

by a decision on the motion—must file a notice of appeal or an amended notice of appeal."

Subsection (b)(1), meanwhile, covers motions "to alter or amend the judgment under Rule

9023."  And finally, Rule 8002(a)(1) states, in relevant part, that any notice of appeal must be

filed "within 14 days after the judgment, order, or decree to be appealed is entered."

Here, MMWR's Motion for Reconsideration of the Bankruptcy Court's July 29, 2024

Opinion and Order is one brought pursuant to Rule 9023, as the firm sought to amend the

Bankruptcy Court's decision regarding the calculation of the applicable pre-judgment interest. *Cf. In re Energy Future Holdings Corp.,* 904 F.3d 298, 310-11 (3d Cir. 2018) (outlining framework for Rule 9023 motions). Thus, pursuant to Rules 8002(b)(3) and 8003, in order to perfect their appeal of the Bankruptcy Court's October 23, 2024 Order granting MMWR's Motion, the Reorganized Debtors would have had to amend their Notice of Appeal—which only sought this Court's review of the Bankruptcy Court's July 29, 2024 decision—to also include the Bankruptcy Court's later decision. They did not do so; thus, the Bankruptcy Court's October 23, 2024 Order granting MMWR's Motion for Reconsideration is not properly before this Court on appeal. *See In re Samson Res. Corp.*, 734 F. App'x 177, 178 (3d Cir. 2018). And pursuant to Rule 8002(a)(1), because any such amendment must have been filed within fourteen days of that later decision, the issue shall be deemed waived.

### B.    Meaning of Term "Claims" [3]

What remains, then, is a review of the Bankruptcy Court's factual findings—specifically, that: (1) the term "claims" as used in the Stipulation meant amounts owed, as advanced by MMWR, and therefore did not include the $680,000 that the Reorganized Debtors paid the firm prior to the execution of the Stipulation; and, (2) the Reorganized Debtors knew or had reason to know that is what MMWR understood the term to mean during that same time.

---

[3] Although the Reorganized Debtors do not argue that the Bankruptcy Court misstated the legal framework governing MMWR's Motion to Enforce, a review of the factual findings would not be complete without a brief overview of that framework. To that end, as the Bankruptcy Court correctly explained, MMWR, as the moving party, was required to prove by a preponderance of evidence that the Reorganized Debtors breached some provision of the Stipulation, which caused MMWR to suffer damages. *See Jacob's Limousine Transp., Inc. v. City of Newark*, 688 F. App'x 150, 152 (3d Cir. 2017) (explaining that a party seeking to enforce a settlement agreement "bears the burden of providing proof sufficient for the Court to find by a preponderance of the evidence that defendants breached a duty under the terms" of that agreement). Here, as explained more fulsomely *infra*, MMWR was required to establish by a preponderance of the evidence that: (1) its interpretation of the term "claims" controlled; and, (2) the Reorganized Debtors knew or should have known of that interpretation at the time it negotiated and entered into the Stipulation. *See Bohler*, 247 F.3d at 99-100 ("[I]t is a central principle of contract interpretation that if a party knew or had reason to know of the other parties' interpretation of terms of a contract, the first party should be bound by that interpretation." (citing *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 775 (3d Cir. 1972)).

The Reorganized Debtors maintain that the evidence presented at the Bankruptcy Court

trial flatly contradicts MMWR's position, as the record demonstrates that it was "understood" by

all parties to the negotiation that "the $2.325 million paid by [the Reorganized Debtors]

encompassed MMWR's claims for all work done before, during, and after bankruptcy."  But a

review of the record does not support their argument, as it is apparent that the Bankruptcy Court

carefully and thoroughly examined the relevant testimony and documentary evidence presented

by the Parties at trial in making its findings.  This Court discerns no clear error or abuse of

discretion in that analysis.

The Bankruptcy Court first identified the "relevant individuals" who negotiated the terms

of the Stipulation, as those individuals conceivably would have had knowledge of or reason to

know the meaning of the term "claims".  *In re TH Properties*, 2024 WL 3579019, at *4.  In so

doing, it described MMWR's presentation of two witnesses: (1) Leonard Busby, an attorney

employed by MMWR who negotiated the Stipulation on the firm's behalf with counsel for the

Reorganized Debtors—Thomas Bielli and Albert Ciardi; and, (2) Craig Scher, a collections

manager for MMWR who assisted Busby.  *See In re TH Properties*, 2024 WL 3579019, at *4.

The Reorganized Debtors only offered the testimony of Joseph LaFlamme, who served as

counsel to several creditors during the negotiations.  *Id.*  All witnesses "were shown and

questioned regarding various documents" that were "admitted into evidence."  *Id.*

Busby testified that he negotiated directly with Bielli and Ciardi "for months" about the

terms of the Stipulation.  *Id.*  He only had discussions with LaFlamme—an individual Busby

described as playing more of an administrative role "behind the scenes"—on a "number of

occasions" and did not negotiate any of the terms with him.  *Id.*  LaFlamme's own testimony

confirmed his limited involvement, noted the Bankruptcy Court, as he conceded that he merely

reviewed the Stipulation's language when it was forwarded to him and did not actively draft or

haggle over any of its terms. *Id.* at *4-5. He also admitted that he was "not certain whether he

saw all drafts of the Stipulation or attended all negotiation meetings between the parties, both of

which the [Bankruptcy] Court would expect to have been the case had he been actively

negotiating the Stipulation's terms." *Id.* at *5.

LaFlamme subsequently testified that his understanding of the term "claims" included

"paid and unpaid fees." *Id.* at *5-6. But, upon further questioning, he was unable to coherently

explain the factual basis for this belief and could not recall the amounts of any of the paid or

unpaid fees at issue. *Id.* Against this backdrop, the Bankruptcy Court deemed his testimony

"irrelevant and unhelpful" in deciding the proper interpretation of the term, *see id.* at *6, and this

Court discerns no abuse of discretion in that decision.

Accordingly, the Bankruptcy Court found that the only individuals who negotiated the

terms of the Stipulation were Busby, Bielli, and Ciardi. *Id.* at *4-5. But the Reorganized

Debtors put neither Bielli nor Ciardi on the stand—a strategy which the Bankruptcy Court

described as "inexplicable." *Id.* at *9. In the absence of any testimony from those individuals,

the Bankruptcy Court then evaluated whether the unrebutted testimony of Busby and Scher,

along with any relevant documentary evidence offered by the Parties, shed light on the Parties'

understanding of the term "claims". *Id.* at *6-9. It first relied on the testimony of Scher, who

Busby had tasked with verifying all figures contained in the Final Fee Application following the

Reorganized Debtors' objections thereto. *Id.* at *6. After Scher confirmed that MMWR's

accounts receivable were approximately $2.6 million, as asserted in the Final Fee Application,

Busby forwarded Scher's analysis to Bielli and Ciardi on October 31, 2012. *Id.* That analysis

detailed "outstanding invoices through May 31, 2012" which, critically, did not include any prior

11

payments received from the Reorganized Debtors. *Id.* at *7. Instead, the ledger reflected that

those prior payments had already been taken into consideration and credited by MMWR in

calculating the $2.6 million balance. *Id.* Based on that letter, the Bankruptcy Court determined

that "it should have been clear" to Bielli and Ciardi that the $2.6 million figure *only* incorporated

outstanding accounts receivables. *Id.* (emphasis added).

Further, the Bankruptcy Court highlighted a September 25, 2012 letter from Bielli to

Busby, which attached the Reorganized Debtors' independent analysis of their outstanding

payments to MMWR and other creditors. *Id.* The Bankruptcy Court noted that the Reorganized

Debtors' analysis matched that of MMWR—namely, that the firm's outstanding invoices were

approximately $2.6 million. *Id.* Therefore, the Bankruptcy Court concluded that while Bielli

"did not testify and . . . provided no explanation or context for his letter to . . . Busby or his

client's letter to him, the undisputed evidence reflects that in the fall of 2012 . . . Bielli conveyed

to . . . Busby, without qualification or objection, his client's analysis reflecting approximately

$2.6 million still owing to MMWR." *Id.*

After agreeing upon the total amount of outstanding payments, Busby testified that he,

Bielli, and Ciardi subsequently "turned . . . to negotiating a discount that MMWR was willing to

accept." *Id.* To do so, the three engaged in several written communications throughout

December 2012, which included, among other things: (1) a December 7, 2012 email from Bielli

to Busby and Ciardi attaching a settlement proposal wherein MMWR would be paid a total of

$2.3 million based on the future sale of lots remaining in the Reorganized Debtors' residential

communities; (2) a December 8, 2012 email from Busby to Bielli and Ciardi proposing that

"MMWR [would] agree to reduce its total fee and cost claim from $2.6 million to $2.325

million, with the said reduction to be applied after receipt by MMWR of $2.325 million, thereby

leaving unchanged the present base number for MMWR for purposes of calculating the

proportional allocation with other creditors"; (3) a December 12, 2012 email from Bielli to

Ciardi attaching the same proposal outlined in his December 7, 2012 email; (4) a December 14,

2012 letter from Busby to Bielli outlining MMWR's concern that "there would be a shortfall of

sale proceeds from lots at [the Reorganized Debtors'] communities" to generate *future* payments

of $2,325,000 to MMWR; (5) a December 18, 2012 email from Busby to Bielli with "further

analysis of the payouts MMWR needed from the future sale of lots," which again reiterated that

the upcoming sales were necessary to "generate payment to MMWR of $2.325 million"; and, (6)

a December 19, 2012 email from Busby to Bielli and Ciardi outlining the settlement terms he

was authorized to accept on MMWR's behalf at a settlement conference scheduled later that day,

which included "*guaranteed minimum payments* to MMWR in the years 2013 to 2016 all with no

reduction in payments from future sales" that should ultimately "*add up to $2.325 million.*" *Id.*

at *8-9 (emphases added).

The Bankruptcy Court observed that, while testifying, Busby "was steadfast that during

those negotiations" at the settlement conference, "the amount of future payment to MMWR of

$2.325 million never changed, and at no point did Bielli, Ciardi, or any other representative of

Debtors or [the creditors] communicate to him anything about offsetting $680,000 in prior

payments from the future payments." *Id.* at *9.  Rather, he testified that they spent the

conference:

> [A]rguing over how much money would be paid from individual lots and for what
> amounts and what number.  And we went back and forth for an hour or more on
> this.  The number was always being added up to $2.325 million in future
> payments to [MMWR].  Everybody knew it.  Everybody was there.

*Id.*

Aside from LaFlamme's testimony, which, as noted above, the Bankruptcy Court

13

disregarded as irrelevant, the Reorganized Debtors only attempted to rebut Busby's testimony

and MMWR's timeline of communications with a single document: a letter dated February 26,

2016 from Bielli's law partner, David Klauder, to Busby. *Id.* That letter advised Busby of the

Reorganized Debtors' position that they had made their final payment in satisfaction of the

Stipulation. *Id.* But the Bankruptcy Court found that this correspondence from Klauder—"an

individual who no party . . . suggested had any involvement in negotiation of the Stipulation"—

provided "absolutely no help" in "ascertaining the meaning" of the term "claims," as it was: (1)

written "years after the Stipulation's negotiations"; (2) "not supported by any document

contemporaneous with those negotiations"; and, (3) ultimately "assumes the answer to the

question the Court [was] tasked with ascertaining." *Id.* If anything, Klauder's letter was "the

reason [MMWR's] Motion to Enforce was filed, not evidence as to why the Reorganized

Debtors' position should prevail." *Id.*

Thus, in light of the "overwhelmingly one-sided evidentiary record," the Bankruptcy

Court determined that "the Stipulation provided for MMWR's $2.6 million claim, for moneys

still owed to it for all pre-bankruptcy, bankruptcy, and post-bankruptcy work for the Debtors, to

be reduced by $275,000, in exchange for future additional payments totaling $2.325 million,

without offset or credit of any kind for payments MMWR received from the Debtors prior to

entry into the Stipulation"—facts that "Bielli and Ciardi knew or should have known during

negotiations with . . . Busby." *Id.* at *9-10.

In their appellate brief, the Reorganized Debtors fault the Bankruptcy Court for allowing

MMWR to offer extrinsic evidence of the parties "subjective intent" when drafting the

Stipulation—a decision that the Reorganized Debtors contend was inappropriate in light of the

Bankruptcy Court's original July 2016 Order concluding that the language of the Stipulation was

14

clear and unambiguous.  But that argument ignores the Third Circuit's explicit holding to the contrary: that the Stipulation was "ambiguous on its face" because the term "claims" was "susceptible to multiple meanings." *In re TH Props.*, 752 F. App'x at 131, 131 n.29.  And it is well-settled under Pennsylvania law that when "contract[ual] terms are ambiguous and susceptible of more than one reasonable interpretation," as is the case here, courts are "free to receive extrinsic evidence, *i.e.* parol evidence, to resolve the ambiguity." *Krizovensky*, 624 A.2d at 642 (citations and internal quotation marks omitted).

The Reorganized Debtors also argue that the Bankruptcy Court discounted certain portions of Busby's testimony, which, in their view, demonstrates that their proposed interpretation of the term should have carried the day.  Specifically, they cite Busby's testimony about a revision to the Stipulation that changed the term from "claim" to "claims"—an edit purportedly "show[ing] that the use of the term 'claims' in the Stipulation encompasses the entire universe of work done by MMWR related to [the Reorganized Debtors], not just the amount set forth" in the Final Fee Application.  But, as MMWR points out, those cherry-picked excerpts from Busby's testimony fail to appreciate the "overwhelmingly one-sided" and largely "unrebutted" evidentiary record presented at trial by MMWR, which illustrated that the other contemporaneous revisions focused on MMWR's demand of ensuring *future* payments from the Reorganized Debtors in the negotiated amount of $2.325 million.

Accordingly, having ascertained no clear error or abuse of discretion, the Bankruptcy Court's decision shall be affirmed, and this matter shall be remanded to the Bankruptcy Court for any further proceedings.

**BY THE COURT:**

S/ **WENDY BEETLESTONE**

**WENDY BEETLESTONE, J.**